**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No.** |
| RIVER NORTH EQUITY LLC, EDWARD M. LICEAGA, MICHAEL A. CHAVEZ, NANOTECH ENTERTAINMENT, INC., NANOTECH GAMING, INC., DAVID R. FOLEY, LISA L. FOLEY, JEFFREY A. FOLEY, and BENNIE L. BLANKENSHIP, | ) ) ) ) ) ) ) ) ) | **Jury Trial Demanded** |
| Defendants, | ) ) | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("the SEC"), alleges as follows:

### Nature of the Case

1.     This case involves an illegal stock distribution and market manipulation scheme orchestrated by defendant David R. Foley, the founder of defendant NanoTech Entertainment, Inc. ("NTEK") and defendant NanoTech Gaming, Inc. ("NTGL").  NTEK and NTGL are microcap or penny stock companies quoted on OTC Link, an electronic inter-dealer quotation system that displays price quotes from broker-dealers for many over-the-counter securities.

2.     Between February 2014 and October 2016, David Foley sold 1.1 billion shares of NTEK stock, and 19.1 million shares of NTGL stock, to defendant River North Equity LLC ("River North"), a securities trading company based in Chicago, Illinois, in a series of

unregistered transactions. Subsequently, River North and its president, defendant Edward M. Liceaga, sold these shares to the public. The scheme involved several steps.

3.    First, David Foley caused NTEK to issue convertible promissory notes to himself for debt purportedly owed to him by NTEK for unpaid salary and expenses. David Foley also acquired a convertible promissory note for a debt purportedly owed by a company which was a predecessor of NTGL.

4.    Second, in February 2014, David Foley began converting his notes to stock in NTEK and NTGL, and selling that stock to River North. Defendant Michael A. Chavez, an employee of River North, acted as an unregistered broker for these transactions. Chavez received fees from David Foley, Liceaga and River North, and also received a bonus consisting of a portion of River North's profits from the resale of NTEK and NTGL securities.

5.    Third, David Foley hired defendant Bennie L. Blankenship, the owner of a stock promotion company, to help him boost the price of and market for NTEK and NTGL stock. David Foley paid Blankenship for his efforts in cash and NTEK stock.

6.    David Foley spent $500,000 to purchase 6.5 million shares of NTEK in the public market, at prices which were substantially higher than the prices at which he could have acquired shares through his own convertible notes. Blankenship used Twitter and YouTube to promote NTEK and NTGL, and encouraged potential investors, including the members of an investor group that he had cultivated, to buy both companies' stock.

7.    Fourth, David Foley directed his brother, defendant Jeffrey A. Foley, who he had appointed as CEO and Chairman of both NTEK and NTGL, to prepare false documents which were used by River North to deposit NTEK and NTGL shares into its brokerage accounts without registering them with the SEC.

2

8.     David Foley also prepared NTEK's and NTGL's quarterly financial statements for publication on website for the OTC Markets Group, Inc. ("OTC Markets"), where they were available to the investing public.  These financial statements materially inflated NTEK's income, and failed to disclose all of the convertible promissory notes and debentures that had been issued to David Foley and his assignees.

9.     This scheme continued even after David Foley pleaded guilty to fraud charges in two unrelated cases and began serving a two-year prison sentence.

10.     Shortly before he reported to prison in June 2015, David Foley and his wife, defendant Lisa Foley, created three companies: Royal Capital Group, Inc. ("Royal Capital"), Galaxy Entertainment Group, Inc. ("Galaxy Entertainment"), and Universal Communication Partners, Inc. ("Universal Communication").  David Foley assigned his remaining convertible notes to Royal Capital and Galaxy Entertainment for no consideration.

11.     David Foley continued to control both NTEK and NTGL from prison, by directing both companies' activities through Jeff Foley and other company employees.  David Foley also communicated with Lisa Foley through emails and recorded phone calls, and instructed her how to convert the notes and sell the shares to River North.

12.     Lisa Foley ultimately completed over half of the sales of NTEK and NTGL stock to River North, with the assistance of Jeff Foley and Chavez.  David Foley and Lisa Foley then funneled proceeds from these stock sales back to NTEK and NTGL through bank accounts held in the names of Royal Capital, Galaxy Entertainment and Universal Communications.

13.     River North and Liceaga ultimately paid approximately $12.5 million to David Foley, Lisa Foley, and their companies to acquire shares of NTEK and NTGL stock, and then

sold these shares for more than $17 million, generating net profits of approximately $3.4 million. David and Lisa Foley obtained personal profits of $4.9 million.

14.     Defendants River North, Edward Liceaga, David Foley, Lisa Foley, Jeff Foley, Bennie Blankenship, NTEK and NTGL violated Sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act").  Defendants David Foley and Blankenship violated Section 17(a) of the Securities Act, and Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act'), and Rule 10b-5 thereunder.  Defendants River North and Michael Chavez violated Section 15(a) of the Exchange Act; Liceaga is subject to control person liability for River North's violations of Section 15(a) of the Exchange Act; and, in the alternative, Liceaga and Chavez aided and abetted River North's violations of Section 15(a) of the Exchange Act.

15.     The SEC seeks to enjoin each of the defendants in this action from future violations of the federal securities laws, and to require certain defendants to disgorge their ill-gotten gains, along with prejudgment interest.  The SEC also seeks civil penalties and penny stock bars against the individual defendants and River North, and to bar David Foley from serving as an officer or director of any public company.

**Jurisdiction and Venue**

16.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

17.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1331.

18.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], because certain of

4

the defendants currently reside or transact business in this district, and some of the acts, practices, and courses of business constituting the securities violations alleged herein occurred within this district.

## Defendants

### A. Unregistered Broker-Dealers

19. **River North Equity LLC** is an Illinois corporation based in Chicago. Since 2013, River North has operated as an investment firm that buys and sells penny stocks through the conversion of promissory notes by third-parties. River North has never been registered as a broker-dealer, investment adviser or investment company.

20. **Edward M. Liceaga**, age 39, is a resident of Cook County, Illinois and Puerto Rico. He also does business and owns property in Chicago, Illinois. Liceaga is River North's President and sole manager. He is also the President of Dorado Investments, LLC ("Dorado Investments"). Liceaga previously was licensed as a registered representative and investment adviser representative.

21. **Michael A. Chavez**, f/k/a Miguel A. Chavez, age 40, is a resident of Austin, Texas. From approximately April 1, 2014 through January 1, 2016, Chavez was the Director of Business Development at River North. On July 17, 2009, the Financial Industry Regulatory Authority ("FINRA") permanently barred Chavez from associating with any FINRA member firm in any capacity.

### B. Stock Issuers and Affiliates

22. **NanoTech Entertainment, Inc.**, is a Nevada corporation with its principal place of business in San Jose, California. NTEK produces technology, including a subscription video streaming platform for viewing movies. At all relevant times, NTEK's stock was quoted on the OTC Link, which is operated by OTC Markets. NTEK published quarterly and annual

disclosures on the OTC Markets website for the periods ending June 2009 through March 2017. NTEK's securities have never been registered with the SEC.

23. **NanoTech Gaming, Inc.**, f/k/a NanoTech Gaming Labs, is a Nevada corporation involved in the development of gaming technology with its principal place of business in Las Vegas, Nevada. Its main product was a skill-based pinball game, but the product was never licensed and NTGL earned no revenue. NTGL operated as a division of NTEK until February 2015, when it became a separate corporation. At all relevant times, NTGL's stock was quoted on OTC Link. NTGL filed quarterly and annual disclosures on the OTC Markets website for the periods ending December 2014 through March 2016. NTGL's securities have never been registered with the SEC.

24. **David R. Foley**, age 53, is a resident of Los Gatos, California. He is the co-founder of NTEK and the founder of NTGL. David Foley has served as NTEK's Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), Chief Technology Officer, Secretary, Treasurer, Director, and Chairman of the Board. In January 2014, he pleaded guilty to charges of conspiracy to commit mail fraud, wire fraud, and bank fraud, arising from two different federal criminal cases, and received a 24-month prison sentence.

25. **Lisa L. Foley**, age 49, is the wife of David Foley and a resident of Los Gatos, California. Lisa Foley was placed on NTEK's payroll when her husband was in prison. She was an officer and director of both Royal Capital and Galaxy Entertainment.

26. **Jeffrey A. Foley**, age 49, is David Foley's younger brother, and a resident of Napa, California. Jeff Foley operates an ice sculpting business which became a subsidiary of NTEK. He became a NTEK director in November 2010 and NTEK's President, CEO, and Chairman of the Board in June 2012. In July 2015, Jeff Foley became NTGL's CEO, Secretary,

and Chairman of the Board.  Jeff Foley resigned from all of his positions at NTEK and NTGL in August 2017.

**C.     Stock Promoter**

27.     **Bennie L. Blankenship**, age 47, is a resident of Springfield, Ohio.  Blankenship founded Big Investment Group LLC, which promoted NTEK and NTGL stock.  Blankenship promoted NTEK stock through an investor internet chat group and on Twitter and in YouTube videos.

## Related Entities

28.     **Royal Capital Group, Inc.** was a South Dakota corporation established by David Foley in March 2015, and managed by Lisa Foley while David Foley was in prison.  Lisa Foley served as Royal Capital's Chairman, Director, President, Treasurer and Secretary until she resigned from these positions in October 2016.  Royal Capital was administratively dissolved in May 2018.

29.     **Galaxy Entertainment Group, Inc.** was a South Dakota corporation established by David Foley in June 2015, and managed by Lisa Foley while David Foley was in prison.  The company was administratively dissolved in May 2018.

30.     **Universal Communication Partners, Inc.** was a South Dakota corporation established by David Foley in June 2015.  The company was administratively dissolved in May 2018.

## Facts

**A.     David Foley Controlled NTEK and NTGL**

31.     David Foley co-founded NTEK in 2007.  At various times, he held the titles of CEO, COO, and various other positions.  David Foley designed and promoted NTEK's technology, ran its operations, issued press releases and prepared financial statements for NTEK.

Although David Foley's titles at NTEK changed over time, he remained in control of its operations, and placed friends and family members on NTEK's board.

32. In January 2012, NTEK announced that David Foley had resigned from all of his officer and director positions, including CEO and Chairman of the Board. A friend of David Foley's began serving as Chairman of the Board, but resigned a few months later because of failing health.

33. In June 2012, David Foley appointed his brother, Jeff Foley, as NTEK's CEO and Chairman. At the time, Jeff Foley knew very little about the NTEK's business and technology. David Foley managed the day-to-day operations of the company. So Jeff Foley had very few responsibilities, other than signing NTEK's financial statements, which were created by David Foley.

34. David Foley also controlled and managed the operations of NTGL. David Foley appointed Jeff Foley as NTGL's CEO, Secretary, and Chairman around July 2015. Jeff Foley held these positions at NTEK and NTGL until he resigned in August 2017.

35. During the time David Foley controlled NTEK and NTGL, he was charged in two unrelated criminal cases. In July 2009, a federal grand jury indicted David Foley for offenses that included mail and wire fraud, theft of trade secrets, and money laundering. In August 2011, a different federal grand jury indicted David Foley on charges of bank fraud and making false statements to a federal agency.

36. On January 6, 2012, David Foley entered guilty pleas, in both criminal cases, for conspiracy to commit mail, wire, and bank fraud. In January 2014, he received a 24-month concurrent prison sentence. David Foley reported to prison in June 2015, and was released from federal custody in December 2016.

**B.**     **David Foley Acquired Convertible Notes for NTEK and NTGL Stock.**

37.     Between his arrest in 2009 and his incarceration in June 2015, David Foley caused NTEK to issue to him a number of convertible promissory notes, dated between September 30, 2011 and May 31, 2014. These notes purported to be compensation for unpaid wages or expenses and totaled approximately $689,500. However, most of these notes were not reflected in NTEK's financial statements.

38.     The NTEK notes issued to David Foley provided that if the debt was not paid within one year, he was entitled to convert the debt into stock, at prices of $0.001 or $0.0001 per share, provided that the shares from such a conversion would be less than 10% of NTEK's outstanding common stock. Beginning in February 2014, David Foley began converting his notes into millions of shares of NTEK stock through River North.

39.     In early 2015, David Foley was assigned a convertible promissory note, dated September 2, 2014 in the amount of $50,000, which previously had been issued to another person. That note purported to be compensation for work performed by an independent contractor for High Velocity Enterprises, Inc. ("HVEL"), a company David Foley controlled, which later became NTGL. However, that contractor had not performed any such work.

40.     This note provided for the conversion of debt into shares, at $0.0005 per share, if the debt was not repaid within a year and if share ownership after the conversion remained less than 10% of the company's outstanding common stock. In March 2015, David Foley converted a small portion of that debt into 1.1 million shares of HVEL, which became NTGL stock after April 2015.

41.     Shortly before reporting to prison, David Foley created Royal Capital and Galaxy Entertainment and named himself and Lisa Foley as directors of each corporation. He then

assigned his NTEK convertible notes to Royal Capital, and assigned the HVEL note he had acquired to Galaxy Entertainment.

42.     In June 2015, David Foley also created Universal Communication, and opened a company bank account by representing that he was its CEO and he and Lisa Foley were its co-owners.

**C.     River North's Unregistered Sales of NTEK and NTGL Stock**

43.     In early 2014, David and Lisa Foley began selling millions of shares of NTEK and NTGL stock to River North and Liceaga, the company's owner and president.

44.     According to River North's website, its primary business was investing in small and micro-cap businesses and providing flexible funding structures for small and micro-cap businesses and securities.  From its inception in 2013, River North sought out and purchased penny stocks from holders of convertible debt instruments, including at microcap industry conferences, and then sold those shares on OTC Link.

45.     During the time River North did business with the Foleys, River North purchased and sold 60 other microcap securities quoted on OTC Link, in addition to NTEK and NTGL. River North acquired more than 9 billion shares from these other companies, and obtained more than $14 million from the sale of those securities.  Liceaga has testified that he specialized in purchasing convertible debt and aged debt investments.

46.     Between February 2014 and October 2016, River North directly and indirectly purchased a total of 1.1 billion shares of NTEK stock, and 19.1 million shares of NTGL stock, from David and Lisa Foley.  River North then sold those shares for approximately $17.8 million. None of these transactions were registered with the SEC.

47.     For the 610 trading days between February 28, 2014 and July 30, 2016, River North's sales of NTEK stock constituted approximately 26% of the total market volume for

NTEK. During this same period, on those days that River North sold any NTEK shares, River North's sales comprised approximately 34% of the total market volume for NTEK.

48. Liceaga personally directed the sales of all of the shares of NTEK and NTGL stock that River North purchased from David and Lisa Foley. River North and Liceaga sold all 1.1 billion shares of NTEK stock through River North's brokerage accounts, often selling millions of NTEK shares on consecutive days as soon as the shares were cleared for trading

49. River North generally owned in its inventory just under 10% of NTEK's outstanding shares of common stock. However, after certain of its purchases from the Foleys, River North actually owned more than 10% of NTEK's outstanding shares of common stock.

50. Liceaga did not deposit all of the NTEK stock certificates into a River North brokerage account until it appeared that River North had sold enough shares to reduce its ownership of NTEK stock below 10% in that particular account. In testimony to the SEC, Liceaga admitted that he "slowly leaked" River North's NTEK shares into the market in order to stay between 20% and 30% of the stock's trading volume; he did not want to "kill" the stock by dumping all of River North's shares at once.

51. River North also purchased 19.1 million shares of NTGL and HVEL stock from David and Lisa Foley, in four separate transactions, and deposited 13 million of the NTGL shares into River North's brokerage accounts. Liceaga later transferred 12 million of the shares of NTGL stock to Dorado Investments, another entity that Liceaga owned and controlled, through a separate stock purchase agreement between River North and Dorado Investments.

52. It took longer for River North and Liceaga to sell their NTGL shares than was required to sell their NTEK shares. However, River North and Dorado Investment eventually

sold all of the NTGL shares purchased from David Foley and his assignees within a few months after they were purchased.

### D. David Foley Controlled NTEK and NTGL from Prison

53. While he was in prison, David Foley continued to control NTEK and NTGL. He made phone calls, sent emails, and sent handwritten letters from prison to Jeff Foley and others, containing his instructions regarding company operations, including the hiring and firing of employees and the publication of press releases.

54. For example, David Foley told Jeff Foley when and how to issue shares to Lisa Foley, Royal Capital, and Galaxy Entertainment. The purpose of issuing these shares was to facilitate the sales of NTEK and NTGL stock to Liceaga and River North, and obtain funds for NTEK, NTGL, and Lisa Foley.

55. David Foley also drafted and sent NTEK shareholder letters to Jeff Foley and directed him to adopt them as his own statements and publish them on the OTC Markets website. David Foley also requested that NTEK employees send him emails with daily NTEK and NTGL stock prices so that he could "make sure that [his] assets are being covered correctly."

56. In addition, while David Foley was in prison, he instructed Lisa Foley to send NTEK some of the funds generated from the note and debenture conversions, and subsequent stock sales to River North and Liceaga.

57. David Foley also wrote NTEK's and NTGL's quarterly financial statements and sent them to Jeff Foley with directions to publish them on the OTC Markets website, where they were available to the investing public.

58. David Foley included some of the funds that he and Lisa Foley received from converting and selling NTEK stock to River North as operating income on NTEK's financial

statements. This improperly inflated NTEK's income during the applicable periods by approximately $7.2 million. Both NTEK and NTGL needed, and relied upon, this funding generated by David Foley because the companies had little or no actual income.

59.     Accordingly, the financial statements of NTEK and NTGL were false and misleading. Without the $7.2 million generated by David Foley from the sale of NTEK stock, NTEK would have reported losses of approximately $5.8 million between 2014 and 2016. In addition, the financial statements prepared by David Foley disclosed only $60,500 of the $495,000 in convertible promissory notes and debentures purportedly issued to David Foley or his assignees (including Lisa Foley, Royal Capital, and Galaxy Entertainment).

### 1.    Jeff Foley assisted David Foley

60.     After David Foley reported to prison, Jeff Foley continued to follow his instructions regarding NTEK's and NTGL's operations, and regarding the issuance of shares of NTEK and NTGL stock. Jeff Foley also was a substantial factor, and a necessary participant, in the offer and sales of NTEK and NTGL stock initiated by David Foley.

61.     David Foley provided Jeff Foley with handwritten instructions to issue 15 million shares of NTEK stock to River North each week. Using forms created by David Foley, Jeff Foley prepared the documents necessary for River North to deposit the NTEK shares into its brokerage accounts and obtain legal opinions stating that the shares did not need to be registered with the SEC.

62.     More specifically, acting at David Foley's direction, Jeff Foley drafted issuer representation letters on behalf of NTEK attesting that: (1) Royal Capital had paid for the NTEK shares more than one year prior to the date of the conversion; (2) Lisa Foley and Royal Capital were not acting as underwriters and were not part of a distribution of NTEK shares; (3) the removal of restricted stock legends was not intended to evade the registration provisions of the

13

Securities Act; and (4) the proposed transactions would not be part of a distribution of NTEK's securities. All of the foregoing representations were false, and David Foley knew that they were false.

63. In addition, acting at David Foley's direction, Jeff Foley also prepared non-affiliate shareholder representation letters that stated that Lisa Foley was not an affiliate or an underwriter, was not aware of any non-public material adverse information about the company, and that full consideration had been paid for the shares. These representations were false, and David Foley knew that they were false.

64. At David Foley's direction, Jeff Foley also prepared stock purchase agreements ("SPAs") and conversion notices for Lisa Foley and/or Royal Capital and River North that identified the amount of debt being converted, the dates of the promissory notes being converted, and the conversion rates. He further drafted NTEK board minutes and consents authorizing the issuance of NTEK shares to Royal Capital in order to "reduce the liabilities of the company and fulfill its obligations." Jeff Foley then contacted NTEK's transfer agent to authorize the issuance of unrestricted NTEK shares to River North, and he emailed documents to River North to help Liceaga obtain legal opinions that the shares were unrestricted.

65. Jeff Foley created the same type of documents for the sale of NTGL shares to River North by Lisa Foley and Galaxy Entertainment, and followed a similar process to assist River North in depositing NTGL shares into its brokerage accounts.

66. On at least one occasion, Jeff Foley followed David Foley's written instructions to create a NTEK debenture to Royal Capital which was backdated to April 7, 2015. David Foley directed Jeff Foley to authorize the issuance of this debenture so that NTEK could obtain money by converting the debenture to shares, and selling those shares to River North.

14

67.     In 2013, acting at David Foley's direction, Jeff Foley opened a brokerage account in his own name at E-Trade.  This account was funded by David Foley, and used by David Foley to manipulate NTEK's trading volume and stock price while he was selling NTEK stock to Liceaga and River North.

68.     Between March and August 2014, Jeff Foley transferred to his own bank account more than $350,000 of the funds that David Foley generated by trading NTEK stock, and used some of those funds to pay expenses for NTEK and NTGL.

### 2.     Lisa Foley assisted David Foley

69.     While David Foley was in prison, Lisa Foley helped him negotiate the sales of NTEK and NTGL stock to Liceaga and River North.  Lisa Foley was a substantial factor and a necessary participant in these transactions.  Between June 2015 and September 2016, Lisa participated in more than 40 stock sales to River North, and allowed Jeff Foley to place her electronic signature on the required SPAs, conversion notices, and non-affiliate shareholder representation letters.

70.     At David Foley's direction, Lisa Foley asked River North for advance payments before the NTEK and NTGL shares were deposited with River North's brokerage firms, and River North paid advances before certain of the transactions.  Lisa Foley used the proceeds of the sales of NTEK and NTGL stock to fund NTEK's and NTGL's payroll and bills, and to cover the Foleys' personal expenses, including the mortgage on their home and their son's private school tuition.

71.     Through Royal Capital, David Foley directed a total of $25,000 to be paid to Blankenship for his "support" of NTEK and NTGL shares, pursuant to an agreement between Blankenship and David Foley.  These payments were made by wire transfer between October and December 2016.  Certain of these payments were handled personally by Lisa Foley.

72.     In addition, Lisa Foley used the bank accounts of Royal Capital, Galaxy Entertainment and Universal Communication to transfer funds to NTEK and NTGL after receiving payments from River North.  Most of NTEK's funds for its operations came from the proceeds of stock sales to River North.

**E.     The Sales of NTEK and NTGL Stock to River North Were Not Exempt from Registration with the SEC**

73.     For each of David and Lisa Foleys' sales of NTEK and NTGL to River North, Liceaga obtained legal opinion letters which purported to exempt the subsequent sale of those shares from registration under the Securities Act, allowing them to be sold without a restrictive legend.  However, these opinion letters were based upon false statements contained in issuer representation letters and non-affiliate shareholder representation letters prepared by Jeff Foley at David Foley's direction.

74.     These false statements included the following:  (a) David Foley, Royal Capital Group, Galaxy Entertainment, and River North were not affiliates of NTEK or NTGL; (b) River North and Liceaga had fully paid for and owned the shares for more than one year pursuant to SEC Rule 144; and (c) River North and Liceaga would not be considered underwriters under SEC rules.

75.     David Foley was an affiliate of both NTEK and NTGL.  He controlled both companies, even after reporting to prison.  With assistance from Lisa Foley, David Foley also controlled Royal Capital and Galaxy Entertainment, which also were affiliates of NTEK and NTGL, and neither company paid any valid consideration for the assignment of David Foley's convertible notes.

76.     In fact, both NTEK and NTGL relied upon the Foleys' conversion of notes, and the subsequent sales of stock, to fund their operations.  Further, the sales of NTEK and NTGL

stock to River North and Liceaga were intended to be part of a distribution of securities to the investing public.

77.     In selling their shares of NTEK and NTGL stock to the unsuspecting investing public, Liceaga and River North ignored several red flags indicating that these sales did not qualify for an exemption from registration.  For example, Liceaga testified that:  he viewed David and Lisa Foley, Royal Capital, and Galaxy Entertainment as one unit; he knew David Foley had been NTEK's CEO; he knew that Jeff Foley was David Foley's brother; and he knew that David Foley had been indicted and charged with fraud.

78.     There were also discrepancies in, and information missing from, the documents provided to and reviewed by River North and Liceaga that called into question the legitimacy of the Foleys' stock conversions.

79.     For example, David Foley converted shares from a promissory note dated March 31, 2012 in the amount of $52,500 five separate times, and sold shares from that note for a total of $92,500.  Further, nine of David Foley's promissory notes, with a total outstanding balance of $378,500, were dated prior to December 2013.  Those notes were converted in transactions with River North in 2014 but were not reflected in NTEK's December 2013 financial statements, or in the company's 2014 financial statements.  Finally, some of the NTGL convertible debentures were not reflected in NTGL's financial statements.

80.     Despite these red flags, River North and Liceaga promptly sold all of the NTEK and NTGL shares which they had purchased from the Foleys into the open market, without waiting a year as indicated in the attorney opinion letters.

**F.     Chavez Acted as an Unregistered Broker**

81.     Chavez acted as an unregistered broker for David and Lisa Foley's sales of NTEK and NTGL stock to River North.  As River North's Director of Business Development, Chavez

17

was responsible for identifying possible investment opportunities involving debt securities, researching the issuers, and negotiating the terms of potential transactions.

82.     Chavez negotiated substantial discounts on the deals involving securities, including NTEK and NTGL, which he brought to Liceaga and River North.  Beginning in 2014, Chavez confirmed the key terms of each stock sale with David and Lisa Foley, and obtained the necessary paperwork from Lisa and Jeff Foley, to deposit the shares in River North's brokerage accounts.  Chavez also assisted the Foleys in obtaining advances from Liceaga and River North in connection with certain stock sales.

83.     Between February 2014 and September 2016, and despite having been barred by FINRA from association with any member firm, Chavez helped facilitate approximately 78 NTEK transactions and four NTGL transactions between David and Lisa Foley, as the sellers, and Liceaga and River North, as the buyers.

84.     For each transaction, Chavez was supposed to receive what the Foleys and Liceaga referred to as a "finder's fee" of 2.5% from each party.  Liceaga paid the entire 5% fee (which included the Foleys' portion) to a brokerage firm in Nassau, Bahamas.

85.     The payments to the Bahamian firm were made as a way to funnel money to Chavez.  For each transaction, after Liceaga wired funds to the Bahamian firm, the firm transferred the money back to Chavez's U.S. bank account, minus a fee for acting as an "intermediary broker."  The Bahamian firm never handled any of the securities at issue.

86.     In addition, for each transaction David and Lisa Foley paid Chavez an additional 1.95% fee that they referred to as a "broker" fee.  And Liceaga paid Chavez a series of bonuses amounting to between 20% and 33% of River North's and Liceaga's profits from the sales of converted NTEK and NTGL stock to the investing public.

18

G.     **David Foley and Blankenship Manipulated the Market for Shares
       of NTEK and NTGL**

87.     In December 2013, David Foley and Blankenship agreed to artificially support the

market price and volume of NTEK and NTGL stock during the time David Foley planned to sell

stock to River North.  David Foley offered to give Blankenship shares of NTEK stock under a

purported consulting agreement with Royal Capital in exchange for Blankenship's promotional

efforts and "secondary" trading support for NTEK and NTGL.

88.     Blankenship owned a stock promotion company, named Big Investment Group

LLC, through which he could promote NTEK stock.  Beginning in January 2014, pursuant to his

agreement with David Foley, Blankenship used Big Investment Group to promote NTEK on

social media through Twitter and YouTube videos.

89.     Around that same time, in early 2014, David Foley began trading NTEK stock in

Jeff Foley's E-Trade account, as well as in David Foley's personal E-Trade account.  Between

January 15, 2014 and September 15, 2014, David Foley placed over 2,000 limit orders in the two

accounts in order to purchase over 6.5 million shares of NTEK for a total cost of approximately

$500,000 (a weighted average share price of $.0771 per share).

90.     During this same time period, David Foley could have acquired the same number

of shares of NTEK stock at substantially lower prices of either $0.0001 or $0.001 by converting

a small portion of his remaining convertible promissory notes.

91.     Instead, by purchasing shares in the open market, David Foley attempted to

increase the prices at which he could sell shares to River North, and at which River North and

Liceaga could sell all of their NTEK and NTGL shares.  As part of this effort, on May 29, 2014

David Foley advised Liceaga and Chavez that "I spent $50k in the last two days ensuring that

your sale price never got below 15% of your purchase price."  In August of 2014, David Foley

advised Liceaga that "I'm buying up to bring it back, and I have more support coming on Tuesday," and "I've been buying to support".

92.     After receiving these emails, River North and Liceaga purchased additional shares of NTEK stock from David Foley, including 7,500,000 NTEK shares on July 28, 2014 and 9,000,000 NTEK shares on August 14 and 28, 2014.

93.     In early 2014, David Foley had agreed to give Blankenship 7.58 million shares of NTEK stock as partial payment for his promotions of NTEK's stock.  However, in an April 3, 2014 email exchange, David Foley and Blankenship agreed that they would represent that Blankenship's deposit of these shares into his brokerage account was the result of a "private placement" for $250,000, rather than as payment for supporting NTEK stock.

94.     David Foley and Blankenship did not complete this transaction until March 2015. At that time, David Foley created a fake convertible promissory note, issued from NTEK to Blankenship, and backdated it to April 1, 2014.  David Foley also placed Jeff Foley's electronic signature on NTEK board minutes and consents, without Jeff Foley's knowledge or permission. Blankenship then used these bogus documents to obtain a legal opinion stating that the NTEK shares did not have to be registered.

95.     Blankenship also created a phony check, backdated to March 26, 2014, purportedly as payment by Blankenship for the 7.58 million NTEK shares, in the amount of $250,000.  Blankenship then endorsed the fake check with a forged bank stamp and provided it to his broker – along with the false representation that NTEK already had deposited the check into its own bank account.

96. Throughout 2014 and the first half of 2015, David Foley and Blankenship worked together to purchase shares of NTEK stock on the open market and to place bids for additional shares of NTEK.

97. In addition, Blankenship promoted NTEK and NTGL stock and sent emails encouraging an investor group he had cultivated on social media to buy shares of NTEK and NTGL stock at specific times throughout the relevant time period. Blankenship documented his own purchases of NTEK shares in numerous emails to David and Lisa Foley, and included the number of shares purchased by members of his investor group as evidence of his successful stock promotion efforts.

98. Blankenship pressured the members of his investor group to buy NTEK and NTGL shares during the same times that David Foley and Blankenship were supporting the stock. Blankenship did not tell the members of his investor group that he was being compensated to promote NTEK and NTGL. The members of Blankenship's investor group who purchased NTEK and NTGL based on his recommendations eventually suffered substantial losses on their investments.

99. Blankenship also promoted NTEK through social media in YouTube videos throughout 2014 and on Twitter during 2014 and 2015. None of Blankenship's tweets and videos disclosed that he was being compensated by David Foley, in cash and stock.

100. During the 18 months when David Foley was in prison, from June 2015 through December 2016, he was not able to support the market for NTEK and NTGL stock through his own trading. So David Foley paid Blankenship to provide artificial "primary" support for NTEK and NTGL, and asked Lisa Foley to find someone else to provide "secondary" support.

101. Lisa Foley used advances provided by River North to pay an individual to support the trading in NTEK and NTGL shares, but that person ultimately did not make any trades. However, Blankenship continued to support the market for NTEK's and NTGL's stock during David Foley's incarceration. Blankenship provided evidence of his NTEK and NTGL stock purchases to Lisa Foley in exchange for cash payments and additional shares of NTEK stock.

102. Between March 2015 and February 2017, David and Lisa Foley issued more than 28 million shares of NTEK stock to Blankenship, and also paid him $25,000 for supporting the market for NTEK and NTGL stock. Blankenship deposited these NTEK shares in his brokerage account and immediately began selling them in the open market.

103. Between May and August 2014, David Foley, Blankenship, and Blankenship's investor group purchased more than 25 million shares of NTEK in the open market, and sold more than 17 million shares. Between December 2015 and February 2016, these same individuals purchased more than 4 million shares of NTGL in the open market, and sold 2 million shares. This trading activity created the appearance of a liquid and active market for NTEK and NTGL stock, and increased the trading volume of NTEK and NTGL stock.

**H.    Proceeds from the Illegal Sales of NTEK and NTGL Stock**

104. The fraudulent and illegal scheme to sell and artificially support the shares of NTEK and NTGL stock was profitable to all of the defendants.

105. Between March 2014 and September 2016, River North paid approximately $12.5 million for the shares of NTEK and NTGL stock, and sold the shares for approximately $17.8 million. After paying expenses, River North and Liceaga jointly enjoyed total profits of approximately $3.4 million.

106.     Similarly, after paying business expenses for NTEK and NTGL, David and Lisa Foley received total profits of approximately $4.9 million.

107.     Jeff Foley obtained profits of at least $213,000.

108.     Bennie Blankenship obtained profits of more than $230,000.

109.     Michael Chavez obtained profits of nearly $2.1 million.

**COUNT I**

**Violations of Section 5(a) and (c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and (c)]**
**(Against Defendants River North, Liceaga, David Foley,**
**Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL)**

110.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

111.     By engaging in the conduct described above, defendants  River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

112.     By reason of the foregoing, defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## COUNT II

**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**
**(Against Defendants David Foley and Blankenship)**

113.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

114.     By engaging in the conduct described above, defendants David Foley and Blankenship, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes and artifices to defraud.

115.     Defendants David Foley and Blankenship acted knowingly or with severe recklessness.

116.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

**Violations of Sections 17(a)(2) and of the Securities Act**
**[15 U.S.C. § 77q(a)(2)]**
**(Against Defendants David Foley and Blankenship)**

117.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

118.     By engaging in the conduct described above, defendants David Foley and Blankenship in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

119.     Defendants David Foley and Blankenship acted knowingly, with severe

recklessness and/or negligently.

120.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV

### Violations of Section 17a(3) of the Securities Act
### [15 U.S.C. § 77q(a)(3)]
### (Against Defendants David Foley and Blankenship)

121.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

122.     By engaging in the conduct described above, defendants David Foley and Blankenship, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

123.     Defendants David Foley and Blankenship acted knowingly, with severe recklessness and/or negligently.

124.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V

### Violations of Section 9(a)(2) of the Exchange Act
### [15 U.S.C. § 78i(a)(2)]
### (Against Defendants David Foley and Blankenship)

125.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

126.     By engaging in the conduct described above, defendants David Foley and Blankenship engaged in a series of transactions in a security registered on a national security exchange, creating actual or apparent active trading in such security or raising or depressing the

price of such security, for the purpose of inducing the purchase or sale of such security by others.

127.    Defendants' conduct was willful.

128.    By reason of the foregoing, defendants David Foley and Blankenship violated Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

### COUNT VI

**Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder
[15 U.S.C. §78j(b, 17 C.F.R. 240.10b-5]
(Against Defendants David Foley and Blankenship)**

129.    Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

130.    Defendants David Foley and Blankenship, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon sellers and purchasers and prospective purchasers of securities.

131.    Defendants acted with *scienter* in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme described above.

132.    By reason of the foregoing, defendants David Foley and Blankenship violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT VII

### Violations of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]
### (Against Defendants River North and Chavez)

133.    Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

134.    Defendant River North operated as a dealer, and as part of its regular business regularly engaged in buying and selling securities for its own account, making use of the mails or means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

135.    Defendant Chavez operated as a broker, engaged in the business of effecting securities transactions for the accounts of others, making use of the mails or means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

136.    By reason of the foregoing, defendants River North and Chavez violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## COUNT VIII

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]
### (Against Liceaga and Chavez)

137.    Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

138.    Defendant River North operated as a dealer, and as part of its regular business regularly engaged in buying and selling securities for its own account, making use of the mails or

27

means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

139. Defendants Liceaga and Chavez aided and abetted River North's violation of Section 15(a) of the Securities Act by knowingly or recklessly providing substantial assistance to River North in violating this section.

140. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], defendants Liceaga and Chavez indirectly violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**COUNT IX**

**Violations of Section 15(a) of the Exchange Act**
**[15 U.S.C. § 78o(a)]**
**(Defendant Liceaga as a Control Person Over River North)**

141. Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

142. As alleged above, defendant River North violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

143. At all relevant times, defendant Liceaga was a control person of defendant River North for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

144. At all relevant times, defendant Liceaga exercised power and control over defendant River North, including by managing and directing that entity, and by directing and participating in the acts constituting River North's violations of the securities laws.

145. By reason of the foregoing, defendant Liceaga is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for defendant River North's violations of the Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Find that the Defendants committed the violations alleged herein.

### II.

Issue orders of permanent injunction restraining and enjoining defendants River North, Liceaga, NTEK, NTGL, David Foley, Lisa Foley, Jeff Foley, and Blankenship, as well as their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e].

### III.

Issue orders of permanent injunction restraining and enjoining defendants River North, Liceaga and Chavez, as well as their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, from directly or indirectly violating Section 15(a) of the Securities Exchange Act [15 U.S.C. § 78o(a)].

### IV.

Issue orders of permanent injunction restraining and enjoining defendants David Foley and Blankenship, as well as their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, from violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2)] and 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### V.

Order defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship

and Chavez to disgorge their ill-gotten gains received directly or indirectly as a result of the violations alleged in this Complaint, with prejudgment interest thereon. Given the close relationship between certain individuals and entities engaging in this misconduct, joint and several liability is appropriate between River North and Liceaga, and between David Foley and Lisa Foley.

## VI.

Order defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship and Chavez to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship and Chavez from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

## VIII.

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit defendant David Foley from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IX.

Retain jurisdiction of this action in order to implement and carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other relief as this Court deems appropriate.

## BANKRUPTCY NOTICE

All relief requested herein as to Defendant David Foley is being sought to the extent permissible pursuant to Section 362(b)(4) of the Bankruptcy Code [1 U.S.C. § 362(b)(4)], as it relates to his Chapter 11 proceeding, *In re David R. Foley*, No. 19-50335 (Bankr. N.D. Cal.). Nothing in this Complaint shall be construed as an act of collection by the SEC against Defendant David Foley until the automatic stay is no longer in effect or has been determined with finality not to apply.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

By: ___*/s/Robert M. Moye*_____

Daniel J. Hayes (HayesD@sec.gov)
Robert M. Moye (MoyeR@sec.gov)
Richard G. Stoltz (StoltzR@sec.gov)
Christine B. Jeon (Jeonc@sec.gov)
U.S. Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, IL 60604-2615
(312) 353-7390

*Attorneys for Plaintiff Securities and Exchange Commission*