EXHIBIT C

Release No. 46745 (S.E.C. Release No.), Release No. 34-46745, 2002 WL 31428622
17 CFR Part 240

S.E.C. Release No.
Securities Exchange Act of 1934

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

DEFINITION OF TERMS IN AND SPECIFIC EXEMPTIONS FOR BANKS, SAVINGS ASSOCIATIONS, AND
SAVINGS BANKS UNDER SECTIONS 3(A)(4) AND 3(A)(5) OF THE SECURITIES EXCHANGE ACT OF 1934

File No. S7-41-02
RIN 3235-AI19
October 30, 2002

**\*1 AGENCY:** Securities and Exchange Commission

**ACTION:** Proposed rule

**SUMMARY:** The Securities and Exchange Commission is proposing to amend its rule granting an exemption to banks
from dealer registration for certain de minimis riskless principal transactions, to amend certain of its rules that define
terms used in the bank exceptions to dealer registration, and to grant a new exemption to banks from broker and dealer
registration for certain securities lending under the Securities Exchange Act of 1934. These rules address certain of the
exceptions for banks from the definitions of "broker" and "dealer" that were added to the Securities Exchange Act of
1934 by the Gramm-Leach-Bliley Act.

**DATES:** Comments should be submitted on or before [insert date 30] days after publication in the <u>Federal Register</u>].

**ADDRESSES:** Comments should be submitted in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange
Commission, 450 5th Street, NW, Washington, DC 20549-0609. Comments also may be submitted electronically at the
following E-mail address: rule-comment@sec.gov. All comment letters should refer to File No. S7-41-02; this file number
should be included on the subject line if E-mail is used. To help us process and review your comments more efficiently,
comments should be submitted by one method only. All comments received will be available for public inspection and
copying in the Commission's Public Reference Room, 450 5th Street, NW, Washington, DC 20549-0102. Electronically
submitted comment letters will be posted on the Commission's Internet site (http://www.sec.gov). Personal identifying
information, such as names or e-mail addresses will not be edited from electronic submissions. Submit only information
you wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Catherine McGuire, Chief Counsel; Lourdes Gonzalez, Assistant
Chief Counsel; or Linda Stamp Sundberg, Attorney Fellow; (202) 942-0073, Office of the Chief Counsel, Division of
Market Regulation, Securities and Exchange Commission, 450 5th Street, NW, Washington, DC 20549-1001.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission ("Commission") is requesting public
comment on the proposed amendments to Rules 3a5-1 [17 CFR 240.3a5-1] and 3b-18 [17 CFR 240.3b-18] under the
Securities Exchange Act of 1934 ("Exchange Act"). The Commission also is requesting public comment on the proposed
exemption from the definitions of "broker" and "dealer" for banks engaging in securities lending transactions pursuant
to new Exchange Act Rule 15a-11 [17 CFR 240.15a-11].

**Table of Contents**

I.          **Introduction**

            **A. Statutory Background -- The Gramm-Leach-Bliley Act**

            **B. Regulatory and Procedural Background -- the Interim Final Rules, Public Comment, and the Temporary Exemptions**

II.         **Dealer Activities and the Dealer/Trader Distinction**

            **A. Buying and Selling Securities for Own Account**

            **B. "Engaged in the Business" Test**

III.        **Discussion of Comments Received on "Dealer" Rules**

            **A. De Minimis Exception and Rule 3a5-1**

            **1. Discussion of Comments Received on Rule 3a5-1, the De Minimis Exemption**

            **2. Proposed Amendment to Rule 3a5-1, the De Minimis Exemption**

            **B. Rule 3b-18 — Definition of Terms Used in Asset-Backed Transaction Exception to Dealer Registration**

            **1. Discussion of Comments Received on Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

            **2. Proposed Amendment to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

IV.         **Rule 15a-11 Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions**

V.          **Definition of "Qualified Investor"**

VI.         **Procedural Matters**

            **A. General Request for Comments**

            **B. Paperwork Reduction Act**

            **C. Consideration of Benefits and Costs**

            **1. Benefits**

            **2. Costs**

            **D. Consideration of Burden on Competition, and on Promotion of Efficiency, Competition, and Capital Formation**

**WESTLAW**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    2

Sailah, James 1/16/2018
For Educational Use Only

### E. Regulatory Flexibility Act Certification

**Statutory Authority**

**Text of Proposed Rules and Rule Amendments**

**I. Introduction**

**A. Statutory Background -- The Gramm-Leach-Bliley Act**

**\*2**  On November 12, 1999, the President signed the Gramm-Leach-Bliley Act ("GLBA") into law. [1]  The GLBA changed federal statutes governing the scope of permissible activities and the supervision of banks, bank holding companies, and their affiliates. The GLBA lowered barriers between the banking and securities industries erected by the Banking Act of 1933 (popularly known as the "Glass-Steagall Act") [2] and between the banking and the insurance industries erected by the 1982 amendments to the Bank Holding Company Act of 1956 (the "Bank Holding Company Act"). [3]

When first enacted in 1934, the Exchange Act completely exempted banks from the regulatory scheme provided for brokers and dealers. Over the past 60 years, however, evolution of the financial markets driven by competition and technology eroded the separation that previously existed between banks, insurance companies, and securities firms. Regulators responded to these changes with interpretations that increasingly sought to accommodate these market changes. [4]  In recent years, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Office of the Comptroller of the Currency ("OCC"), and the Federal Deposit Insurance Corporation ("FDIC") have permitted banks and bank holding companies to engage in retail and institutional securities brokerage and private placement activities.

The Commission supported modernizing the legal framework governing financial services consistent with a system of functional regulation to ensure that investors purchasing securities through banks received the same protections as when they purchased securities from registered broker-dealers. [5]  The GLBA codified this concept of functional regulation -- that is, regulation of the same functions, or activities, by the same expert regulator, regardless of the type of entity engaging in those activities. Congress believed that, given the expansion of the activities and affiliations in the financial marketplace, functional regulation was important in building a coherent financial regulatory scheme. [6]

Accordingly, Title II of the GLBA amended the federal securities laws to provide for functional regulation of securities activities by eliminating the complete exception for banks from the definitions of "broker" and "dealer." As the legislative history noted, prior to the passage of the GLBA, the exception for banks from broker-dealer registration created a competitive disparity by permitting banks to engage in securities activities without being subject to the same regulatory requirements as broker-dealers. Indeed, Congress specifically expressed concern that the complete exception had permitted banks to engage in securities activities without being subject to the provisions of the federal securities laws that were designed to protect investors. [7]

The federal securities laws provide a comprehensive and coordinated system of regulation of securities activities under the oversight of a single regulator. The primary purpose of the federal securities laws is the protection of investors. The securities laws are also aimed at ensuring the maintenance of fair and orderly markets as well as fair competition among all participants in the securities markets. In contrast, the primary purpose of the federal banking laws is to protect the

solvency of banks. [8] Bank securities activities have historically taken place outside of the coordinated system of securities regulation that is designed to protect investors. This led to regulatory disparities that, in part, fostered the GLBA. [9]

**\*3** The GLBA is the product of many years of Congressional deliberation. It reflects a careful balance between providing investors with the same protections wherever they purchase securities, while not unnecessarily disturbing certain bank securities activities.

In particular, Sections 201 and 202 of the GLBA substantially amended the Exchange Act's definitions of "broker" and "dealer," respectively. [10] Before amendment, Sections 3(a)(4) and 3(a)(5) of the Exchange Act provided that the terms "broker" and "dealer" did not include a "bank." [11] Accordingly, banks [12] that engaged in securities activities were excepted from the requirement to register as broker-dealers under the Exchange Act. [13] The amended definitions narrowed this general exception for banks by specifying particular functional exceptions from broker-dealer registration for certain bank securities activities.

The amended definitions create eleven "broker" and four "dealer" exceptions for banks. The GLBA provided that these amended definitions had a delayed effective date of May 12, 2001. To accommodate the industry's compliance concerns, the Commission delayed the effective dates as more fully set forth below.

**B. Regulatory and Procedural Background -- the Interim Final Rules, Public Comment, and the Temporary Exemptions**

Because the exceptions from the definition of "dealer" are exceptions to the Exchange Act, the Commission is statutorily charged with interpreting these exceptions. In response to interpretive questions as well as industry-specific concerns, the Commission adopted interim final rules ("the Rules") on May 11, 2001. [14] The Rules were designed to provide guidance by defining certain key terms used in the new statutory exceptions. The Rules also provided additional exemptions from the definition of broker for banks that were engaged in certain types of securities activities. Although the Rules were adopted as interim final rules, the Commission specifically solicited public comment on them. Moreover, in order to give banks time to comply, the Rules included a temporary exemption that effectively extended the general exception from broker-dealer registration until October 1, 2001. [15]

The Commission received over 200 letters commenting on the Rules. The vast majority of these letters came from banks or persons representing banks and the banking industry. Of those letters, 33 described concerns about the process of adopting the Rules, with most of those expressing concern about the lack of a comment period before adoption. Of those 33 letters, thirteen were from trade groups, [16] thirteen were from banks, [17] two were from eight Congressmen, [18] two were from mutual fund companies, [19] one was from a Senator, [20] one was from a law firm [21] and one was from three federal banking agencies. [22]

Commenters offered various reasons for their concern about adopting the Rules before considering public comment. Some of the Congressmen expressed concern that this process may have caused confusion and created a dilemma for banks. The banking agencies stated that there would be significant practical operational implications of potential approaches to implementing the statutory exceptions and they specifically urged that resolution of those issues could be greatly aided by an open process of public comment on a proposal. One trade group questioned whether the Commission had satisfied section 553 of the Administrative Procedure Act by publishing the Rules without prior notice and comment. [23]

**\*4** Separate from the issue of public comment, the banking agencies, as well as some trade groups and individual banks, stated that the immediate effective date, coupled with exemptions that function only to suspend temporarily the Rules' effectiveness, placed banks in an untenable position. The banking agencies strongly urged the Commission to extend the effective date of these GLBA provisions (until after considering public comment and adopting final rules) and to provide banks with at least a one-year transition period after the revised rules become final.

In response to concerns that banks needed more time, and in recognition of the likelihood that the Rules would be amended in light of the continuing dialogue between the Commission and industry participants, we extended the effective date of the Rules on July 18, 2001. [24] At the same time, we extended the temporary exemption from the definitions of "broker" and "dealer" provided in Exchange Act Rule 15a-7. On May 8, 2002, we further extended the temporary exemption from the definition of "dealer" to November 12, 2002. [25] By separate order issued in conjunction with this release, we are further extending that temporary exemption to February 10, 2003.

## II. Dealer Activities and the Dealer/Trader Distinction

Exchange Act Section 3(a)(5) defines a "dealer" generally as a person that is "engaged in the business of buying and selling securities" for its own account through a broker or otherwise, but excepts persons, whether bank or non-bank, who do not buy or sell securities "as part of a regular business." [26] Undertaking the analysis of whether a bank's securities activities come within the definition of dealer under the federal securities laws is something that banks did not have to consider before the passage of the GLBA. Banks, however, can take advantage of several additional exceptions or exemptions from the "dealer" definition, as discussed below. If a bank's securities-related activities fall under the general definition of "dealer," the bank must register as a broker-dealer unless that bank can meet the terms of an exception or exemption from the dealer definition.

The question of whether a bank acts as a "dealer" that must register with the Commission therefore turns upon a two-stage analysis. The first stage focuses on two factual questions: (1) whether the bank is "buying and selling securities" for its own account; and (2) whether the bank is "engaged in the business" of that activity "as part of a regular business." A bank would not be a dealer unless both of those factual tests are met. The second stage of the analysis focuses on whether the bank can take advantage of bank-specific exceptions or exemptions from the definition of dealer. If all of the bank's securities activities fall within one or more of those bank-specific exceptions or exemptions, the bank does not have to register as a broker-dealer.

**\*5** As a result, a bank has flexibility in the way that it analyzes whether its securities activities would require it to register with the Commission as a dealer. A bank may opt first to consider whether its proprietary securities purchases and sales cause it to be "engaged in the business" of buying and selling securities for its own account "as part of a regular business." If the bank meets that part of the test, the bank then would have to consider whether those securities activities fall within one of the bank-specific exceptions or exemptions from the dealer definition in Exchange Act Section 3(a)(5). Alternatively, a bank may simply analyze whether its proprietary securities purchases and sales fall within an exception or exemption from Section 3(a)(5). If all of the bank's securities activities fall within one or more exception or exemption from the dealer definition, then the bank could avoid having to determine separately whether it satisfies the "engaged in the business" component of the definition.

As exemplified by the discussion of riskless principal transactions below, the question of whether a bank acts as a dealer under the securities laws is entirely separate from the question of whether it acts as a dealer under the banking laws, and it is possible for a bank to be a "dealer" under the securities laws but not under the banking laws. Banks therefore should look to the securities laws and the Commission's rules and interpretations in conducting the analysis under the Exchange

Act. A bank also should continue to determine whether any proposed securities activity is permitted under banking law, and should consult its appropriate Federal banking agency to assist it in that analysis.

In addition, the bank-specific exceptions and exemptions from the definition of "dealer" for specific products or transactions are independent of the question of whether a person would satisfy the general definition of "dealer" in the first instance. [27]

### A. Buying and Selling Securities for Own Account

The phrase "buying and selling securities for such person's own account" means purchasing or selling securities as principal, which includes so-called "riskless principal" transactions. Under the securities laws, "riskless principal" transactions are dealer activity [28] Entities that engage in these transactions as a matter of course would be involved in the business of buying and selling securities for their own accounts, even if the risk associated with the transactions is minimal or non-existent. [29] Although the OCC and the Federal Reserve interpret "riskless" principal activity as equivalent to agency activity under the banking laws, [30] "riskless" principal activity requires registration under the securities laws unless an exception or exemption applies.

### B. "Engaged in the Business" Test

As noted above, a person that is buying securities for its own account may still not be a "dealer" because it is not "engaged in the business" of buying and selling securities for its own account as part of a regular business. This exclusion is often referred to as the dealer/trader distinction. A "trader" does not have to register as a broker-dealer.

**\*6** As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), and generally transact a substantial portion of their business with investors (or, in the case of dealers who are market makers, principally trade with other professionals). [31] In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities. [32]

A person generally may satisfy the definition, and therefore, be acting as a dealer in the securities markets by conducting various activities: (1) underwriting; (2) acting as a market maker or specialist on an organized exchange or trading system; (3) acting as a de facto market maker whereby market professionals or the public look to the firm for liquidity; or (4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account. These principles demonstrate that the analysis of whether a person meets the definition of a dealer depends upon all of the relevant facts and circumstances.

A person must evaluate the totality of its securities activities to determine if those activities may constitute engaging in dealer activities for which there is no exception or exemption from the dealer registration requirements. By analogy when analyzing whether a security exists, some courts have used an analysis that turns on the "economic realities" underlying a transaction and not the name appended to the transaction. [33]

The GLBA bank "dealer" exceptions are outlined briefly below. [34]

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

☐ Investment transactions: permits banks to buy and sell securities for investment purposes for the bank and for its customers' trustee and fiduciary accounts.

☐ Permissible securities transactions: permits banks to buy and sell exempted securities, certain Canadian government obligations, and Brady bonds.

☐ Identified banking products: permits banks to buy and sell certain "identified banking products," as defined in Section 206 of the GLBA.

☐ Asset-backed transactions: permits banks through a grantor trust or other separate entity to issue and sell to qualified investors certain asset-backed securities representing obligations predominantly originated by a bank, an affiliate of the bank other than a broker-dealer, or a syndicate in which the bank is a member for some types of products.

With respect to the "dealer" exceptions, the Rules defined terms found in the asset-backed transactions exception and provided an exemption for a de minimis number of riskless principal transactions.

**7** In general, the bank dealer exceptions apply to specified products and contain certain limiting conditions. For example, some of the bank dealer exceptions permit a bank to buy and sell securities, but the asset-backed transactions exception only permits a bank to issue and sell securities through a grantor trust or other separate entity to qualified investors. The investment transactions exception only permits the bank to buy or sell securities "for investment purposes" for its own account or for the accounts for which it acts as a trustee or fiduciary.

As a bank considers its securities activities, the bank must evaluate the totality of its securities activities to determine if those activities are permissible under banking law, meet the definition of dealer (or broker) activities under the securities laws, and are excepted or exempted from the dealer registration requirements under the Exchange Act. [35]

### III. Discussion of Comments Received on "Dealer" Rules

As outlined above, the GLBA provides four exceptions to banks from the definition of "dealer." Each of these exceptions permits a bank to act as a dealer with respect to the specified securities products if the bank complies with the enumerated statutory conditions. Only six comment letters addressed either the dealer statutory exceptions or the dealer exemption. [36]

In particular, the Risk Management Association ("RMA") addressed the need for interpretive relief or an exemption for noncustodial securities lending. A letter from a coalition of banks also addressed the need for clarification that would provide legal certainty for banks engaging in securities lending with entities that might not strictly meet the statutory definition of qualified investor in Exchange Act Section 3(a)(54).

The Banking Agencies' and the NYCH addressed the definitions interpreting the statutory dealer exception for asset-backed activities. The remaining two commenters addressed the asset-backed exception and the de minimis exception. To more fully understand the concerns leading to these comments, the staff held meetings in person and by telephone with interested parties.

### A. De Minimis Exception and Rule 3a5-1

Exchange Act Section 3(a)(4)(B)(xi) [37] excepts a bank from the definition of broker, if the bank effects no more than 500 securities transactions per calendar year, other than transactions that qualify for one of the other statutory exceptions. A transaction in which a bank is acting as an agent for a customer would count as one transaction toward the 500-transaction limit. The GLBA provisions did not extend this de minimis exception to dealer transactions.

Questions arose as to whether banks can rely on the de minimis exception from the definition of broker when they engage in riskless principal transactions. [38] The Commission addressed this issue in the Rules by providing an exemption that permits riskless principal transactions as well as agency transactions to be counted under the 500-transaction limit. The Rules provide that a transaction in which the dealer bank is acting as a riskless principal intermediary between two non-broker-dealer customers counts as two trades (one with each customer) under the 500-transaction limit.

### 1. Discussion of Comments Received on Rule 3a5-1, the De Minimis Exemption

**\*8**  Two commenters addressed this exemption. Both commenters criticized the Rules for counting as two transactions something that they characterize as essentially being a single transaction.

### 2. Proposed Amendment to Rule 3a5-1, the De Minimis Exemption

As we explained in adopting the Rules, riskless principal transactions are "dealer" transactions under the securities laws. The GLBA did not provide an exception for dealer transactions, except for limited types of securities. Indeed, the GLBA did not provide any exception from the definition of dealer that would allow banks to continue to engage in riskless principal transactions. By allowing banks to use the de minimis transaction exception found in the broker exceptions for riskless principal transactions, the Commission was attempting to give banks more — not less — flexibility than provided under the literal terms of the GLBA. In other words, this exemption permits banks to continue to engage in a limited number of these transactions without having to register as a dealer.

We continue to believe that a de minimis exemption for a limited number of riskless principal transactions is appropriate. We believe that one reason that the GLBA may not have extended the de minimis exception to riskless principal transactions is the difference in the way riskless principal transactions are viewed under banking law as compared to the securities laws. In banking law, riskless principal transactions are considered agency activity because the principal does not assume principal risk. [39] Under the securities laws, however, riskless principal activity is conducted by a dealer, acting as principal, attempting to eliminate his principal risk. Because the exception is in the Exchange Act, the interpretation under the securities laws is controlling.

The Commission addressed this distinction in the Rules by providing that riskless principal transactions as well as agency transactions can be counted under the limit of 500 securities transactions per calendar year. Exchange Act Rule 3a5-1 counted a transaction in which the dealer bank is acting as a riskless principal intermediary between two non-broker-dealer customers as two trades under the 500-transaction limit.

In response to the two comments on this issue that expressed the view that counting a riskless principal transaction as two trades in certain circumstances may be needlessly restrictive, we propose amending the counting of the number of riskless principal transactions. Under the proposed amendment to Rule 3a5-1, a riskless principal transaction, even if it involves two separate counterparties, would count as only one transaction against the annual 500-transaction limit. [40] We believe that this change will simplify the rule and make it easier for banks to understand and apply its terms to a small annual number of riskless principal securities transactions.

We request comment on this proposed amendment to Exchange Act Rule 3a5-1 and whether this is an appropriate way to count transactions under this exemption.

**B. Rule 3b-18 — Definition of Terms Used in Asset-Backed Transaction Exception to Dealer Registration**

 **\*9**  The GLBA exception to the definition of dealer for banks engaging in certain asset-backed issuance and sale transactions provides that a bank may engage in the issuance or sale to qualified investors, through a grantor trust or other separate entity, of securities backed by or representing an interest in notes, drafts, acceptances, loans, leases, receivables, other obligations (other than securities of which the bank is not the issuer), or pools of any of these obligations predominantly originated by the bank, an affiliate of the bank other than a broker-dealer, or a syndicate in which the bank is a member. [41]  As we explained when we adopted the Rules, this statutory exception allows banks to issue and sell asset-backed securities through a grantor trust or other separate entity. It does not, however, allow banks to deal in asset-backed securities. In other words, this exception is not broad enough to permit banks to regularly purchase and sell these securities in the secondary market. [42]

Exchange Act Rule 3b-18 defined terms used in the asset-backed transactions exception to clarify the parameters of this exception. In particular, Rule 3b-18 defined the terms: "affiliate," "consumer-related receivable," "member of a syndicate of banks," "obligation," "originated," "pool," "predominantly originated," and "syndicate of banks."

**1. Discussion of Comments Received on Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

Four commenters addressed these definitions. [43]  All four commenters focused primarily on the definition of "predominantly originated." One commenter also addressed the requirement that a member of a syndicate originate more than 10% of the value of a pool of obligations. [44]

For the purpose of the asset-backed transaction exception, the Rules defined "predominantly originated" so that a bank could engage in the issuance or sale of asset-backed securities without registration as a dealer if at least 85% of the obligations underlying the securities were originated by the bank or its affiliates, other than its broker-dealer affiliates. The definition also stated that the bank and its affiliates include any financial institution with which the bank or its affiliates have merged but does not include the purchase of a pool of obligations or the purchase of a line of business.

Each of the commenters stated that the definition was too narrow and should be expanded to permit a greater percentage of the assets in a pool to be purchased. The commenters suggested that the percentage used in this definition should be reduced to a simple majority or 51% to permit a bank to issue asset-backed securities on pools with a smaller percentage of assets originated by the bank and its affiliates. Each of the commenters urged the Commission to consider the impact that a rule that discourages banks from selling assets could have on smaller banks.

 **\*10**  One commenter also addressed the definition of the term, "syndicate of banks of which the bank is a member." [45]  That commenter stated that Exchange Act Rule 3b-18 defines a "syndicate" in a manner that is wholly inconsistent with banking practice and, thus, effectively eliminates the statutory provisions authorizing syndicate transactions. In particular, the commenter stated that by defining a "syndicate" to mean "a group of banks that acts jointly, on a temporary basis, to loan money in one or more bank credit obligations," the rule reflected a fundamental misunderstanding of how syndicates function in the banking industry. This would effectively preclude banks from taking

advantage of the syndicate portion of the asset-backed transactions exception in the GLBA, and will have "seriously deleterious effects on bank securitization activities."

One commenter addressed the requirement that each member of a syndicate of banks originate at least 10% of the value of a pool of obligations. [46] This commenter stated that this test is too high, that there is no reason to impose a minimum percentage on the concept of syndicate membership, and that the test discriminates against smaller banks that may be unable to securitize obligations individually and must participate in a syndicate.

### 2. Proposed Amendments to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration

The asset-backed transactions exception permits a bank to create, issue, and sell through a grantor trust or other separate entity asset-backed securities predominantly originated by the bank and its affiliates. This exception does not permit a bank to be a dealer by regularly repurchasing and reselling the asset-backed securities that it issues. [47] However, a bank may purchase these asset-backed securities for investment purposes, so long as the bank is not acting as a dealer. [48]

We considered the comments we received as well as additional factual information that the staff learned during subsequent conversations with banking agencies and some individual banks. [49] After considering the banks' business practices, we propose to expand the definition of "originated" by considering obligations that a bank initially approves and underwrites, or agrees to purchase, to be "originated" by the bank as long as the bank meet two conditions. First, the obligation would have to conform to the bank's underwriting standards or be evidenced on the bank's documents. This requirement is imposed to ensure that the bank and the entity from whom it obtains the loan have an established arrangement prior to the time the loan is made to either use the bank's underwriting standards or documentation prepared by the bank. Second, the bank would be required to fund the obligation in a timely manner, not to exceed six months after the obligation is created. We also continue to define an obligation that the bank funds at the time that the obligation is closed as "originated" by the bank.

 **\*11**  Under this revised definition, a bank should be able to use loan origination channels such as automobile dealers, mortgage companies, and other banks, even though the bank does not "make and fund" the obligation at the exact time that the obligation is created. Conversely, a bank that purchases obligations that do not meet the conditions of this exemption would not have originated that particular obligation for the purpose of the 85% test. We believe that it is important to limit the time within which funding of the obligation must occur in order to give meaning to the term "originate" in the exception.

Although commenters urged the Commission to modify the definition of "predominantly originated" to permit banks to purchase more of the underlying obligations being securitized, we have not proposed to modify the 85% test because the test closely tracks the language of the statute. [50] To enhance clarity, however, we are modifying the definition to expressly set forth the meaning of the term in the context of a syndicate of banks. Thus, the banks, and their affiliates other than broker-dealer affiliates, participating in any such syndicate must have originated 85% of the obligations in any pool as measured by the value of the obligations.

We also propose to clarify the rule by replacing the definition of "member of a syndicate of banks" with two separate definitions. In particular, we first propose to define "member" as it relates to the term "syndicate of banks" to make clear that the individual banks and their affiliates other than their broker or dealer affiliates, originate the obligations, rather than the syndicate. The syndicate of banks only comes together to issue and sell the obligations. Second, we propose to modify the definition of "syndicate of banks" to mean a group of banks that acts jointly, on a temporary basis, to issue

securities backed by obligations originated by each of the individual banks and their affiliates other than their broker or dealer affiliates. These definitions will make it clear that banks may join together for the purpose of issuing securities backed by the pool of obligations, rather than having to join together before the obligations are created.

We propose to retain the requirement that when a syndicate of banks issues asset-backed securities through a grantor trust or other separate entity, each bank and its affiliates other than its broker or dealer affiliates selling the securities, and thus acting as a dealer in the transaction, must have originated at least 10% of the value of the pool of obligations backing the securities. This 10% requirement is applicable only to the bank or banks that actively sell the securities backed by the pool because these are the only banks that need to use the dealer exception. We received only one comment on this requirement. [51] We believe that this commenter viewed the definition as applicable to all of the banks that provide assets to the pool but do not actually sell the securities.

 **\*12** We propose to retain this requirement because the legislative history indicates that each bank selling the securities should be more than an insignificant member of the syndicate. [52] The legislative history suggests that threshold is met when a bank together with its affiliates other than broker or dealer affiliates provided at least 10% of the obligations in the pool. We believe that it is reasonable as well as in accordance with the legislative history to retain this requirement for the bank or banks that need the exception because they sell the securities secured by the pool of obligations originated by banks that are members of a syndicate of banks. We did, however, modify the rule to clarify that the affiliates of the banks other than broker or dealer affiliates also may originate the obligations.

Based on our staff's conversations with those banks that sold asset-backed securities, we expect that the changes we propose will permit the banks that currently issue and sell asset-backed securities directly to continue to do so under the terms of the exception without having to employ a broker-dealer.

We request comment on all aspects of the proposed amendments to Rule 3b-18. In particular, we request comment from banks that currently sell asset-backed securities on the impact, if any, of the proposed definition of "originate" on them. We request that these banks confirm whether the proposed changes to the definitions will permit them to continue to conduct this business. We also request comment on the requirement to fund the loans in a timely manner not to exceed six months and whether this requirement will have any impact on the banks making or funding the loans. In addition, we request comment on the requirement that there be established relationships as shown by conforming loans to the underwriting standards of the bank or using documentation prepared by the bank to evidence the loans. Commenters are invited to discuss whether these requirements would impose any burdens on banks.

### IV. Rule 15a-11 Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions

Institutional investors often place securities in custody with banks. These custodian banks effect and administer securities loans in return for an agreed fee. Banks also may engage in securities lending transactions when they do not have custody of the securities. A non-custodial securities lending arrangement permits a customer to divide custody and securities lending management between two expert entities. For example, a custodian may be selected for efficiency and low cost, while a lending agent may be selected for its ability to maximize the profitability of the portfolio.

Although banks play a role in both custodial and non-custodial securities lending transactions, the GLBA bank exceptions to the definitions of broker and dealer provide only one exception for securities lending and borrowing transactions. The need for an exemption to give banks legal certainty for securities lending transactions when the bank does not have custody of the securities was initially drawn to our attention through a letter from a trade group. [53]

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

**\*13** Exchange Act Section 3(a)(4)(B)(viii) addresses securities lending by custodian banks as an exception to the definition of broker. [54] Under paragraph (cc) of Section 3(a)(4)(B)(viii), a bank is permitted, without being considered a broker, to effect securities lending or borrowing transactions by custodian banks with or on behalf of customers in two situations: (1) as part of the services provided to safekeeping and custody customers; and (2) when facilitating the transfer of funds or securities as a custodian or a clearing agency in connection with the settlement of customers' transactions in securities.

We have been advised that the existence of this limited bank exception from the definition of broker creates uncertainty for banks that may engage in securities lending or borrowing transactions without having custody of the underlying securities or in situations where a bank might meet the definition of dealer under the securities laws. To provide legal certainty to banks engaging in securities lending transactions, we propose to add an exemption from the definition of broker for banks engaging in non-custodial securities lending activities as well as an exemption from the definition of dealer for banks engaging in certain custodial and non-custodial securities lending activities. This exemption would also enhance legal certainty for banks that have custody of collateral or that have custody of the securities subject to a lending arrangement for less than the entire period of the stock loan.

Industry representatives have advised our staff that banks' primary role in securities lending transactions, whether operating with or without custody of the securities, is to act in an agency capacity. Less frequently, banks may engage in securities lending as principal while acting as a conduit between the parties. [55] In that role, a bank provides credit intermediation and anonymity by standing between the lender and borrower.

The proposed exemption would require a written securities lending agreement, which would be any contract to conduct securities lending transactions on behalf of a qualified investor. In connection with a securities lending transaction, the bank may select and negotiate with a borrower and execute, or direct the execution of, the loan with the borrower; receive, deliver, or take custody of loaned securities; receive, deliver, or take custody of collateral; provide mark-to-market, corporate action, recordkeeping or other services incidental to the administration of the securities lending transaction; reinvest, or direct the reinvestment of, cash collateral; or indemnify the lender of securities with respect to various matters.

We propose to make this exemption available for banks' current securities lending business. The exemption would be limited to transactions with "qualified investors," as defined in Exchange Act Section 3(a)(54). [56] Commenters have suggested that both custodial and non-custodial banks should be able to act either as a conduit lender or as agent in order to offer to institutional investors the opportunity to select different banks to provide this service. [57]

**\*14** We propose that a bank be required to deal with a qualified investor on both sides of the transaction as a condition of this exemption. We understand that borrowers of securities that are not qualified investors do not directly borrow securities from noncustodial banks. Any borrowers of securities that do not meet the qualified investor test generally borrow securities through intermediaries that would be qualified investors. We request comment on any business practices that involve banks engaging in noncustodial securities lending directly with persons that are not qualified investors.

We do not propose extending the securities lending exemption to banks borrowing securities for, or lending from, their own accounts except as a conduit lender. [58] For the purposes of this provision, the term <u>conduit lender</u> means a bank that borrows (or loans) securities, as principal, for its own account, and contemporaneously loans (or borrows) the same securities, as principal, for its own account. A bank that qualifies under this definition as a conduit lender at the

commencement of a transaction would continue to qualify as long as the original securities lending transaction remains outstanding, even though substitutions of collateral may occur on the securities borrowing side of the transaction.

To the extent that banks may have a legitimate need to, on occasion, lend or borrow securities on their own behalf for hedging or for other reasons, they should be subject to the same dealer/trader distinction that applies to all other market participants. [59] In addition, the exemption is not indicative of whether banks or other persons may otherwise engage in securities lending as principal without being considered a dealer.

Even though we recognize that engaging in securities lending transactions involves taking risks that require effective internal controls, we have not proposed conditions to the exemption that would require that banks conform to the standards applicable to registered broker-dealers that engage in securities lending transactions. [60] We are proposing an exemption because we believe that it will assist institutional investors in obtaining stock loan services for banks that do not act as their custodians. We also believe that the exemption is appropriate in the public interest and is consistent with the protection of investors because it is limited to qualified investors.

We have asked bank regulators to advise us if this exemption would pose any risks that the Commission should address. We specifically request commenters to address our decision not to impose the kinds of conditions that are applicable to broker-dealers that engage in securities lending, which require them to take precautions against financial risks to the firm.

If conditions were to be imposed, we request comment on whether we should require banks to verify that: (1) the participants to the securities lending transactions are borrowing securities for a proper purpose; or (2) the participants to the transaction have been evaluated for their suitability to participate in the transaction, including their creditworthiness. Moreover, we request comment on whether this exemption should include a condition that it not be used to avoid U.S. margin requirements applicable to securities financing transactions, or to avoid other restrictions on the alienability of securities. We also request comment on all other aspects of the proposed exemption for securities lending transactions.

## V. Definition of "Qualified Investor"

 **\*15**  In defining the term "qualified investor," Exchange Act Section 3(a)(54) expressly provides authority to the Commission by rule or order to expand the definition to include any other person, taking into consideration such factors as the financial sophistication of the person, net worth, and knowledge and experience in financial matters. [61] In the context of the securities lending exemption, one commenter suggested that we use this authority to clarify the definition of "qualified investor" so that it would include any other person, plan, or legal entity of any kind that owns or invests on a discretionary basis not less than $25 million in investments, even if it is not expressly included in Section 3(a)(54). [62]

The term "qualified investor" was defined as a part of the GLBA and has application to several of the bank exceptions from broker-dealer registration. Under the GLBA bank exceptions to broker and dealer registration, certain securities may only be sold to qualified investors. The sections that list the securities that may only be sold to qualified investors include: [63] (1) the broker exception for identified banking products when the product is an equity swap agreement; [64] (2) the dealer exception for identified banking products when the product is an equity swap agreement; [65] and (3) the dealer exception for asset-backed securities. [66]

With regard to the expansion of the definition of qualified investor in the context of the exemption for securities lending transactions, one commenter stated:

As you are aware, banks provide custodial and non-custodial securities lending services to a variety of different types of lenders of securities. Frequently, these lenders include U.S. persons that are not organized as corporations, companies, or partnerships. For example, a significant number of lenders are organized as trusts. In addition, some banks regularly provide securities lending services to non-U.S. entities whose legal form has been established pursuant to applicable non-U.S. law. Such entities may be organized as trusts, pension plans managed by foreign banks or advisers qualified under local law (and as a result not included within Section 3(a)(54)(A)(v)), or as some other legal form that does not fit clearly within the U.S.-based concepts of a "corporation, company or partnership." [67]

Exchange Act Section 3(a)(54) enumerates an extensive list of persons who qualify for the designation, "qualified investor." [68] Some of these entities qualify by merely being certain types of entities, while other entities must qualify by being both a certain type of entity and by meeting an ownership and investment test. For example, Subsection (xi) of Section 3(a)(54)(A) provides that "any corporation, company, or partnership that owns and invests on a discretionary basis, not less than $25,000,000 in investments" is a qualified investor.

In considering this definition, we first looked to Exchange Act Section 3(a)(9), which defines the term "person" to mean "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." [69] We also looked to Investment Company Act Section 2(a)(8), which provides that the term "'company' means a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not; or any receiver, trustee in a case under title 11 of the United States Code or similar official or any liquidating agent for any of the foregoing, in his capacity as such." [70]

**\*16** In light of these other definitions, for the purposes of the GLBA provisions in the Exchange Act, we interpret the term "company" as used in the definition of "qualified investor" in subsection (xi) of Section 3(a)(54) to have a broad meaning that encompasses any other type of entity not otherwise specifically listed in Section 3(a)(54). We believe that interpreting the definition of qualified investor in this way is an appropriate way to enhance legal certainty for entities that are not as precisely described as others in the list of entities expressly listed as "qualified investors."

We believe that it may be appropriate to utilize this interpretation in all circumstances where the term is used in the GLBA exceptions as well as in the securities lending exemption. However, any type of entity that is specifically listed in Exchange Act Section 3(a)(54) will continue to be subject to the requirements imposed by that section. For example, a government or political subdivision, agency, or instrumentality of a government is required to invest on a discretionary basis at least $50 million in investments in order to be considered a qualified investor. [71] The statutory requirement for these governmental entities would not be changed by this interpretation.

We request comment on all aspects of this interpretation, including whether there are any other entities that should be considered qualified investors or whether we should exclude any entities that might meet the qualifying investment threshold but that nonetheless should be excluded from the definition. In addition, we request comment on whether the expansion of the definition of "qualified investor" should apply: (1) whenever the term is used in the GLBA exceptions; or (2) only to securities lending transactions. We also request comment on whether this interpretation brings sufficient clarity to provide legal certainty to banks and their customers.

## VI. Procedural Matters

## A. General Request for Comments

We are soliciting comments on all aspects of these proposed amendments as well as the portions of the Rules pertaining to banks' dealer activities that we are not proposing to amend. We will amend the Rules as appropriate in response to comments received when we adopt final rules relating to the exceptions from the definition of dealer and the new proposed exemption set forth in this proposal. We also specifically request comment on the timing of the final implementation of this proposal and the Rules relating to the exceptions from the definition of dealer as well as any specific extensions that individual banks may need.

## B. Paperwork Reduction Act

These proposed rules do not impose recordkeeping or information collection requirements, or other collections of information that require approval of the Office of Management and Budget under 44 U.S.C. 3501, et seq. Accordingly, the Paperwork Reduction Act does not apply. [72]

## C. Consideration of Benefits and Costs

**\*17** We believe that these proposed amendments and the new exemption are consistent with Congress's intent in enacting the GLBA and are responsive to the comments we received. These proposed amendments to the Rules are very limited in scope. The amendments propose three changes. In particular, we propose to: (1) modify the way in which transactions are counted under the exemption from the definition of "dealer" for a bank engaged in riskless principal transactions, which would permit the bank to engage in more transactions under the de minimis exception to broker and dealer registration; (2) modify certain definitions under the exemption for asset-backed transactions exception to the "dealer" rules to permit banks to issue and sell more asset-backed securities; and (3) add a new exemption from the definitions of both "broker" and "dealer" to provide banks with enhanced legal certainty when they engage in securities lending transactions.

## 1. Benefits

Both of the proposed amendments to the existing Rules would modify the exceptions and the interpretations found in Rules 3a5-1 and 3b-18 in a way that expands the scope of activity in which banks may engage without registering as dealers. The new proposed exemption for banks to engage in securities lending transactions found in new Rule 15a-11 also grants increased legal certainty to banks. All of these proposals make it easier for banks to conduct these activities.

Amending Rule 3a5-1 to change the way riskless principal transactions are counted will allow banks to engage in more such transactions before triggering the dealer registration requirement.

Directly engaging in asset-backed transactions without employing a broker-dealer is very unusual for banks. We found only two banks that regularly issue and sell asset-backed securities. Based on the staff discussions with these two banks, we believe that the proposed amendments to Rule 3b- 18 will permit these two banks to continue to utilize their existing business models with little or no change in their procedures. These proposed amendments modify the definition of "originate" to permit banks to use loan origination channels that would not be permitted under the Rules. We believe that the proposed amendments to the definitions under the asset-backed transactions exception will accommodate these banks' business without sacrificing the statutory limits Congress imposed on banks' dealer activities.

Lending securities is a highly specialized business for which Congress provided partial relief under the custody exception to broker registration. As discussed above, some banks were concerned about legal certainty for securities lending

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 15

transactions that may not meet the terms of the custody exception to broker registration and to the extent that some securities lending transactions might be considered to be subject to dealer registration. The proposed amendments modify the definition of "originate" to permit banks to use loan pipelines that would not be permitted under the Rules. We believe that banks provide an important function in this market and that it is in the public interest that they continue to do so. The proposed exemption should provide banks that lend securities with enhanced legal certainty that will permit them to continue to engage in this activity without broker-dealer registration.

## 2. Costs

 **\*18**  Although banks may incur certain costs to comply with the GLBA, these costs will be necessary because of the statutory change. Congress determined that all securities activities should be functionally regulated by the expert securities regulator to ensure investor protection, regardless of the entity in which the activities occur. Thus, any regulatory costs arise from Congress's determination that amendment of the Exchange Act was necessary. There are no out-of-pocket costs as a result of these proposals. Any costs would be those associated with moving the supervision of these limited securities transactions or products from the Commission and placing them under the banking agencies, which we do not believe to be significant.

In addition, because the types of dealer activities that are the subject of these rules are not the types of activities in which small banks or small broker-dealers participate, there should be no competitive costs to small broker-dealers due to the way in which these rules modify the terms of the bank exceptions and exemptions. None of the commenters on the dealer rules specifically identified costs to complying with those rules.

## D. Consideration of Burden on Competition, and on Promotion of Efficiency, Competition, and Capital Formation

In accordance with our responsibilities under Section 3(f) of the Exchange Act, we have considered both the protection of investors and whether these proposed amendments to certain of the Rules would promote efficiency, competition, and capital formation in determining whether they are consistent with the public interest. [73]  In addition, Section 23(a) (2) of the Exchange Act [74]  requires us, in adopting rules under the Exchange Act, to consider the anticompetitive effects of such rules, if any, and to refrain from adopting a rule that will impose a burden on competition not necessary or appropriate in furthering the purpose of the Exchange Act.

We do not believe that the interpretations, definitions, and exemptions contained in these proposed amendments to certain of the Rules, or the proposed rules will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. The interim final rules define terms in the statutory exceptions to the definitions of broker and dealer added to the Exchange Act by Congress in the GLBA, and provide guidance to banks regarding the scope of those exceptions. The proposed rule amendments and proposed rules also do not impose any additional competitive burdens on banks engaging in a securities business, other than those imposed by Congress through functional regulation in the GLBA.

Because the types of dealer activities that are the subject of these rules are not the types of activities in which small banks or small broker-dealers directly participate, there should be no competitive costs to small banks or small broker-dealers due to the way in which these rules modify the terms of the bank exceptions and exemptions.

 **\*19**  The new conditional exemption from broker-dealer registration would provide banks increased legal certainty when they engage in securities lending transactions without any new burdens on banks seeking to use this limited exemption. Nothing in the proposed amendments to the Rules, in the new proposed exemption, or in the proposed rule will adversely

affect capital formation. Banks that alter their securities-related activities in accordance with the GLBA will continue to be able to provide securities services to their customers. In enacting the GLBA, Congress determined that functional regulation was appropriate — that is, when a bank was conducting a securities business outside of the enumerated exceptions, that bank should be registered as a broker-dealer or shifted securities activities to a registered broker-dealer. In the interest of protecting the public and ensuring orderly markets, Congress determined that banks conducting a broad securities business should be subject to the same regulatory oversight as broker-dealers conducting the same types of activities. These amendments to the Rules and the new proposed exemption promote Congress' intent and make it easier for banks to comply with the requirements of the GLBA.

Since certain of these proposed amendments to the Rules define statutory exceptions mandated by Congress, we do not believe that those rules impose any extrastatutory adverse effects on efficiency, competition, or capital formation. With respect to the proposed amendment to a Rule that provides exemptive relief and the new proposed exemption for banks, both changes would make it easier for banks to comply with the GLBA and the Rules and give them enhanced legal certainty. We also do not believe that those rules impose any extra-statutory adverse effects on efficiency, competition, or capital formation. When Congress passed the GLBA, it effectively determined that regulation of banks conducting a securities operation outside of certain exceptions was necessary, appropriate, and in the public interest.

We are, however, interested in receiving comments regarding the effect of these proposed amendments to the Rules, the new proposed exemption, and the proposed rule may have on efficiency, competition, and capital formation. We will consider those comments in making any changes to the proposed amendments to the Rules, the new proposed exemption, and the new rule as necessary.

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996, the Commission is also requesting information regarding the potential impact of the proposed rules and rule amendments on the economy on an annual basis. Commenters should provide empirical data to support their views.

### E. Regulatory Flexibility Act Certification

Section 3(a) of the Regulatory Flexibility Act [75] requires the Commission to undertake an initial regulatory flexibility analysis of the effects of proposed rules and rule amendments on small entities, unless the Commission certifies that the rules and rule amendments, if adopted, would not have a significant economic impact on a substantial number of small entities. [76]

**\*20**  The Commission hereby certifies pursuant to 5 U.S.C. 605(b) that proposed amendments to Rules 3a5-1 and 3b-18 under the Exchange Act, and a proposed exemption for securities lending transactions in Rule 15a-11 under the Exchange Act under the Exchange Act contained in this release, if adopted, would not have a significant economic impact on a substantial number of small entities. The proposed amendments and proposed rules will not impose compliance requirements on depository institutions of any size. They impose no performance standards, no fees, no reporting or recordkeeping criteria, nor any other type of restriction or requirement with which depository institutions must comply. Furthermore, nothing in these rules prevents or impedes small banks from engaging in any of these activities. The activities addressed by these proposed amendments and proposed rules are not of a type that a small bank is likely to engage in. In addition, all of these rules remove impediments to any bank, including a small bank, engaging these activities.

First, the proposals would modify the method of counting a bank's riskless principal transactions for purposes of determining whether the volume of such transactions requires the bank to register as a dealer. The modification would,

Sallah, James 1/16/2018
For Educational Use Only

if anything, permit banks to engage in more transactions than would be permitted without registration under the Rules. Second, the proposals would amend a rule defining certain terms in Section 3(a)(5) of the Exchange Act concerning exceptions to the statutory definition of "dealer" for certain bank activities. These amendments also would, if anything, permit banks to engage in more transactions than would be permitted without registration under the Rules. Third, the proposals would add a new rule permitting banks to engage in certain securities lending activities without triggering registration requirements. Again, this proposal would, if anything, permit banks to engage in more transactions than would be permitted without registration under the Rules. For these reasons, none of the proposals should have a significant economic impact on a substantial number of small entities.

We encourage written comments regarding this certification. We solicit comment as to whether the proposed changes could have an effect that we have not considered. We request that commenters describe the nature of any impact on small entities and provide empirical data to support the extent of the impact.

**Statutory Authority**

The Commission is proposing amendments to Rules 3a5-1 and 3b-18, and a new exemption for securities lending transactions in Rule 15a-11 under the Exchange Act, pursuant to authority set forth in Sections 3(b), 15, 23(a), and 36 of the Exchange Act (15 U.S.C. 78c(b), 78*o*, 78w(a), and 78mm, respectively).

**Text of Proposed Rules and Rule Amendments**

**List of Subjects**

**17 CFR Part 240**

 **\*21**  Broker-dealers, Reporting and recordkeeping requirements, Securities.

**TEXT OF AMENDMENT**

For the reasons set forth in the preamble, Title 17, Chapter II of the Code of Federal Regulations is proposed to be amended as follows:

**PART 240 — GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**

1. The authority citation for Part 240 continues to read, in part, as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78*o*, 78p, 78q, 78s, 78u-5, 78w, 78x, 78 ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4 and 80b-11, unless otherwise noted.

 **\*22**  *\*\*\*\*\**

2. Section 240.3a5-1 is revised to read as follows:

**§ 240.3a5-1 Exemption from the definition of "dealer" for a bank engaged in riskless principal transactions.**

Sallah, James 1/16/2018
For Educational Use Only

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

(a) A bank is exempt from the definition of the term "dealer" solely for engaging in riskless principal transactions if the number of such riskless principal transactions during a calendar year combined with transactions in which the bank is acting as an agent for a customer pursuant to Section 3(a)(4)(B)(xi) of the Act (15 U.S.C. 78c(a)(4)(B)(xi)) during that same year does not exceed 500.

(b) For purposes of this section, the term <u>riskless principal transaction</u> means a transaction in which, after having received an order to buy from a customer, the bank purchased the security from another person to offset a contemporaneous sale to such customer or, after having received <u>an order to sell from a customer</u>, the bank sold the security to another person to offset a contemporaneous purchase from such customer.

3. Section 240.3b-18 is revised to read as follows:

**§ 240.3b-18 Definitions of terms used in Section 3(a)(5) of the Act.**

For the purposes of Section 3(a)(5)(C) of the Act (15 U.S.C. 78c(a)(5)(C):

(a) The term <u>affiliate</u> means any company that controls, is controlled by, or is under common control with another company.

(b) The term <u>consumer-related receivable</u> means any obligation incurred by any natural person to pay money arising out of a transaction in which the money, property, insurance, or services (being purchased) are primarily for personal, family, or household purposes.

(c) The term <u>member</u> as it relates to the term "syndicate of banks" means a bank that is a participant in a syndicate of banks and together with its affiliates other than its broker or dealer affiliates, originates no less than 10% of the value of the obligations in a pool of obligations used to back the securities issued through a grantor trust or other separate entity.

(d) The term <u>obligation</u> means any note, draft, acceptance, loan, lease, receivable, or other evidence of indebtedness that is not a security issued by a person other than the bank.

(e) The term <u>originated</u> means:

(1) Funding an obligation at the time that the obligation is created; or

(2) Initially approving and underwriting the obligation, or initially agreeing to purchase the obligation, provided that:

(i) The obligation conforms to the bank's own underwriting standards or is evidenced by the bank's own loan documents; and

(ii) The bank funds the obligation in a timely manner, not to exceed six months after the obligation is created.

(f) The term <u>pool</u> means more than one obligation or type of obligation grouped together to provide collateral for a securities offering.

**\*23** (g) The term <u>predominantly originated</u> means that no less than 85% of the value of the obligations in any pool were originated by:

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

(1) The bank, or its affiliates other than its broker or dealer affiliates; or

(2) Banks that are members of a syndicate of banks and affiliates of such banks other than their broker or dealer affiliates, if the obligations or pool of obligations consist of mortgage obligations or consumer-related receivables.

(3) For this purpose, the bank and its affiliates include any financial institution with which the bank or its affiliates have merged but does not include the purchase of a pool of obligations or the purchase of a line of business.

(h) The term <u>syndicate of banks</u> means a group of banks that acts jointly, on a temporary basis, to issue through a grantor trust or other separate entity, securities backed by obligations originated by each of the individual banks or their affiliates other than their broker or dealer affiliates.

4. Section 240.15a-11 is added to read as follows:

**§ 240.15a-11 Exemption from the definitions of "broker" and "dealer" for banks engaging in securities lending transactions.**

(a) Except as otherwise provided in paragraph (d) of this section, a bank is exempt from the definitions of the terms "broker" and "dealer" under Sections 3(a)(4) and 3(a)(5) of the Act (15 U.S.C. 78c(a)(4) and (a)(5)), solely to engage in or effect securities lending transactions with a qualified investor, pursuant to an agreement to provide securities lending services to a qualified investor, whether the bank acts as a conduit lender, or an agent.

(b) Securities lending transaction means a transaction in which the owner of a security lends the security temporarily to another party pursuant to a written securities lending agreement under which the lender retains the economic interests of an owner of such securities, and has the right to terminate the transaction and to recall the loaned securities on terms agreed by the parties.

(c) An agreement to provide securities lending services means any contract to conduct securities lending transactions on behalf of a qualified investor in connection with which the bank may:

(1) Select and negotiate with a borrower and execute, or direct the execution, of the loan with the borrower;

(2) Receive, deliver, or take custody of loaned securities;

(3) Receive, deliver, or take custody of collateral;

(4) Provide mark-to-market, corporate action, recordkeeping or other services incidental to the administration of the securities lending transaction;

(5) Reinvest, or direct the reinvestment of, cash collateral; or

(6) Indemnify the lender of securities with respect to various matters.

(d) For the purposes of this section, the term conduit lender means a bank that borrows (or loans) securities, as principal, for its own account, and contemporaneously loans (or borrows) the same securities, as principal, for its own account. A bank that qualifies under this definition as a conduit lender at the commencement of a transaction will continue to have that character as long as the original securities lending transaction remains outstanding, even though substitutions of collateral may occur on the securities borrowing side of the transaction.

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

---

**\*24** (e) For the purposes of this section, the term <u>qualified investor</u> has the meaning set forth in Section 3(a)(54) of the Act (15 U.S.C. 78c(a)(54)).

By the Commission.
Margaret H. McFarland
Deputy Secretary

Footnotes

1    Pub. L. No. 106-102, 113 Stat. 1338 (1999).
2    Pub. L. No. 73-66, ch. 89, 48 Stat. 162 (1933) (as codified in various sections of 12 U.S.C.).
3    The Garn-St. Germain Depository Institutions Act of 1982, Pub. L. No. 97-320, 96 Stat. 1469 (1982) (as codified in various sections of 12 U.S.C.), amending section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. 1841-1850 (1994).
4    See Mayer, Martin, "Banking's Future Lies in its Past," The New York Times, Sec. 4, page 9, August 25, 2002.
5    See, e.g., letter from Arthur Levitt, Chairman, U.S. Securities and Exchange Commission, to Senator Phil Gramm, Chairman, Committee on Banking, Housing and Urban Affairs, U.S. Senate (Oct. 14, 1999) (stating that "the Securities and Exchange Commission has long supported financial modernization legislation that provides the protections of the securities laws to all investors.").
6    H.R. Rep. No. 106-74, pt. 3, at 113 (1999).
7    Id. at 113-14.
8    See Board of Governors of Federal Reserve System v. Investment Co. Institute, 450 U.S. 46, 61, 101 S. Ct. 973, 984, 67 L. Ed. 2d 36 (1981); 75 Cong. Rec. 9913-9914 (1932) (remarks of Sen. Bulkley).
9    See U.S. General Accounting Office, Report to Congressional Requesters: Bank Mutual Sales Practices and Regulatory Issues GAO/GGD-95-210, at p. 52 (Sept. 1995); U.S. General Accounting Office, Report to Congressional Requesters: Banks' Securities Activities — Oversight Differs Depending on Activity and Regulator, GAO/GGD-95-214, at p. 25 (Sept. 1995).
10   Exchange Act Sections 3(a)(4) and 3(a)(5) [I 5 U.S.C. 78c(a)(4) and 78c(a)(5)].
11   Before the GLBA, Exchange Act Section 3(a)(4) defined the term "broker" as "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." Before the GLBA, Exchange Act Section 3(a)(5) defined the term "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank …."
12   Exchange Act Section 3(a)(6) [15 U.S.C. 78c(a)(6)] defines the term "bank" as:
     (A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency … and which is supervised and examined by State or Federal authority having supervision over banks, and which is not operated for the purpose of evading the provisions of this title, and (D) a receiver, conservator, or other liquidating agent of any institution or firm included in clauses (A), (B), or (C) of this paragraph.
13   Exchange Act Section 15(a) [15 U.S.C. 78*o*(a)] generally provides that:
     [i]t shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with [the provisions] of this section.
14   Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Release No. 34-44291, 66 FR 27760 (May 18, 2001).
15   17 CFR 240.15a-7.

---

Case: 1:19-cv-01711 Document #: 37-3 Filed: 05/10/19 Page 23 of 26 PageID #:166

Salah, James 1/16/2018

**For Educational Use Only**

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

16    See letter dated June 4, 2001 from James D. McLaughlin, Director, Regulatory and Trust Affairs, American Bankers Association and Beth L. Climo, Executive Director, ABA Securities Association; letter dated July 17, 2001 from Edward L. Yingling, Deputy Executive Vice President and Executive Director, American Bankers Association, and Beth L. Climo, Executive Director, ABA Securities Association; letter dated July 17, 2001 from John Duncan, American Bar Association Banking Law Committee of the Business Law Section; letter dated July 16, 2001 from Roger D. Wiegley, Chair, Committee on Banking Law, The Association of The Bar of the City of New York; letter dated July 17, 2001 from Charlotte M. Bahin, Director of Regulatory Affairs, Senior Regulatory Counsel, America's Community Bankers; letter dated July 17, 2001 from Robert M. Kurcza, General Counsel, Bank Securities Association ("the BSA letter"); letter dated July 17, 2001 from Neil Milner, President and CEO, the Conference of State Bank Supervisors; letter dated July 17, 2001 from Gerald M. Noonan, President, the Connecticut Bankers Association; letter dated July 17, 2001 from Richard M. Whiting, Executive Director, Financial Services Roundtable; letter dated July 17, 2001 from Robert J Gulledge, Chairman, Independent Community Bankers of America ("the ICBA letter"); letter dated July 17, 2001 from Lawrence R. Uhlick, Executive Director and General Counsel, Institute of International Bankers; letter dated August 1, 2001 from Jeffrey P. Neubert, President and Chief Executive Officer, New York Clearing House ("the NYCH letter"); and letter dated July 17, 2001 from A. Michelle Roberts, Executive Director, The Trust Financial Services Division of the Texas Bankers Association.

17    See letter dated July 16, 2001 from Alan R. Leach, President, BancorpSouth Investment Services, Inc.; letter dated July 16, 2001 from John M. Kramer, Deputy General Counsel, Bank One Corporation; letter dated September 10, 2001 from David P. Johnson, Investment Advisor, Bank Midwest; letter dated September 4, 2001 from Warren R. Jamieson, Chairman, Bonham State Bank; letter dated July 17, 2001 from Jeffrey S. Missman, Vice President, Director — Regulatory Compliance, Commerce Bancshares, Inc.; letter dated July 10, 2001 from William Nappi, CTCP, Trust Compliance Officer, FirstMerit Corp., N.A.; letter dated July 16, 2001 from William C. Mutterperl, Executive Vice President, General Counsel and Secretary, FleetBoston Financial Corporation; letter dated July 17, 2001 from Maureen W. Sullivan, Associate General Counsel, Manufacturers and Traders Trust Company; letter dated July 16, 2001 from David A. Daberko, Chairman and Chief Executive Officer, National City Corporation; letter dated July 17, 2001 from James S. Keller, Chief Regulatory Counsel, PNC Financial Services Group (PNC); letter dated July 17, 2001 from Norimichi Kanari, President and CEO, Union Bank of California; letter dated July 16, 2001 from W. David Hemingway, Chief Financial Officer Zions Bancorporation; and letter dated July 16, 2001 from A. Scott Anderson, President and Chief Executive Officer, Zions Bank Capital Markets, Zions First National.

18    See letter dated July 19, 2001 from Representative Michael G. Oxley, Chairman, Committee on Financial Services, Representative Richard H. Baker, Chairman Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, Representative Spencer Bachus, Chairman, Subcommittee on Financial Institutions and Consumer Credit, Marge Roukema, Chairwoman, Subcommittee on Housing And Community Opportunity, Sue W. Kelly, Chairwoman, Subcommittee on Oversight and Investigations, Peter T. King, Chairman, Subcommittee on Domestic Monetary Policy, Technology, and Economic Growth, Doug Bereuter, Chairman, Subcommittee on International Monetary Policy and Trade, U.S. House of Representatives; and letter dated July 20, 2001 from Representative John J. LaFalce, Ranking Member, Committee on Financial Services, U.S. House of Representatives.

19    See letter dated July 2, 2001 from Melanie L. Fein, Attorney at Law, on behalf of Federated Investors, Inc.; letter dated July 17, 2001 from Stewart P. Greene, Chief Counsel, Securities Law, Teachers Insurance and Annuity-College Retirement Equities Fund.

20    See letter dated July 18, 2001 from Senator Phil Gramm, Ranking Member, Committee on Banking, Housing and Urban Affairs, United States Senate.

21    See letter dated July 17, 2001 from Satish M. Kini of Wilmer, Cutler & Pickering.

22    See letter dated June 29, 2001 from Alan Greenspan, Chairman, Board of Governors of the Federal Reserve System, Donna Tanoue, Chairman, Federal Deposit Insurance Corporation, and John D. Hawke, Comptroller of the Currency (collectively, "the banking agencies" and "the Banking Agencies' letter").

23    The BSA letter.

24    Release No. 34-44570.

25    Release No. 34-45897. At the same time, we further extended the temporary exemption from the definition of broker until May 12, 2003.

26    Exchange Act Section 3(a)(5) [15 U.S.C. 78c(a)(5)].

27    The SEC's analysis of what constitutes "dealer" activity has not changed for persons that are not banks just because banks have exceptions and exemptions for specific securities activities and products. These exceptions and exemptions provide banks with legal certainty for their securities business.

28    "Riskless principal" transactions are generally described as trades in which, after receiving an order to buy (or sell) from a customer, the broker-dealer purchases (or sells) the security from (or to) another person in a contemporaneous offsetting transaction. See Exchange Act Rule 10b-10(a)(2)(ii)(A) [17 CFR 240. 10b-10(a)(2)(ii)(A)]; Rel. No. 34-33743 (Mar. 9, 1994) at n. 11.

29    See Exchange Act Section 3(a)(5). The Commission has noted that "riskless" principal transactions are in many respects equivalent to transactions effected on an agency basis. See Securities Confirmations. Rel. No. 34-15219 (Oct. 6, 1978), 43 FR 47495 (Oct. 6, 1978).

30    The OCC stated that, "riskless principal activities are the legal and economic equivalent of permissible brokerage activities inasmuch as riskless principal brokerage is conducted in a manner consistent with the express terms of section 16," of the Glass-Steagall Act. See OCC Interpretive Letter No. 371 (June 13, 1986). See also 1989 FRB 829 (October 30, 1989) and 1996 FRB 748 (June 13, 1996).

31    See, e.g., Rel. No. 34-11742 (October 5, 1975) (noting that a bank might be subject to registration as a municipal securities dealer if it engaged in underwriting, maintain a trading account or carried a dealer inventory, advertised itself as a dealer or otherwise held itself out as a dealer).

32    See generally L. Loss & J. Seligman, SECURITIES REGULATION, §§ 8-A-2 and 8-A-3 nn. 115 and 143 (3d ed. 2001).

33    See United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, rehearing denied, 423 U.S. 884 (1975).

34    This outline is a summary. It does not describe the exceptions in full.

35    A bank that contemplates a new securities activity may also seek an exemption or no-action relief from the Commission. Exchange Act Section 36 [15 U.S.C. 78mm] authorizes us to exempt any person, security, or transaction from the provisions of the Exchange Act, to the extent that such exemption is necessary or appropriate in the public interest, and consistent with the protection of investors. We authorized the Director of the Division of Market Regulation to consider, on a case-by-case basis, individual requests for exemptive relief from banks, savings associations, and savings banks. Exchange Act Rule Rule 30-3 [17 CFR 200.30-3(a)(72)].

      In appropriate circumstances, the staff also may provide guidance in the form of no-action letters. See Release No. 33-5127 (January 25, 1971). See also Release No. 33-6279 (December 5, 1980).

36    See the ICBA letter, the NYCH letter, the Banking Agencies' letter, letter dated July 17, 2001 from Rick D. Burtenshaw, Senior Vice President, Investment Division, Zions First National Bank ("the Zions letter"). In addition, a letter dated October 16, 2002 from Elizabeth Shea Fries of Goodwin Proctor on behalf the Risk Management Association ("the RMA letter") addresses the need for an exemption for activities related to securities lending. Moreover, a letter to Annette Nazareth, Director, Division of Market Regulation, dated October 9, 2002, from Edward J. Rosen, Cleary, Gottlieb, Steen & Hamilton, on behalf of a coalition of banks actively involved in securities lending ("Coalition of Banks letter") suggests that the definition of "qualified investor" be clarified to cover all entities with at least $25 million in investments that are not otherwise covered under the statutory definition in connection with the securities lending exemption.

37    15 U.S.C. 78c(a)(4)(B)(xi).

38    See description of riskless principal transactions under the securities laws at notes 28 to 30, supra.

39    See Bankers Trust New York Corporation, 75 Fed. Res. Bull. 829 (1989); Bank of New York Company, Inc. (Order dated June 10, 1996); and OCC Interp. Ltr. No. 626, reprinted in [1993-1994 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ (July 7, 1993).

40    If, however, a bank offsets the risk in a transaction with one counterparty by arranging multiple transactions with other counterparties, the bank must count each of the transactions on the side of the transaction that involves the largest number of transactions as a separate transaction against the annual 500 transaction-limit.

41    Exchange Act Section 3(a)(5)(C)(iii) [15 U.S.C. 78c(a)(5)(C)(iii)].

42    66 FR 27760 at 27785 (May 18, 2001).

43    See note 36, supra.

44    See the NYCH letter.

45    See the Banking Agencies' letter.

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

46  See the NYCH letter.

47  See Section II, supra, for a discussion of dealer activities and the dealer/trader distinction.

48  Exchange Act Section 3(a)(5)(C)(ii) [15 U.S.C. 78c(a)(C)(ii)]. In contrast, a bank also may deal in government securities, such as securities of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). Exchange Act Sections 3(a)(5)(C)(II) (exception from "dealer" for exempted securities) [15 U.S.C. 78c(a)(5)(C)(II)], 3(a)(12)(A) (exempted security defined) [15 U.S.C. 78c(a)(12)(A)], and 3(a)(42)(B) and (C) (government securities defined) [15 U.S.C. 78c(a)(42)(B)and (C)].

49  We were informed that very few banks issue and sell asset-backed securities without employing a registered broker-dealer. The banking agencies identified only four banks that might have issued and sold asset-backed securities directly without using a broker-dealer within the past two years. Of these four banks, only two regularly issue and sell asset-backed securities without employing a broker-dealer. These two banks actively participate in making new small business, residential and automobile loans for securitization but employ loan distribution channels that would not permit the banks to meet the definition of "originated" in Exchange Act Rule 3b-18.

50  In defining the term "predominantly," which modifies the term "originated," we looked to other sections of the GLBA in which the term is used. Section 103(n) of the GLBA uses the term "predominantly" to modify "financial" and to allow analysis of whether nonfinancial activities and affiliations may be retained. Bank Holding Company Act Section 4(n)(2) [ 12 U.S.C. 1843(n)(2)]. Section 103(n)(2) of the GLBA expressly provides that a firm is predominantly engaged in financial activities when at least 85% of the annual gross revenues of the consolidated company derive from financial activities, excluding any revenue from banks. To be consistent, we applied the same numerical test found in Section 103(n)(2) of GLBA for loan product originations for the purpose of the asset-backed securities exception from the definition of dealer.

51  See the NYCH letter.

52  The legislative history states that, "[t]he Committee expects this provision shall be interpreted so that the bank will [have] not less than ten percent of the assets in the syndicate or pool of obligations." H.R. Rep. No. 106-74, pt. 3, at 171 (1999).

53  See the RMA letter, supra, note 36.

54  15 U.S.C. 78c(a)(4)(B)(viii).

55  This conduit role is similar to a riskless principal transaction, but does not involve activities that could be characterized as running a matched book. Running a matched book of repurchase agreements or other stock loans has been characterized as a dealer activity because the "book running dealer" holds itself out as willing to buy and sell and as thus, engaged in the business of buying and selling securities. Unlike a riskless principal transaction, a conduit lender may on occasion substitute collateral on the securities borrowing side of the transaction while the original securities lending transaction remains outstanding.

56  See discussion at Section V, infra.

57  See the RMA letter, supra note 36.

58  Under banking law, with some exceptions, banks are not permitted to own equity securities.

59  See Section II, supra, for a discussion of dealer activities and the dealer/trader distinction.

60  See Rule 15c3-3(b)(3) [17 CFR 240.15c3-3(b)(3)].

61  15 U.S.C. 78c(a)(54). Under this definition qualified investors include investment companies, banks, small business investment companies, any State sponsored employee benefit plan, institutional trusts, market intermediaries, and natural persons, corporations or partnerships that own and invest on a discretionary basis more than $25,000,000.

62  See Coalition of Securities Lending Banks letter.

63  In addition to these three provisions, a participation in a loan to be an "identified banking product," also must either be sold to: (1) a qualified investor; or (2) to other persons that have an opportunity to review and assess any material information regarding the borrower's creditworthiness and based on such factors as financial sophistication, net worth, and knowledge and experience in financial matters, have the capability to evaluate the information available, as determined under generally applicable banking standards or guidelines. Thus, a bank utilizing the exceptions to broker and dealer registration to sell a participation interest would either have to sell such an interest to a qualified investor or undertake a more extensive factual assessment of the purchaser. See Section 206(a)(5) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(4)(B)(ix) [15 U.S.C. 78c(a)(4)(B)(ix)] and Section 3(a)(5)(C)(iv) [15 U.S.C. 78c(a)(5)(C)(iv)].

64  Section 206(a)(6) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(4)(B)(ix)[15 U.S.C. 78c(a)(4)(B)(ix)].

In re Definition of Terms in and Specific Exemptions for..., Release No. 46745...

65    Section 206(a)(6) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(5)(C)(iv) [15 U.S.C. 78c(a)(5)(C)(iv)].

66    Exchange Act Section 3(a)(5)(C)(iii) [15 U.S.C. 78c(a)(5)(C)(iii)].

67    Coalition of Securities Lending Banks letter.

68    Subsections (i) through (xiv) of Section 3(a)(54) list entities that are qualified investors.

69    Exchange Act Section 3(a)(9) [15 U.S.C. 78c(a)(9)].

70    Investment Company Act Section 2(a)(8) [15 U.S.C. 80a-2(a)(8)].

71    Section 3(a)(54)(C)(xiii) of the Exchange Act [15 U.S.C. 78c(a)(54)(C)(xiii)].

72    We would expect banks, as a matter of good business practice, to be able to demonstrate that they meet the terms of a particular exemption. We also note that Section 203 of the GLBA specifically requires the bank regulators to promulgate recordkeeping requirements.

73    15 U.S.C. 78c(f).

74    15 U.S.C. 78w(a)(2).

75    5 U.S.C. 603(a).

76    5 U.S.C. 605(b).

Release No. 46745 (S.E.C. Release No.), Release No. 34-46745, 2002 WL 31428622

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.