UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                                Plaintiff,

            v.

RIVER NORTH EQUITY, ET AL.,

                                Defendants.

Case No. 1:19-cv-01711

Honorable Thomas M. Durkin

Magistrate Judge Susan E. Cox

**SEC'S CORRECTED COMBINED RESPONSE TO MOTIONS TO DISMISS
FILED BY DEFENDANTS RIVER NORTH, LICEAGA, AND CHAVEZ**

Daniel J. Hayes (hayesdj@sec.gov)
Robert M. Moye (moyer@sec.gov)
Richard G. Stoltz (stoltzr@sec.gov)
Christine B. Jeon (jeonc@sec.gov)
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)

Dated: July 12, 2019

*U.S. Securities and Exchange Commission*

## TABLE OF CONTENTS

I.  Introduction ........................................................................................................... 1

II.  Statutory Scheme ................................................................................................. 2

    A.  Broker-Dealer Registration Under The Exchange Act ................................. 2

        1.  What is a Dealer? ................................................................................. 4

        2.  What is a Broker? ................................................................................ 6

III.  Facts .................................................................................................................... 7

IV.  Legal Standard .................................................................................................. 11

V.  Argument ........................................................................................................... 11

    A.  The Complaint Properly Alleges That River North Acted As An Underwriter And Unregistered Dealer When It Bought NTEK And NTGL Securities From The Foleys And Resold Them To The Public. ........................................................ 12

    B.  The Complaint Properly Pleads That Chavez Was An Unregistered Broker Engaged In The Business Of Effecting Securities Transactions For The Account Of Others. ................................................................................................. 16

    C.  The Complaint Properly Alleges That Chavez Aided And Abetted River North's Violations Of Section 15(a) For Not Registering As A Dealer. ................................. 21

    D.  River North And Liceaga's Remaining Arguments Are Without Merit.................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases and SEC Administrative Decisions**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................11

*Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016) .....................................................................18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................11

*Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285 (7th Cir. 2016).....................................11

*Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362 (7th Cir. 2018) ........................................11

*Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985
    (D. Neb. Sept. 12, 2006) ...........................................................................................................17

*Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)............................3

*Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006) ........................................................................22

*In the Matter of Bravo Enter. Ltd.*, 2015 WL 5047983 (Aug. 27, 2015)....................................2, 3

*In the Matter of David F. Bandimere*, Release No. 9972, 2015 WL 6575665 (Oct. 29, 2015) .................18

*In the Matter of Gordon Wesley Sodorff, Jr.*, Exchange Act Release No. 31134, 1992 WL 224082
    (Sept. 2, 1992).........................................................................................................4, 5, 16, 24

*In the Matter of Ironridge Global Partners, LLC*, Securities Exchange Act of 1934 Rel. No. 75272,
    2015 WL 3862868 (June 23, 2015) ..........................................................................................24

*Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411 (D. Mass.)......................13

*Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 545 F.2d 754 (1st Cir. 1976)......................13

*Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982)..........................4

*Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994)...............................................................................3, 4

*SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016)...................................................................12

*SEC v. Benger*, 697 F. Supp. 2d 932 (N.D. Ill. 2010)................................................6, 12, 15, 18, 19

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015).................................13, 24

*SEC v. China Energy Sav. Tech., Inc.*, 2009 WL 875997 (E.D.N.Y. Mar. 27, 2009) ...................3

*SEC v. Cook*, 2015 WL 5022152 (S.D. Ind. 2015)......................................................................21

*SEC v. Crawford*, 861 F.3d 760 (8th Cir. 2017);..........................................................................6

*SEC v. George*, 426 F.3d 786 (6th Cir. 2005)..............................................................6, 17, 19

*SEC v. Hansen*, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).........................................6, 7, 18, 19

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ...........................................................................19

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) .......................................4, 17

*SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011)......................................................20, 21

*SEC v. M&A West, Inc.*, 2005 WL 1514101 (N. D. Cal. 2005)..............................................20, 21

*SEC v. Mapp*, 240 F. Supp. 3d 569 (E.D. Texas 2017)..........................................................20, 21

*SEC v. Margolin*, 1992 WL 279735 (S.D.N.Y. 1992)...................................................................6

*SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y.2003 ...........................................................6, 17, 19

*SEC v. McNamee*, 481 F.3d 451 (7th Cir. 2007) .....................................................................14, 15

*SEC v. Rabinovich & Associates, LP*, No. 07-10547, 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) .......18

*SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990)……………………………………….…………….17

*SEC v. Randy*, 38 F. Supp. 2d 657 (N.D. Ill. 1999) .....................................................................25

*SEC v. Ustian*, 229 F. Supp. 3d 739 (N.D. Ill. 2017)..........................................................22, 23
*Tobey v. Chibucos*, 890 F.3d 634 (7th Cir. 2018)................................................................11
*United States v. Coscia*, 866 F. 3d 782 (7th Cir. 2017) ......................................................24
*Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996).............................................................................24
*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009)...............................................................3

## Securities Exchange Act of 1934

Section 15(a), 15 U.S.C. § 78o(a) ..............................................................................passim
Section 15(a)(1), 15 U.S.C. § 78o(a)(1).................................................................................3
Section 15(b), 15 U.S.C. § 78o(b) ....................................................................................3, 24
Section 20(e), 15 U.S.C. § 78t(e)........................................................................................21
Section 3(a)(4)(A), 15 U.S.C. 78c(a)(4)(A)..............................................................3, 16, 18
Section 3(a)(5)(A), 15 U.S.C. 78c(a)(5)(A).........................................................................12
Section 3(a)(5)(B), 15 U.S.C. § 78c(a)(5)(B) ........................................................................4

## Securities Act of 1933

Section 5, 15 U.S. Code § 77e ...................................................................................8, 10, 14

## Rules

Fed. R. Civ. P. 8(a)(2)...........................................................................................................11

## Treatises

Robert R.D. Colby & Lanny Schwartz, *Broker-Dealer Regulation*, § 2:1.2
    (July 25, 2016)........................................................................................3, 6, 12, 14, 15
Thomas Lee Hazen, 5 Law of Securities Regulation § 14.54 (6th ed. Jan. 2011).........................4

## Other Authorities

67 Fed. Reg. at 67499 .........................................................................................................4, 5
Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings
    Banks Under Sections 3(a)(4) and 3(a)(5 of the Securities Exchange Act of 1934, SEC Release
    No. 34-47364 (Feb. 13, 2003) .................................................................................5, 14
*Distribution by Broker-Dealers of Unregistered Securities*, 1962 WL 69442 (Feb. 2, 1962) .......2
Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54 Fed. Reg.
    30013 (July 18, 1989)...............................................................................................4
SEC, Staff Study on Investment Advisers and Broker-Dealers at 10-11 (Jan. 2011),
    http://www.sec.gov/news/studies/2011/913studyfinal.pdf .........................................5

## I. INTRODUCTION

The complaint charges defendant River North with acting as an unregistered dealer and defendant Chavez with acting as an unregistered broker, both in violation of Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"). For River North, the relevant legal question is whether it was engaged in the business of buying and selling securities for its own account. Although River North moves to dismiss the SEC's claim, it concedes that whether it functioned as a dealer rests upon a fact-based analysis of the totality of its activities. The complaint properly alleges that River North, which was buying and selling billions of shares of stock issued by dozens of microcap companies, was engaged in the business of buying and selling securities for its own account. As to the two microcap companies at issue here (NTEK and NTGL), between February 2014 and October 2016, River North bought over 1.1 billion shares of stock from the control person of the companies (defendant David Foley) in 82 separate transactions, and then acted as an underwriter when it resold those securities in unregistered transactions to the public. River North received over $17.8 million from these unregistered sales, some of which it funneled back to the Foleys and their companies. River North was acting as a dealer, not an ordinary trader.

For defendant Chavez, who was River North's Director of Business Development, the question is whether he effectuated securities transactions for the account of others. Chavez brokered the sales of NTEK and NTGL stock by defendant Foley and his wife (defendant Lisa Foley) to River North. Chavez negotiated the terms of the stock sales between Foley and River North, including obtaining significant discounts on the purchase price paid by River North. He also confirmed sale terms with the Foleys, handled paperwork for the sales, assisted with the transfer of the shares from the Foleys to River North's brokerage accounts, and helped the Foleys

obtain advances on the purchase price from River North. In return for his services, the Foleys, River North, and defendant Edward Liceaga (River North's owner and president) paid him a "broker" fee and other commissions on each sale. River North and Liceaga also paid him a percentage of the profits River North made when it quickly resold the stock it purchased from the Foleys, at a discount, to the investing public.

The complaint more than adequately alleges that River North and Chavez violated Section 15(a) by acting as an unregistered dealer and unregistered broker, respectively.

Moreover, Chavez and Liceaga are secondarily liable for aiding and abetting River North's violations because they substantially assisted River North. Liceaga, as River North's owner and president, is also liable for River North's violations as its control person.

The Court should deny defendants' motions.

## II.    STATUTORY SCHEME

### A.    Broker-Dealer Registration Under The Exchange Act

Brokers and dealers act as essential intermediaries between the investing public and the securities markets. They are gatekeepers, and one of their most important responsibilities is to ensure that they are not participating in an illegal unregistered public offering of securities, "particularly in situations where the securities are those of relatively obscure and unseasoned companies"—*i.e.* microcap securities. *Distribution by Broker-Dealers of Unregistered Securities*, 1962 WL 69442, at *1 (Feb. 2, 1962).

Issuers in the microcap space are varied. Some are small businesses, some are shell companies engaged in no business at all. *See In the Matter of Bravo Enter. Ltd.*, 2015 WL 5047983, at *5 (Aug. 27, 2015). Microcap stocks typically trade in low volumes, are closely held, are highly volatile, and are not typically followed by mainstream analysts and press,

making "[a]ccurate information … difficult to locate for anyone who is not an insider." *Id*. This lack of information makes penny stocks unusually susceptible to fraud, manipulation, and abuse. *Id*.; *SEC v. China Energy Sav. Tech., Inc.*, 2009 WL 875997, at *4 (E.D.N.Y. Mar. 27, 2009). For these reasons, the gatekeeper role entrusted to brokers and dealers is particularly essential in the microcap space because illegal unregistered offerings deprive investors of the information and transparency mandated by the Act.

In light of their importance, persons who act as "brokers" or "dealers" must register with the SEC unless they are specifically exempt from registration. *Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009). *See* Exchange Act Section 15(a)(1), 15 U.S.C. § 78o(a)(1) (prohibiting a broker or dealer from using the mail or any other instrumentality of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless "registered in accordance with [Section 15(b) of the Exchange Act]"). This registration requirement "serves as the keystone of the entire system of broker-dealer regulation." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (cites and quotes omitted); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968); Robert R.D. Colby & Lanny Schwartz, *Broker-Dealer Regulation*, § 2:1.2 (July 25, 2016) [EXHIBIT A].

The Exchange Act contains definitions of both "dealer" and "broker." The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities … *for such person's own account*." Section 3(a)(4)(A), 15 U.S.C. 78c(5)(A) (emph. added). A broker is defined as "any person engaged in the business of effecting transactions in securities *for the account of others*." Section 3(a)(4)(A) of the Exchange Act, 15 U.S.C. 78c(a)(4)(A) (emph. added). These statutory definitions "were drawn broadly by Congress to encompass a wide range of activities involving investors and securities markets." Registration Requirements for Foreign

3

Broker-Dealers, Release No. 34-27017, 54 Fed. Reg. 30013, 30015 (July 18, 1989) [EXHIBIT B].[1] Broad definitions of "broker" and "dealer" advance the Exchange Act's investor-protection imperative because it "is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records." *Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th Cir. 1982) (citation and quotation marks omitted); *see also Roth*, 22 F.3d at 1109 (D.C. Cir. 1994).

    1.    <u>What is a Dealer?</u>

Courts and the SEC use conduct-based factors to determine when a person or entity is "engaged in the securities business" and "buying and selling for his own account." *In the Matter of Gordon Wesley Sodorff, Jr.,* Exchange Act Release No. 31134, 1992 WL 224082, at *4-5 (Sept. 2, 1992). "[T]he primary indicia . . . that a person has 'engaged in the business' . . . is that the level of participation in purchasing and selling securities involves more than a few isolated transactions." *Id.* at *4; *see SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 13 (D.D.C. 1998) ("regularity of participation is the primary indicia of being 'engaged in the business'"); *Eastside Church of Christ*, 391 F.2d at 361 (Defendant was a dealer because it purchased many church bonds prior to the ones in question for its own account as a part of its regular business and sold some of them).

The term dealer does not encompass a person who buys or sells securities "not as a part of a regular business," 15 U.S.C. § 78c(a)(5)(B). This is sometimes referred to as the trader

---

[1]    S*ee also* Thomas Lee Hazen, 5 Law of Securities Regulation § 14.54 (May 2019) [EXHIBIT C] (the Exchange Act's "registration requirements, as well as the definitions of broker and dealer, are drafted broadly"); Colby, *Broker-Dealer Regulation*, § 2:2 [Ex. A] ("The courts and the SEC have taken an expansive view of the scope" of the terms "broker," "engaged in the business" and "effecting transactions.").

exception. 67 Fed. Reg. at 67499. The totality of one's activities determines which side of the dealer/trader line one falls. *Id.* The purpose of the trader exception is to "exclude from the definition of 'dealer' members of the public who buy and sell securities for their own account as ordinary traders," even though their trading may involve more than isolated transactions. *Gordon Wesley Sodorff*, 1992 WL 224082, at *5.

A person generally falls on the dealer side of the line when they hold themselves out to a regular clientele as regularly buying and selling securities at an established place of business. Similarly, participating in the sale or public distribution of new issuances of securities is a dealer function. *See* Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, SEC Release No. 34-47364 (Feb. 13, 2003) at *4 ["Bank Exemptions Adopting Release"] [EXHIBIT D]. A trader, on the other hand, does not make a market, render investment advice, extend credit, or lend securities. Nor does a trader function as an underwriter—serving as a conduit for newly issued shares originating from an issuer to land in the hands of investors in the public market. Moreover, when a person's trading profits do not "result from appreciation in the value of the securities," but rather from a markup over the price paid to acquire the securities, this is characteristic of dealer activity as opposed to ordinary trading. *Gordon Wesley Sodorff*, 1992 WL 224082, at *5. *See also* SEC, Staff Study on Investment Advisers and Broker-Dealers at 10-11 (Jan. 2011), http://www.sec.gov/news/studies/2011/913studyfinal.pdf [EXHIBIT E] [Study on Investment Advisers and Broker-Dealers] ("Generally, the compensation in a broker-dealer relationship is transaction-based and is earned through commissions, mark-ups, mark-downs, sales loads or similar fees on specific transactions, where advice is provided that is solely incidental to the transaction.").

5

2.    What is a Broker?

Courts and the SEC also use conduct-based factors to determine whether a person has

engaged in the business of a broker. Like the dealer evaluation, whether one is in the brokerage

business—effecting securities transactions for the account of others—looks at whether the

individual shows "a certain regularity of participation in securities transactions at key points in

the chain of distribution." *SEC v. Benger* 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (*quoting SEC

v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y.2003) (*quoting SEC v. Hansen*, 1984 WL 2413,

at *10 (S.D.N.Y. Apr. 6, 1984)). If the person receives commissions or other transaction-based

compensation in connection with securities transactions and regularly participates in securities

transactions, *those factors weigh heavily* in favor of finding that the person is a broker.[2]

Courts consider other factors as well, including whether: (i) the person is an employee of

the issuer; (ii) is selling or previously sold the securities of other issuers; (iii) solicits investors;

(iv) is involved in negotiations between the issuer and the investor; (iv) makes valuations as to

the merits of the investment or gives advice; and (iv) is an active rather than passive finder of

investors. *SEC v. Benger*, 697 F. Supp. 2d 932, 945-46 (citing *Hansen*, 1984 WL 2413 at *10).

These factors, however, are "not designed to be exclusive," and a court may find a person to be a

broker where only one or a few factors are present. *Id*. at 946 (denying motion to dismiss even

though most factors were not present, where complaint alleged escrow agent received

transaction-based compensation and participated in other aspects of the sales transactions

---

[2]        *See, e.g., SEC v. Crawford*, 861 F.3d 760, 766 (8th Cir. 2017); *SEC v. George*, 426 F.3d 786, 797
(6th Cir. 2005); *SEC v. Margolin*, 1992 WL 279735, at *5 (S.D.N.Y. 1992) (finding Margolin
participated in dozens of transactions for various clients demonstrating "regularity of business activity,
and other brokerage activity such as receiving transaction-based compensation, advertising for clients,
and possessing client funds and securities); *see* Colby, *Broker-Dealer Regulation* §2:2.6 and citations
therein ("In the SEC's no-action guidance and enforcement actions, receiving commissions or other
transaction-related compensation is one of the determinative factors in deciding whether a person is a
"broker" subject to the registration requirements under the Exchange Act.").

between penny stock issuers and investors). The important question is whether the complaint's allegations demonstrate "a certain regularity of participation in securities transactions at key points in the chain of distribution." *Id*. at 945 (quotes and citations omitted).

## III.    FACTS

The SEC's complaint alleges that, between February 2014 and October 2016, David Foley and others engaged in a fraudulent stock distribution and market manipulation scheme involving the stocks of two microcap companies—NTEK and NTGL—under Foley's control. First, Foley caused the companies to issue him over 1 billion shares of stock. He and his wife, defendant Lisa Foley, then orchestrated the sale of those shares, at discounted prices, to River North in dozens of separate transactions brokered by Chavez. Chavez, River North's Director of Business Development, was paid commissions by Foley, River North, and Liceaga (River North's owner and president) on each sale. River North, acting through Liceaga, quickly resold the stock to investors in unregistered transactions and paid some of the sales proceeds back to the Foleys. The Foleys funneled some of the stock sales proceeds back to NTGL and NTEK through bank accounts held in the names of shell companies the Foleys created.[3]

River North, Liceaga, and Chavez now move to dismiss various claims against them:

- Count VII—charging River North with acting as an unregistered dealer and Chavez with acting as an unregistered broker in violation of Section 15(a) of the Exchange Act;

---

[3]     The complaint also charges Foley and others with violating the antifraud provisions of the securities laws by taking part in a scheme that included the fraudulent issuance of convertible notes to Foley as purported compensation, Foley's conversion of these notes into stock which he then sold to River North, Foley's subsequent manipulation of the market for NTEK and NTGL shares with the assistance of Defendant Bennie Blankenship, and Foley's fraudulent inclusion of stock sale proceeds as operating income in the companies' financial statements. The complaint's allegations underlying those charges are not discussed herein because River North, Liceaga, and Chavez are not charged with this fraud, although they certainly were not oblivious to it. (*See* Compl. ¶¶ 73-80, 91) (alleging River North and Liceaga ignored red flags, obtained false attorney opinion letters, and that Foley advised them and Chavez that he was buying stock to prop up "your sale price").

- Count VIII—charging Liceaga and Chavez with aiding and abetting River North's violations of Section 15(a);
- Count IX—charging Liceaga, in the alternative, with liability as a control person for River North's violations of Section 15(a).

River North and Liceaga do not challenge Count I, which charges them with violating Section 5 of the Securities Act for taking part in the illegal, unregistered offering of securities to investors.

More specifically, the SEC's complaint alleges: Foley controlled two publicly traded companies, NTEK and NTGL. (Compl. ¶¶ 24, 31-35, 53-58, 60-71, 75.) Between 2009 and 2015, Foley caused the companies to issue to himself (or to shell companies he created and controlled with Lisa) convertible promissory notes as purported compensation. Beginning in 2014, he began converting those notes into millions of shares of stock. (*Id*. ¶¶ 37-42.) Between 2014 and 2016, Foley, with Lisa's assistance, sold 1.1 billion shares of NTEK stock and 19.1 million shares of NTGL stock to River North at discounted prices. Within a few months after purchasing the stocks, River North, at Liceaga's direction, resold the stock to the public, in unregistered sales, for $17.8 million. (*Id*. ¶¶ 43-52.)

As advertised on its website, River North is primarily engaged in the business of investing in small and micro-cap issuers. From its inception in 2013, River North sought out and purchased penny stocks from holders of convertible debt instruments and thereafter sold those shares to investors over the counter on OTC Link. (*Id*. ¶ 44.) During the time River North and Liceaga did business with the Foleys, River North also purchased securities from 60 other microcap issuers and then resold those stocks. River North acquired more than 9 billion shares from these microcap issuers, and received more than $14 million upon reselling those shares. (*Id*. ¶ 45.)

Chavez was River North's Director of Business Development from April 2014 to January 2106. (*Id*. ¶ 21.) He was responsible for identifying possible debt securities investments,

researching the issuers, and negotiating the terms of potential securities transactions. (*Id*. ¶ 81.) Chavez was previously barred by FINRA from associating as a registered representative with any member broker-dealer firm. (*Id*. ¶¶ 21, 83.) Chavez negotiated substantial discounts on River North's purchases of securities, including its purchases of NTEK and NTGL stock from the Foleys, which he brought to Liceaga and River North. He also confirmed the key terms of each stock sale with the Foleys, obtained the paperwork needed to effectuate the transfer of the shares from the Foleys to River North's brokerage accounts, and provided the Foleys with advance payments from River North with respect to some of these sales. (*Id*. ¶¶ 82-83.) Chavez orchestrated 78 NTEK transactions and 4 NTGL transactions between the Foleys, as sellers, and Liceaga and River North, as buyers. (*Id*. ¶¶ 83.)

Chavez was paid brokers fees and other commissions on each stock sale, plus bonuses based on the profits generated by River North after it resold the stock the public. For each sale Chavez brokered, the Foleys paid him a "broker" fee of 1.95%. (*Id*. ¶ 86.) He also received an additional 5% commission on each sale—called a "finder's fee"—which was to be split evenly by the Foleys and River North. Liceaga paid the entire 5% fee to Chavez, which included the Foleys' 2.5%, by funneling the commissions through a brokerage firm in Nassau, Bahamas, which then transferred the money to Chavez's U.S. bank account (minus an "intermediary broker" fee). (*Id*. ¶¶ 84-85.) Finally, Liceaga paid Chavez a series of bonuses amounting to 20% and 33% of profits received by River North and Liceaga on their subsequent resales of the stock to the public. (*Id*. ¶ 86.)

Over the course of 610 trading days, River North's sales of NTEK stock constituted 26% of the total market volume for NTEK. (*Id*. ¶ 47.) River North generally held in its brokerage account inventory just under 10% of NTEK's outstanding shares. Liceaga did not deposit

additional shares into River North's brokerage account until it had sold enough of its inventory to keep its inventory under 10%. But after some of the purchases from the Foleys, River North actually owned and held in its inventory more than 10% of NTEK's outstanding shares. Liceaga "slowly leaked" NTEK shares into the market to keep River North within 20-30% of NTEK's trading volume so as not to "kill" the stock by dumping all shares at once. (*Id.* ¶¶ 49-50.)

Between March 2014 and September 2016, River North paid the Foleys approximately $12.5 million of NTEK and NTGL stock and sold that stock in unregistered transactions to the public, obtaining approximately $17.8 million in sales proceeds. (*Id.* ¶¶ 46, 105.) After expenses, River North and Liceaga profited $3.4 million, the Foleys profited $4.9 million, and Chavez profited nearly $2.1 million. (*Id.* ¶¶ 105, 109.)

The upshot of the SEC's allegations is that River North and Liceaga participated in an indirect primary offering of securities, in which stock originating from the issuers' control person (Foley) flowed through River North and Liceaga into the hands of unsuspecting investors in unregistered stock sales. In addition to violating Section 5 of the Securities Act by not registering the sales transactions, defendants also violated Section 15(a) of the Exchange Act by not registering as either a dealer (River North) or broker (Chavez). River North is in the business of buying and selling securities for its own account and, therefore, was required to register as a dealer. Chavez was in the business of effectuating securities transactions for the account of others—River North. Both Chavez, River North's Director of Business Development, and Liceaga, River North's owner and president, aided and abetted River North's violations. Liceaga is alternatively responsible for River North's violations as its control person.

## IV.    LEGAL STANDARD

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide the defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (*quoting Iqbal*, 556 U.S. at 678). In applying this standard, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## V.    ARGUMENT

Defendants do not meaningfully dispute that their activities literally meet the statutory definitions for "dealer" and "broker." River North was in the business of buying and selling securities for its own account. During the period in question, River North bought and sold over 10 billion shares of stock from more than 62 different microcap issuers, and then resold those shares to the investing public for over $31 million in profit. (Compl. ¶¶ 45-46.) Chavez does not dispute that he was in the business of buying and selling securities for River North's account. (*Id*. ¶¶ 81-86.) In fact, that was his job as River North's Director of Business Development. (*Id*. ¶ 81.) And each defendant acknowledges that the determination of whether one is a dealer or broker requires consideration of the totality of the circumstances. Yet they ask the court to rule,

as a matter of law, that River North acted as a mere trader of stock, and that Chavez merely "facilitated"—but did not "effectuate"—River North's stock purchases and did not function as a broker. The complaint alleges abundant facts that give defendants "fair notice" of the SEC's claims and that allow the Court "to draw the reasonable inference that [each] defendant is liable for the misconduct alleged." The Court should deny defendants' motions.[4]

### A.    The Complaint Properly Alleges That River North Acted As An Underwriter And Unregistered Dealer When It Bought NTEK And NTGL Securities From The Foleys And Resold Them To The Public.

The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities … for such person's own account." 15 U.S.C. § 78c(a)(5)(A). That definition casts a wide net to cover those who engage in the business of buying and selling securities for themselves. Court decisions, legal treatises, and SEC guidance all consistently establish that whether someone is "in the business of buying and selling securities" is a fact-based inquiry. Indeed, the defendants' own cited authorities confirm as much.[5]

Defendants do not dispute that River North's business was to buy penny stocks from issuers and sell them into the market, which it did on a frequent basis. (Compl. ¶¶ 44-45.) Over

---

[4]    Chavez's argument (ECF 41 at 6) that he merely "facilitated"—rather than "effectuated"—the stock sales between Foley and River North is an exercise in semantics. Courts in the district have used "facilitated" synonymously with "effectuated." *See Benger*, 697 F. Supp. 2d at 945 ("In short, as discussed above, Powers *facilitated* the consummation of the sales. Accordingly, the SEC has pled sufficient facts to state a claim under Section 15(a).") (emph. added); *SEC v. Battoo*, 158 F. Supp. 3d 676, 695 & n. 15 )(N.D. Ill. 2016) (holding that "the [broker] inquiry focuses on whether the alleged broker '*facilitated* the consummation of [securities] sales'" and finding defendant who "*facilitated* investments" was acting as a broker) (quoting *Benger*) (emph. added). It is the substance of the allegations that demonstrates Chavez was acting as a broker.

[5]    *See* ECF 37-1 at 156 (attaching Colby treatise which contains an expansive list of factors for evaluating the dealer-trader distinction, and observes that "[a] person does not have to exhibit all or any given number of these above-listed factors in order to be considered a dealer" and "depends substantially upon all of the relevant facts and circumstances"); ECF 37-2 at 161 (attaching June 26, 1986 SEC Staff No Action Letter (analysis is fact dependent  and determination of status under the Act requires analysis of all securities activities); ECF 37-3 (SEC proposed rulemaking statement) at 172 (same).

roughly two-and-a-half years, and in addition to the stock sales at issue in this case, River North

bought and sold 60 other microcap securities quoted on OTC Link, acquiring more than 9 billion

shares from these issuers and then reselling them to the investing public for more than $14

million. (*Id*.) With respect to the two stocks at issue here, River North bought, at discounted

prices, 1.1 billion shares of NTEK stock and 19.1 million shares of NTGL stock directly from a

control person of the issuers, and then quickly resold those shares on OTC Link in unregistered

transactions through River North's brokerage account, generating $17.8 million from the sales of

those shares. (*Id*. ¶ 46.)

These facts show the requisite "regularity of participation in securities transactions"

*Massachusetts Fin. Servs., Inc. v. Sec. Investor Prot. Corp.,* 411 F. Supp. 411, 415 (D. Mass.),

*aff'd*, 545 F.2d 754 (1st Cir. 1976). River North cannot credibly characterize their activities as

isolated transactions as a matter of law to warrant dismissal of the complaint. Like the facts in

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), the complaint here

alleges that River North's "business model" was predicated on "acquiring client stock and selling

that stock to support operations and earn a profit." *Big Apple Consulting*, 783 F.3d at 809-10.

And again, in the words of the *Big Apple* court, River North purchased the stocks "at deep

discounts pursuant to its contractual agreement" with the Foleys and "then sold those stocks for

profit." *Id.*

The complaint also properly pleads other facts bearing on the dealer analysis. Perhaps the

most important fact alleged is that River North and Liceaga acquired their securities from Foley,

a control person of both companies—securities that had never been introduced into the market

before. When Liceaga resold those securities to the public soon after they acquired them, they

13

were participating in an indirect primary offering and were thus statutory underwriters.[6] *See*
*SEC v. McNamee*, 481 F.3d 451, 453 (7th Cir. 2007) (explaining that persons who acquire
securities from control persons of the issuer and who promptly resell them into the market are
underwriters and the registration requirement therefore applies "to all sales until the shares came
to rest in the hands of *bona fide* investors and for some time thereafter"). The market and
investors, therefore, were deprived of the information they would have received in a registration
statement: *i.e.*, that underwriters were selling securities that they acquired directly from a control
person of the issuer, and that newly issued shares were entering the market for the first time.[7]

Participating in the sale or public distribution of new issuances of securities—*i.e.*
underwriting—is a well-understood function of a dealer. *See* Bank Exemptions Adopting
Release, SEC Release No. 34-47364 (Feb. 13, 2003) at *4. Defendants concede the relevance of
underwriting activity as a factor in determining dealer status. *See* River North Br. at 3, and
Exhibit D (ECF 37-4) (acting as an underwriter is a relevant factor). This allegation thus weighs
heavily in favor of finding that River North acted as an unregistered dealer.

The complaint further alleges that River North carried an inventory of stock and that it
extended credit to the Foleys in connection with the securities transactions. (*See* Compl. ¶¶ 49-
50, 70.) These actions also are indicative of dealer activity. *See* Colby, *Broker-Dealer
Registration*, §2:3.2.

---

[6]     *See* Compl. ¶ 75 (Foley was an affiliate); ¶ 74 (Liceaga obtained attorney opinion letters that
*falsely* represented that River North and Liceaga would not be underwriters because they paid for and
owned the shares for more than one year); ¶ 80 (River North and Liceaga promptly sold NTEK and
NTGL into the market without waiting a year as indicated in the attorney opinion letters); ¶ 76 (NTEK
and NTGL relied on Foleys' note conversions, and the subsequent sale of stock, to fund their operations).

[7]     This is part of the basis for the Section 5 claim against them in Count I, which Defendants
notably have not moved to dismiss.

Defendants claim dismissal of the Section 15(a) charge is required because the SEC did not allege some of the other conduct-based factors courts have cited in prior cases to identify dealers. *See* ECF 37 at 3 (arguing among other things that the complaint does not allege that the defendants advertised as willing to buy or sell, sold securities to customers, carried a dealer inventory, quoted a market, provided investment advice, arranged for the extension of credit, loaned securities to customers, issued or originated securities, acted as an underwriter). This argument fails for several reasons.

First, the conduct-based factors considered in other cases do not function as a checklist. As defendants' own cited authority recognizes, a person's securities activities need not meet all, or even most, of the factors to be considered a dealer. ECF 37-1 at 156 (Colby, *Broker-Dealer Registration*, §2:3.2) ("A person does not have to exhibit all or any given number of these factors in order to be considered a dealer."); *cf. Benger*, 697 F. Supp. 2d at 945-46 (majority of factors not present, but court still found defendant was broker). Second, defendants do not dispute that River North was engaged in the business of buying and selling securities for its own account, nor do they dispute the significant quantity of shares and the frequency of their sales into the market. Third, defendants have misstated the allegations in the complaint. Contrary to their assertions, and as explained above, the complaint <u>does</u> allege facts demonstrating River North acted as an underwriter. (Compl. ¶¶ 31-36, 43-52, 74; *see also McNamee*, 481 F.3d 451, 453 (persons who acquire securities from control persons of the issuer and who promptly resell the securities into the market are underwriters)). It also alleges River North extended credit to the Foleys (*id.* ¶ 70), and that it carried an inventory of stock (*id.* ¶ 49).

Finally, defendants argue (ECF 37 at 5) that the conduct alleged in the complaint shows that River North functioned more as a trader than a dealer. The allegations in the complaint

underscore the meagerness of this argument. River North was not buying and selling securities already in the marketplace at market prices, like traders do. It was negotiating the acquisition, at a discount, of newly issued stock directly from the issuers' control person. Also unlike traders, River North profited from the difference between the discounted price it paid the Foleys and the price at which they subsequently sold the stock into the market (shortly after purchase). The reasonable inference to be drawn from those facts is that River North generates business profits not by purchasing stock in the market and then selling the stock after its market price has appreciated. To the contrary, its profits are derived from its active negotiation of a discounted purchase price with the issuer and its control person, and then quickly reselling the shares to lock in a profit based on the marked-up sales price over the discounted purchase price. Selling securities for a markup is exactly what dealers do. *See Gordon Wesley Sodorff*, 1992 WL 224082 at *5 (Sept. 2, 1992) (finding Sodorff to be an unregistered dealer when "[u]nlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid.")

## B. The Complaint Properly Pleads That Chavez Was An Unregistered Broker Engaged In The Business Of Effecting Securities Transactions For The Account Of Others.

As with the allegations that River North acted as a dealer, the SEC's complaint far exceeds the pleading requirements of Rule 8 in alleging that Chavez acted as an unregistered broker. The Exchange Act defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). As alleged in the complaint and discussed below, it was Chavez's job to effect securities transactions for River North, including in the two penny stocks at issue in this case.

As River North's Director of Business Development, Chavez was responsible for identifying investment opportunities and negotiating terms of securities transactions for River

North. (Compl. ¶ 81.) And River North specialized in searching out and purchasing penny stocks, convertible debt, and aged debt instruments to be sold on OTC Link. (*Id.* ¶¶ 44-45.) And Chavez's conduct was not isolated or sporadic. He brokered 82 separate sales of NTEK stock (1.1 billion shares) and NTGL stock (19.1 million) from the Foleys to River North. (*Id.* ¶¶ 46, 81-83.) Moreover, Chavez was involved at key points in the sales chain from the Foleys to River North. He:

- Negotiated the terms of the stock purchase agreements;

- Obtained substantial purchase price discounts for River North;

- Confirmed key terms of each stock sale with the Foleys;

- Obtained the necessary paperwork for the sales transactions from the Foleys;

- Arranged for the transfer of securities from the Foleys to River North's brokerage account; and

- Assisted the Foleys in obtaining advances from River North in connection with some of these securities transactions.

(*Id.* ¶¶ 81-83.)[8]

And, for each sales transaction, Chavez was paid a "broker" fee and other transaction-based compensation (*Id.* ¶¶ 84-86), which is a "hallmark" of being a broker. *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006); *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005) ("payment by commission" indicates broker status); *Martino*, 255 F. Supp. 2d at 284 (defendants were brokers in part because they "received

---

[8] The requisite "regularity of participation" is shown by such things as the level of activity in the securities markets, a history of selling securities, the volume and price of securities sold, and the number of customers involved. *See, e.g., SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (level of activity); *George*, 426 F.3d at 797 (history of selling securities); *Kenton Capital*, 69 F. Supp. 2d at 12 (dollar amounts sold); *Martino*, 255 F. Supp. 2d at 283-84.

commissions").[9]  The fact that Chavez was <u>also</u> paid a portion (20% to 33%) of River North's profits from its resales of NTEK and NTGL stock to the public (Compl. ¶¶ 4, 86) does not undercut the broker analysis. Rather, it shows how Chavez also profited from his participation in River North's unregistered dealer activities and in the illegal public offering of NTGL and NTEK stock.

In sum, Chavez's participation in the securities transactions, as River North's Director of Business Development, went well beyond performing mere clerical or ministerial tasks. Negotiating terms of sale, and the price to be paid, as well as engaging in steps necessary for the transfer of securities and related funds are all functions at key points in the chain of distribution. The complaint adequately alleges that Chavez brokered the sales of NTGL and NTEK stock from the issuers' control person (Foley) to River North.

Chavez argues that the complaint does not allege that he was an employee of the issuer, that he provided investment advice, or that he actively solicited investors. (ECF 41 at 4-5.) Chavez's cherry-picked list does not undermine the SEC's allegations.[10]  There "is not an exhaustive list of the relevant factors, and no one factor is dispositive." *In the Matter of David F. Bandimere*, Release No. 9972, 2015 WL 6575665, at *8 (Oct. 29, 2015), vacated on other grounds, *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016); *accord Benger*, 697 F. Supp. 2d at

---

[9]     The percentage-based commission that Chavez received reflected his success in his "business of effecting transactions in securities." Section 3(a)(4)(A). Indeed, Chavez's total transaction-based compensation of nearly $2.1 million, *see* Compl. ¶109, was higher than compensation received by other individuals that courts and the Commission have found to have engaged in broker conduct. *See, e.g., Benger*, 697 F. Supp. 2d at 945 (commission calculated as the greater of 1% percent or $5,000); *SEC v. Hansen*, No. 83-3692, 1984 WL 2413, at *2, *11 (S.D.N.Y. April 6, 1984) (15% commission on securities sales totaling $400,000); *SEC v. Rabinovich & Associates, LP*, No. 07-10547, 2008 WL 4937360, at *5-*6 (S.D.N.Y. Nov. 18, 2008) ($92,000 in compensation).

[10]    Chavez also contends (ECF 41 at 5) that the complaint does not allege that he was involved in negotiations between the issuer and the investor. He is wrong. Paragraph 82 of the complaint clearly alleges that he negotiated the stock sales between the Foleys and River North, the investor.

945 (denying motion to dismiss, even though SEC made no allegation that defendant was an employee of the issuer, gave investment advice, or actively solicited investors). The SEC's complaint alleges those factors that are considered "hallmarks" of broker activity or "key" to the broker analysis— transaction-based compensation, regularity of participation in securities transactions, and essential participation in the key points of distribution.

Moreover, being an employee of the issuer, particularly one who solicits investments and receives commissions, may indicate that one is a broker, but employee status is not required.[11] Chavez might not have been responsible for soliciting investors to purchase directly from the issuer, but he certainly was responsible for finding debt securities for River North to purchase. And while the complaint does not allege what kind of advice Chavez provided, he negotiated terms of purchase on behalf of River North and Liceaga, including significant discounts.

Chavez also argues that the complaint "does not allege that Chavez 'received commissions' separate and apart from his employment compensation at River North." (ECF 41 at 4-5.) This argument fails for at least two reasons. First, it is wrong. The complaint clearly alleges the Foleys paid him a 1.95% "broker" fee on each sales transaction. He also received an additional 2.5% commission on each sale from the Foleys, which was remitted to him by River North. (Compl. ¶¶ 84, 86.) Second, Chavez cites no authority requiring that, in order to be considered a broker, the commissions must be paid "separate and apart" from the person's employment compensation. If anything, the fact that River North and Liceaga *also* paid him commissions reinforces—not undermines—his status as a broker.

---

[11] Independent contractors and consultants who solicit investments and are paid commissions frequently are brokers. *See, e.g., George*, 426 F.3d at 797 (non-employee was a broker); *Martino*, 255 F. Supp. 2d at 284 (non-employee with "consulting" agreement with the issuer was a broker); *Hansen*, 1984 WL 2413, at *10-11 (non-employee was a broker); *Benger*, 697 F. Supp. 2d at 945 (non-employee escrow agent was a broker).

Chavez claims he is more like the defendants in three cases where the courts found the party not to be acting as a broker: *SEC v. M&A West, Inc.*, 2005 WL 1514101 (N. D. Cal. 2005) (granting summary judgment to defendant who was not acting as a broker when he was involved with the purchase and sale of shell companies); *SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011) (after a bench trial, court found defendant was not acting as broker where merely brought parties together but did not participate in negotiations or discuss the details of the transactions); and *SEC v. Mapp*, 240 F. Supp. 3d 569 (E.D. Texas 2017) (granting motion to dismiss where defendant did not handle securities, enter trades or otherwise exert any authority over anyone's account). These cases do not help Chavez. First, two of them were decided at later procedural stages—summary judgment and trial. Second, all three cases are easily distinguishable on their facts. In *M&A West*, the defendant matched private companies with public shell companies in order to execute a reverse merger of the private company into the public shell. *M&A West*, 2005 WL 1514101, at *3. He was not buying or selling stock for others. The *M&A West* court granted summary judgment to the defendant, finding that he acted more like a paralegal or lawyer assisting with a business transaction. *Id*. at *9. In *Kramer*, the evidence adduced at trial showed the defendant arranged for a single broker to meet with the issuer and gave the broker a ride from the airport to a meeting with the issuer's president. *Kramer*, 778 F. Supp. 2d at 1340. He also recommended the issuer's stock to a few "intimate friends and family" he had known for decades, but was not involved in any negotiations or stock purchases, which the investors made through their own brokers. *Id*. at 1332-33 and n.32, 1338-40. Similarly, in *Mapp*, although the defendant recruited investors (over a period of less than three weeks), *Mapp*, 240 F. Supp. 3d at 573, he "was neither involved in negotiating price or terms of the transaction nor was he performing any other functions of [a] broker-dealer." *Id*. at 593. Moreover, in none of these cases

were the defendants "authorized to transact for the account of others." *Id*.; *Kramer*, 778 F. Supp. 2d at 1339; *M&A West*, 2005 WL 15114101, at *9.

Chavez's involvement in the stock sales was much more robust. His job was to source and negotiating securities transactions for River North's account, including 82 separate stock purchases involving NTGL and NTEK and over 1.1 billion shares of stock. He participated in keys points of the sales transactions, including negotiating and confirming sale terms, handling paperwork, assisting with the deposit of the shares into River North's brokerage account, and helping the Foleys obtain advances from Liceaga and River North. And, in return, he was paid "broker" fees and other transaction-based compensation on every purchase. In short, he was regularly participating in securities transactions at key points in the chain of distribution for River North. He was acting as a broker.

Chavez essentially asks this Court to engage in a fact-finding exercise that his conduct was more like those found not be brokers, based on the facts established in those cases as though the presence or absence of certain facts or factor are determinative. This is not an appropriate exercise at the pleading stage.

**C.     The Complaint Properly Alleges That Chavez Aided And Abetted River North's Violations Of Section 15(a) For Not Registering As A Dealer.**

Chavez argues that the complaint fails to allege facts sufficient to charge him with aiding and abetting River North's activities as an unregistered dealer. He is wrong.

Section 20(e) provides for aiding and abetting liability for anyone who knowingly or recklessly provides substantial assistance to another in violating the securities laws. *SEC v. Cook*, 2015 WL 5022152 (S.D. Ind. 2015). The elements of an aiding and abetting claim under Section 20(e) are: "(1) there is a primary violation of securities law; (2) the aidor and abettor generally was aware that his actions were part of an overall course of conduct that was improper or illegal;

and (3) the aider and abettor substantially assisted in the primary violation." *SEC v. Ustian*, 229 F. Supp. 3d 739, 776 (N.D. Ill. 2017) (internal quotes and cites omitted). The "awareness" requirement is met by either knowing or reckless conduct. 15 U.S.C. § 78t(e) ("any person that knowingly or recklessly provides substantial assistance to another person in violation of this chapter, or any rule or regulation issued under this chapter, shall be deemed to be in violation of this chapter to the same extent as the person to whom such assistance is provided"). Here, Chavez challenges only the SEC's allegations regarding the second and third elements. The complaint more than adequately pleads these elements.

First, as discussed above, the complaint describes how Chavez substantially assisted in negotiating and completing River North's purchases of over 1.1 billion shares of NTGL and NTEK stock from the Foleys. Those stock sales, completed over the course of two-and-a-half years and 82 separate transactions, are the crux of the SEC's unregistered dealer claim against River North. It defies common sense for Chavez to argue he did not substantially assist River North in buying and selling securities. *See* ECF 41 at 11 ("The phrase 'operating as a dealer' refers to the 'business of buying and selling securities.'") (quoting 15 U.S.C. § 78c(a)(5)). It was Chavez's job to broker the buying and selling of securities between River North and microcap issuers, including NTEK and NTGL. (Compl. ¶¶ 21, 81-86.) There is no question he substantially assisted River North in buying and selling securities for its own account. (*Id.* ¶ 139.)

Second, the complaint also sufficiently alleges that Chavez "generally was aware" that he was assisting River North's improper or illegal conduct. The complaint alleges that Chavez "knowingly or recklessly provid[ed] substantial assistance to River North in violat[ing] [Section 15(a)]." (*Id.*) That is sufficient. *Hefferman v. Bass*, 467 F.3d 596, 602 (7th Cir. 2006) (reversing

district court's dismissal) (holding allegation that "Bass's participation in St. Pierre's fraud was knowing and intentional" was sufficient for aiding and abetting claim). Moreover, the complaint's other allegations back up this allegation. Chavez was barred by FINRA from associating with any member firm. (Compl. ¶¶ 21, 83.) He, therefore, had to check the registration status of any firm that employed him. He was an experienced securities professional who made millions of dollars brokering stock purchases for River North, as its Director of Business Development. (*Id*. ¶¶ 81-86, 109.) Given his disciplinary history and experience in the securities industry, Chavez must have known that River North was not registered. If not, he was reckless in not knowing. Either way, drawing all reasonable inferences in favor of the SEC, these allegations are more than adequate to allege Chavez's general awareness (or at least reckless unawareness) that his actions "were part of an overall course of conduct that was improper or illegal." *Ustian*, 229 F. Supp. 3d at 776.

## D. River North And Liceaga's Remaining Arguments Are Without Merit.

Liceaga seeks to dismiss his aiding and abetting and control person liability on the ground that the complaint insufficiently alleged River North's primary violation. As explained above, the complaint properly alleges River North's primary liability and thus that element of secondary liability has been met. Moreover, just as the complaint adequately alleges that Chavez "generally was aware" that his actions were part of overall conduct that was improper (*supra*, p. 22-23), the complaint's allegations concerning Liceaga's awareness are equally sufficient. (Compl. ¶¶ 19-20, 43-52, 73-80, 139) (alleging, among other facts, that Liceaga "knowingly or recklessly provided substantial assistance" to River North's violations of Section 15(a)). Liceaga does not raise any other challenges to this claim.

Finally, defendants' due process challenge—that they lacked any notice that their activities required dealer registration—is meritless. Their reliance on *Upton v. SEC*, 75 F.3d 92

(2d Cir. 1996), is misplaced. In that case, which was on appeal following a full administrative hearing, "[i]t was undisputed the [respondent] complied with the literal terms of the [SEC] Rule at all times." *Id*. at 95. Nevertheless, he was charged with and found liable, after an evidentiary hearing, of violating the rule based on a new interpretation that, apart from one consent decree carrying "little, if any, precedential weight," had never been communicated to the public. *Id*. at 98.

The facts here are much different. First, this case is at the pleading stage. Second, we are dealing with a federal statute passed by Congress, not agency rule. Third, the relevant language requiring dealers to register, including Congress's definition of the term "dealer," have been subject to prior interpretation by courts, the SEC, and legal scholars. *See SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968); *SEC v. Offill,* 2012 WL 246061 (N.D. Tex. Jan. 26, 2012); *In the Matter of Gordon Wesley Sodorff, Jr.,* Exchange Act Release No. 31134, 1992 WL 224082 (Sept. 2, 1992); *In the Matter of Ironridge Global Partners, LLC*, Securities Exchange Act of 1934 Rel. No. 75272, 2015 WL 3862868 (June 23, 2015) (instituting proceedings under Section 15(b) against unregistered dealer in connection with its serial underwriting activity, providing related investment advice, and receiving and selling billions of shares in connection with self-described financing services for domestic microcap issuers); *United States v. Coscia*, 866 F. 3d 782, 793 (7th Cir. 2017) (in denying due process challenge to "spoofing" statute, appellate court held that "Congress provided the necessary definition [of spoofing] and, in doing so, put the trading community on notice").

Defendants had fair notice of the dealer registration laws, as well as how those laws are being interpreted by courts, the SEC, and others. They have not been denied due process.[12]


Date: July 12, 2019

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

  /s/ Daniel J. Hayes
Daniel J. Hayes (hayesdj@sec.gov)
Robert M. Moye (moyer@sec.gov)
Richard G. Stoltz (stoltzr@sec.gov)
Christine B. Jeon (jeonc@sec.gov)
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*

---

[12] There is no scienter requirement for violations of Section 15(a). *See SEC v. Holschuh*, 694 F.2d 130, 137, n.10 (7th Cir. 1982); *SEC v. Randy*, 38 F. Supp. 2d 657, 667 (N.D. Ill. 1999). Thus, defendants need not know that their actions actually violated the law.

<u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that, on July 12, 2019, he served copies of the

foregoing document on all counsel of record by filing it with the Court's CM/ECF system, which

will automatically send copies to all counsel of record.


s/Daniel J. Hayes