# EXHIBIT D

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 2 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

Release No. 47364 (S.E.C. Release No.), Release No. 34-47364, 79 S.E.C. Docket 1838, 2003 WL 328058

17 CFR Part 240

S.E.C. Release No.

Securities Exchange Act of 1934

**DEFINITION** OF **TERMS** IN AND SPECIFIC **EXEMPTIONS** FOR **BANKS**, **SAVINGS** ASSOCIATIONS, AND **SAVINGS BANKS** UNDER **SECTIONS 3**( **A**) ( **4**) **AND 3**( **A**)( **5**) OF THE **SECURITIES EXCHANGE ACT OF 1934**

File No. S7-41-02

RIN 3235-AI19

February 13, 2003

**\*1 AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission is adopting amendments to its rule granting an exemption to banks from dealer registration for a de minimis number of riskless principal transactions, and to its rule that defines terms used in the bank exception to dealer registration for asset-backed transactions. The Commission also is adopting a new exemption for banks from the definition of broker and dealer under the Securities Exchange Act of 1934 for certain securities lending transactions. In addition, the Commission is extending the exemption from rescission liability under Exchange Act Section 29 to contracts entered into by banks acting in a dealer capacity before March 31, 2005. These rules address certain of the exceptions for banks from the definitions of "broker" and "dealer" that were added to the Securities Exchange Act of 1934 by the Gramm-Leach-Bliley Act.

**DATES:** Effective Date: [insert date 30 days after date of publication in Federal Register]
Compliance Date: September 30, 2003.

**FOR FURTHER INFORMATION CONTACT:** Catherine McGuire, Chief Counsel; Lourdes Gonzalez, Assistant Chief Counsel; or Linda Stamp Sundberg, Attorney Fellow; (202) 942-0073, Office of the Chief Counsel, Division of Market Regulation, Securities and Exchange Commission, 450 5th Street, NW, Washington, DC 20549-1001.

**SUPPLEMENTARY INFORMATION:** The Securities and Exchange Commission ("Commission") is adopting amendments to Rules 3a5-1 [17 CFR 240.3a5-1], 3b-18 [17 CFR 240.3b-18], and 15a-8 [17 CFR 240.15a-8] under the Securities Exchange Act of 1934 ("Exchange Act"). The Commission also is adopting an exemption from the definitions of "broker" and "dealer" for banks engaging in securities lending transactions pursuant to new Exchange Act Rule 15a-11 [17 CFR 240.15a-11].

**Table of Contents**

I.         Introduction

II.        Temporary Exemption from the Definition of "Dealer"

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 3 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

**III.      General Comments on the Proposed Amendments**

**IV.      Dealer Activities and the Dealer/Trader Distinction**

**V.      Discussion of Comments and Adoption of "Dealer" Rules**

  **A. Rule 3a5-1 — the De Minimis Exemption for Riskless Principal Transactions**

    **1. Discussion of Comments Received on the Amendment to Rule 3a5-1 — the De Minimis Exemption**

    **2. Amendment to Rule 3a5-1 — the De Minimis Exemption**

  **B. Rule 3b-18 — Definition of Terms Used in Asset-Backed Transaction Exception to Dealer Registration**

    **1. Discussion of Comments Received on the Amendment to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

    **2. Amendment to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

  **C. Rule 15a-11 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions**

    **1. Discussion of Comments Received on the Amendment to Rule 15a-11 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions**

    **2. Amendment to Rule 15a-11 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions**

  **D. Definition of "Qualified Investor"**

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 4 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

**E. Temporary Exemption**

**1. Discussion of Comments on the Temporary Exemption**

**2. Adoption of Temporary Exemption and Effective Date of Dealer Rules**

**F. Extension of Rule 15a-8 — Section 29 Liability Exemption**

**VI.    Procedural Matters**

**A. Paperwork Reduction Act**

**B. Consideration of Comments on Benefits and Costs**

**1. Benefits**

**2. Costs**

**C. Consideration of Burden on Competition, and on Promotion of Efficiency, Competition, and Capital Formation**

**D. Regulatory Flexibility Act Certification**

**Statutory Authority**

**Text of Rules and Rule Amendments**

**I. Introduction**

**\*2** On October 30, 2002, the Commission proposed amendments to the Interim Final Rules [1] ("the Rules") under the Exchange Act concerning the definition of "dealer." [2] Today, the Commission adopts these "dealer" rules substantially as proposed with some technical amendments to the exemptions in response to comments received. In addition, the Commission is, by separate order, extending the banks' temporary exemption from the definition of dealer until September 30, 2003. Finally, the Commission is amending Rule 15a-8 to give practical effect to the exemption from rescission liability under Exchange Act Section 29 on contracts entered into by banks in a dealer capacity for a finite transition period until March 31, 2005. This exemption was previously adopted, subject to comment.

The Commission previously adopted Exchange Act Rules 3a5-1, 3b-18, and 15a-8 on May 11, 2001 as part of the Rules, which were designed to implement the specific transactional exceptions for banks from the definitions of "broker" and

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 5 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

"dealer." The definitions of "broker" and "dealer," in Exchange Act Sections 3(a)(4) and 3(a)(5), respectively, were amended by the Gramm-Leach-Bliley Act ("GLBA"). [3]

Among other things, the GLBA provided for functional regulation of securities activities by eliminating the complete exception for banks from the definitions of "broker" and "dealer" and replacing them with specific transaction-based exceptions. Before the GLBA amendments, Sections 3(a)(4) and 3(a)(5) of the Exchange Act provided that the terms "broker" and "dealer" did not include a "bank." [4] Accordingly, banks [5] that engaged in securities activities were excepted from the requirement to register as broker-dealers under the Exchange Act. [6] The amended statutory definitions create eleven "broker" and four "dealer" exceptions for banks.

In response to interpretive questions as well as industry-specific concerns, the Commission adopted the Rules on May 11, 2001 to give the banking industry guidance on the parameters of these new bank exceptions. Although the GLBA became law in November 1999, these amended statutory definitions had a delayed effective date of May 12, 2001. Because the exceptions from the definition of "broker" and "dealer" are exceptions to the Exchange Act, the Commission is statutorily charged with interpreting them. The Rules were designed to provide guidance by defining certain key terms used in the new statutory exceptions and provided additional exemptions from the definition of "broker" and "dealer" for banks that were engaged in certain types of securities transactions. Although the Rules were adopted as interim final rules, the Commission specifically solicited public comment on them.

The amendments we are adopting today generally are limited to certain of the "dealer" exceptions under GLBA. While there are four statutory dealer exceptions, these amendments only define terms used in one of them — the exception for asset-backed transactions. These amendments also make the counting of riskless principal transactions more flexible under the de minimis exemption and create a new exemption for securities lending transactions, which will be all exception to the definitions of both broker and dealer for qualifying transactions.

 **3** Congress believed that, given the expansion of the activities and affiliations in the financial marketplace, functional regulation was important in building a coherent financial regulatory scheme. [7] The Commission supported modernizing the legal framework governing financial services consistent with a system of functional regulation to ensure that investors purchasing securities through banks received the same protections as when they purchased securities through registered broker-dealers. [8]

## II. Temporary Exemption from the Definition of "Dealer"

In order to give banks time to ensure that their securities transactions conform to the requirements of the GLBA, the Rules included a temporary exemption that effectively extended the general bank exception from broker-dealer registration. [9] To further accommodate the industry's continuing compliance concerns, the Commission delayed the effective date of the bank "dealer" rules through a series of orders that ultimately extended the temporary exemption to February 10, 2003. [10] Concurrently with issuing this Release, the Commission is issuing an additional Order extending the temporary exemption from the effective date of the bank "dealer" rules through September 30, 2003. [11]

## III. General Comments on the Proposed Amendments

We received 12 comments on the proposed amendments to the Rules relating to the definition of "dealer" for banks and the proposed exemption for securities lending. [12] These comments were from two banks, five bank associations, a coalition of banks, the general counsels of the federal banking agencies, the state securities administrators' association, a pension fund, and one unknown person. [13]

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 6 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

Generally, the commenters supported the efforts of the Commission and its staff in listening to the concerns of the banking industry, making the dealer rules more flexible, and making banks' compliance with the dealer rules easier. [14] Several commenters also generally praised the Commission and its staff for proposing the securities lending exemption to provide banks with greater legal certainty in connection with their activities as custodians, clearing agents, and noncustodial agents or intermediaries, and in facilitating securities lending and borrowing transactions. [15]

The General Counsels of the Federal Reserve, the OCC, and the FDIC ("the General Counsels") stated that they appreciate the efforts of the SEC reflected in the proposed rules as well as the opportunity provided to discuss how the Interim Final Rules would affect the activities and customer relationships of banks. [16]

Finally, one commenter noted that the proposing Release included a discussion of the background of the GLBA. [17] This commenter acknowledged that the primary purpose of the federal securities laws is to protect investors and that the primary purpose of the federal banking laws is to protect the solvency of banks. The Commenter, however, stated that federal banking laws, "implement the banking laws' purpose of protecting investors." [18]

 **\*4** We note, however, that the federal securities laws are unique in providing a comprehensive, uniform, and coordinated system of regulation of securities activities under the oversight of a single expert regulator with the protection of investors as its overarching purpose. [19]

The remainder of the comments dealt with specific issues related to the proposal and will be discussed in connection with the final rules, below.

### IV. Dealer Activities and the Dealer/Trader Distinction

Exchange Act Section 3(a)(5) defines a "dealer" generally as a person that is "engaged in the business of buying and selling securities" for its own account through a broker or otherwise, and excepts persons, whether banks or non-banks, who do not buy or sell securities "as part of a regular business." [20] Therefore, banks, like other active participants in the securities markets need not register unless they satisfy these criteria.

As developed over the years, the dealer definition has been interpreted to exclude "traders." The dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of inventory (or participate in the sale or distribution of new issues, such as by acting as an underwriter [21] ), and generally provide liquidity services in transactions with investors (or, in the case of dealers who are market makers, for other professionals). [22]

The question of whether a bank acts as a "dealer" that must register with the Commission therefore turns upon a two-stage analysis. The first stage of the analysis, which is the general "dealer/trader" distinction, [23] focuses on two factual questions: (1) whether the bank is "buying and selling securities" for its own account; and (2) whether the bank is "engaged in the business" of that activity "as part of a regular business." A bank would not be a dealer unless both of those factual tests are met. The second stage of the analysis focuses on whether the bank can take advantage of bank-specific transactional exceptions or exemptions from the definition of dealer. If all of the bank's securities activities fall within one or more of those bank-specific exceptions or exemptions, the bank does not have to register as a broker-dealer.

We received two comments on the dealer/trader analysis that we set forth in the proposing Release. [24] One commenter stated: "The Release also recognized the customary distinction under the securities laws between a 'dealer' and a 'trader,' observing that 'banks may have a legitimate need to, on occasion, lend or borrow securities on their own behalf for

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 7 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

hedging or for other reasons' and that, in such circumstances, 'they should be subject to the same dealer/trader distinction that applies to all other market participants.' We agree wholeheartedly with all of these statements." [25]

**\*5** Our dealer/trader discussion was meant to give guidance on the underlying principles that should be applied to any factual situation. [26] The question of whether a bank acts as a dealer under the securities laws is entirely separate from the question of whether it acts as a dealer under the banking laws, and it is possible for a bank to be a "dealer" under the securities laws but not under the banking laws. A bank therefore should look to the securities laws and the Commission's rules and interpretations in conducting its analysis under the Exchange Act. [27]

The other commenter asked whether the failure to meet a condition of a statutory exception or Commission exemption was sufficient reason to presume dealer activity. [28] A bank has flexibility when it analyzes whether its securities activities would require it to register with the Commission as a dealer. As we stated in the proposing Release, as an analytical matter, a bank may opt first to consider whether its proprietary securities purchases and sales cause it to be "engaged in the business" of buying and selling securities for its own account "as part of a regular business." If the bank meets that part of the test, then the bank would have to consider whether those securities activities fall within one of the bank-specific transaction exceptions or exemptions from the dealer definition in Exchange Act Section 3(a)(5). Alternatively, a bank may simply analyze whether its proprietary securities purchases and sales fall within an exception or exemption from Section 3(a)(5). If all of the bank's securities activities fall within one or more exceptions or exemptions from the dealer definition, then the bank could avoid having to determine separately whether it satisfies the "engaged in the business" component of the definition. A bank that relies on a transaction exception or an exemption must meet all of the terms of that exception or exemption in order to claim it.

Finally, we note that our analysis of what constitutes "dealer" activity has not changed for persons that are not banks merely because banks have specific transactional exceptions and exemptions. These bank exceptions and exemptions provide banks with legal certainty for transactions conducted in accordance with the terms of these exceptions and exemptions. The bank-specific exceptions and exemptions from the definition of "dealer" for specific products or transactions are independent of the question of whether a person would satisfy the general definition of "dealer" in the first instance.

In general, the bank dealer exceptions apply to transactions in specified products and contain limiting conditions. Some of these bank exceptions and exemptions are more restrictive than others. For example, while some bank dealer exceptions permit a bank to buy and sell securities, the asset-backed transactions exception only permits a bank to issue and sell securities through a grantor trust or other separate entity to qualified investors. [29] In addition, the investment transactions exception only permits the bank to buy or sell securities "for investment purposes" for its own account or in the accounts for which it acts as a trustee or fiduciary. [30]

**\*6** In sum, as a bank considers its securities activities, it must evaluate the totality of these activities to determine if they are permissible under banking law, meet the definition of dealer (or broker) activities under the securities laws, and are excepted or exempted from the dealer (or broker) registration requirements under the Exchange Act. [31]

### V. Discussion of Comments and Adoption of "Dealer" Rules

The GLBA provides four exceptions to banks from the definition of "dealer." Each of these exceptions permits a bank to act as a dealer with respect to specified securities products if the bank complies with the enumerated statutory conditions. The GLBA bank "dealer" exceptions are outlined briefly below. [32]

☐ Investment transactions: permits banks to buy and sell securities for investment purposes for the bank and in its customers' trustee and fiduciary accounts.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 8 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

☐ Permissible securities transactions: permits banks to buy and sell exempted securities, certain Canadian government obligations, and Brady bonds.

☐ Identified banking products: permits banks to buy and sell certain "identified banking products," as defined in Section 206 of the GLBA.

☐ Asset-backed transactions: permits banks through a grantor trust or other separate entity to issue and sell to qualified investors certain asset-backed securities representing obligations predominantly originated by a bank, an affiliate of the bank other than a broker-dealer, or a syndicate in which the bank is a member for some types of products.

With respect to the "dealer" exceptions, the Rules defined terms found in the asset-backed transactions exception and provided an exemption for a de minimis number of riskless principal transactions. In the proposing Release, we proposed amendments to those definitions as well as to the exemption for a de minimis number of riskless principal transactions. We also proposed a new exemption for securities lending transactions. The changes we have made in response to comments are discussed below.

**A. Rule 3a5-1 — the De Minimis Exemption for Riskless Principal Transactions**

In the Rules, the Commission provided an exemption that permits riskless principal transactions [33] as well as brokerage transactions to be counted under the 500-transaction limit. [34] The proposed amendment would permit a riskless principal transaction, even if it involves two separate counterparties, to count as only one transaction against the annual 500-transaction limit.

**1. Discussion of Comments Received on the Amendment to Rule 3a5-1 — the De Minimis Exemption**

Only two commenters addressed this exemption. [35] Both commenters commended the Commission for proposing to count the buy and sell components of a "riskless principal" transaction as one transaction for purposes of the de minimis exemption. [36]

**2. Amendment to Rule 3a5-1 — the De Minimis Exemption**

After considering the comments, we are adopting this amendment without substantive change. [37] We believe that this amendment will simplify the rule and make it easier for banks to understand and apply its terms to a small annual number of riskless principal securities transactions. Thus, under Rule 3a5-1, a riskless principal transaction, even if it involves two separate counterparties, would count as only one transaction against the annual 500-transaction limit. [38]

**B. Rule 3b-18 — Definition of Terms Used in Asset-Backed Transaction Exception to Dealer Registration**

**\*7** The GLBA asset-backed exception provides that a bank may engage in the issuance or sale to qualified investors, through a grantor trust or other separate entity, of securities backed by or representing an interest in notes, drafts, acceptances, loans, leases, receivables, other obligations (other than securities of which the bank is not the issuer), or pools of any of these obligations predominantly originated by the bank, an affiliate of the bank other than a broker-dealer, or a syndicate in which the bank is a member. [39] As we explained when we adopted the Rules, this statutory exception only allows banks to issue and sell asset-backed securities to qualified investors through a grantor trust or

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 9 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

other separate entity. It does not allow banks to <u>deal in</u> asset-backed securities. In other words, this exception is not broad enough to permit banks to regularly purchase and sell these securities in the secondary market. [40]

Exchange Act Rule 3b-18 defines terms used in the asset-backed transactions exception to clarify the parameters of this exception. In particular, Rule 3b-18 defines the terms: "affiliate," "consumer-related receivable," "member of a syndicate of banks," "obligation," "originated," "pool," "predominantly originated," and "syndicate of banks." After consulting the banks that engage in this business and considering their business practices, we proposed amendments to some of the definitions of terms used in the asset-backed transactions exception.

In particular, we proposed expanding the definition of "originated" in Rule 3b-18(e) by considering obligations that a bank initially approves and underwrites, or agrees to purchase, to be "originated" by the bank as long as the bank meets two conditions. First, the obligation must conform to the bank's underwriting standards or be evidenced on the bank's documents. This requirement is intended to ensure that the bank and the entity from which it obtains the loan have an established arrangement prior to the time the loan is made to either use the bank's underwriting standards or documentation prepared by the bank. Second, the bank must fund the obligation in a timely manner, not to exceed six months after the obligation is created.

As we explained in the proposing Release, a bank should be able to use loan origination channels such as automobile dealers, mortgage companies, and other banks, even though the bank does not "make and fund" the obligation at the exact time that the obligation is created. Conversely, a bank that purchases an obligation that does not meet the conditions of this exemption would not have "originated" the particular obligation for the purpose of meeting the test that the obligations in the pool backing an issuance of securities were predominately originated by the bank and its affiliates.

Rule 3b-18(g) defines "predominantly originated" so that a bank may engage in the issuance or sale of asset-backed securities without registration as a dealer if at least 85% of the obligations underlying the securities were originated by the bank or its affiliates, other than its broker-dealer affiliates, or any permitted syndicate of which the bank is more than an insignificant member. Specifically, the bank, its affiliates, or any such syndicate must have originated 85% of the obligations in any pool as measured by the value of the obligations. We did not change the 85% requirement for the purpose of the asset-backed transaction exception. To enhance clarity, however, we proposed a change to the definition of "predominantly originated" in Rule 3b-18(g) to expressly set forth the meaning of the term in the context of a syndicate of banks. Thus, the banks, and their affiliates other than broker-dealer affiliates, participating in any such syndicate must have originated 85% of the obligations in any pool as measured by the value of the obligations. We received no comments on this change.

 **8**  To enhance clarity, we also proposed to substitute two separate definitions for the definition of "member of a syndicate of banks" found Rule 3b-18(c). In particular, we first proposed to define "member" as it relates to the term "syndicate of banks" in proposed Rule 3b-18(c) to make clear that the individual banks and their affiliates other than their broker or dealer affiliates, originate the obligations, rather than the syndicate. This change recognizes that the syndicate of banks only comes together to issue and sell the obligations. Second, we proposed to modify the definition of "syndicate of banks" in Rule 3b-18(h) to mean a group of banks that acts jointly, on a temporary basis, to issue securities backed by obligations originated by each of the individual banks and their affiliates other than their broker or dealer affiliates.

We proposed to keep the requirement found in Rule 3b-18(c) that when a syndicate of banks issues asset-backed securities through a grantor trust or other separate entity, each bank and its affiliates other than its broker or dealer affiliates selling the securities, and thus acting as a dealer in the transaction, must have originated at least 10% of the value of the pool of obligations backing the securities. This 10% requirement is applicable only to the bank or banks that actively sell the securities backed by the pool because these are the only banks that need to use an exception from the definition of

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 10 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

dealer. [41] We believe that it is reasonable as well as in accordance with the legislative history to retain this requirement for the bank or banks that need the exception because they sell the securities secured by the pool of obligations originated by banks that are members of a syndicate of banks. We did, however, propose a change to the rule to clarify that the affiliates of the banks other than broker or dealer affiliates also may originate the obligations.

**1. Discussion of Comments Received on the Amendment to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

We received four comments regarding the proposed amendments to Rule 3b-18. [42] One commenter supported the proposed amendments and specifically agreed with our clarification of when a bank "predominantly originates" obligations. [43] One commenter stated that requiring a bank to originate at least 85% of the loans under an asset-backed transaction is likely to be a barrier to community banks' ability to sell loans on the secondary market and recommended that we adopt a definition that would allow a bank to originate only a simple majority (i.e. 51%) of the underlying loans. [44]

Two commenters stated that the use of the term "initially" in the definition of "originate" could be interpreted to require a correspondent bank to enter into a firm contractual commitment to sell a loan prior to funding for the loan to be considered "originated" by the bank utilizing the asset-backed transactions exception. [45] These commenters suggested eliminating the word "initially" or changing the term "provided that" to "as evidenced by" to indicate that the test would be met by fulfilling the conditions. Alternatively, they suggested that the Commission provide guidance as to the meaning of "initially approving and underwriting" and "initially agreeing to purchase" to clarify when the approval or agreement must be in place and whether a contractual commitment must be in place to fund a loan for the loan to be considered originated by the purchasing bank.

**2. Amendments to Rule 3b-18 — Definition of Terms Used in Asset-Backed Exception to Dealer Registration**

**\*9** In the proposing Release, we noted we had been informed that very few banks issue and sell asset-backed securities without employing a registered broker-dealer. Indeed, we had identified only two banks that conduct this business without a broker-dealer. Although we requested comment on whether any additional banks engage in issuing and selling asset-backed securities without utilizing a broker-dealer, we received no comments on this question.

Based on the comments received, we expect that the amendments we are adopting will permit the banks that currently issue and sell asset-backed securities directly to continue to do so under the terms of the exception without having to employ a broker-dealer. Thus, while not necessarily covering all hypothetical business practices, the proposed amendments appear to accommodate current business practice. We are, therefore, adopting the definitions as proposed.

Although we are sensitive to the concerns expressed by the two commenters regarding the definition of "originated," we continue to believe that to meet the test of having "originated" a loan, a bank must have some established relationship to the entity making the loan at the time the loan is initially made. The proposed definition does not require the bank to have a binding contractual relationship with the person making the loan at the time the loan is made. Rather, the rule requires the bank to have some established relationship to the entity making the loan. In addition, the loan must be made using the underwriting standards of the bank. We believe the proposed definition of the term "originated" permits a bank to have some flexibility in the way that it structures its relationship to the borrower and to the person who deals directly with the borrower. We believe that the proposed definition of the term "originated" appropriately balances the needs of banks for flexibility while also giving effect to the statutory requirement that the bank and its affiliates predominantly originate the loans backing the securities.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 11 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364....

With respect to the 85% test, as we explained in the proposing Release, we included this requirement to define "predominantly originated" because the test closely tracks the language of the statute. [46] We did not propose changing this test, and only one trade group urged us to relax this requirement. Because the definition closely tracks the statutory provision, we are retaining the current test.

We received no comments on the technical, clarifying changes that we proposed. First, we revised the definition of "predominantly originated" in Rule 3b-18(g) to expressly set forth the meaning of the term in the context of a syndicate of banks. Second, we substituted the definitions of "member" as it relates to the term "syndicate of banks" for the definition of "member of a syndicate of banks" found in Rule 3b-18-(c). Third, we proposed a change to Rule 3b-18(c) to clarify that the affiliates of banks other than broker-dealer affiliates, also may originate the obligations in a pool of obligations issued by a syndicate of banks. We are adopting each of these amendments without substantive change. [47]

## C. Rule 15a-11 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions

 **\*10**  Institutional investors often place securities in custody with banks. These custodian banks effect and administer securities loans in return for an agreed fee. Banks also may engage in securities lending transactions when they do not have custody of the securities. A non-custodial securities lending arrangement permits a customer to divide custody and securities lending management between two expert entities. For example, a custodian may be selected for efficiency and low cost, while a lending agent may be selected for its ability to maximize the profitability of the portfolio.

Although banks play a role in both custodial and non-custodial securities lending transactions, the GLBA bank exceptions to the definitions of broker and dealer provide only one exception for securities lending and borrowing transactions. Exchange Act Section 3(a)(4)(B)(viii) addresses securities lending by custodian banks as an exception to the definition of broker. [48]  Under paragraph (cc) of this section, a bank is permitted, without being considered a broker, to effect securities lending or borrowing transactions by custodian banks with or on behalf of customers in two situations: (1) as part of the services provided to safekeeping and custody customers; and (2) when facilitating the transfer of funds or securities as a custodian or a clearing agency in connection with the settlement of customers' transactions in securities.

We proposed the exemption in Rule 15a-11 in part because we had been advised that the existence of this limited statutory bank exception from the definition of broker creates uncertainty for banks that may engage in securities lending, or borrowing transactions without having custody of the underlying securities or in situations where a bank might meet the definition of dealer under the securities laws. To provide legal certainty to banks engaging in securities lending transactions, we proposed to add an exemption from the definition of broker for banks engaging in non-custodial securities lending activities as well as an exemption from the definition of dealer for banks engaging in certain custodial and non-custodial securities lending activities. This exemption was also intended to enhance legal certainty for banks that have custody of collateral or that have custody of the securities subject to a lending arrangement for less than the entire period of the stock loan.

Industry representatives advised our staff that banks' primary role in securities lending transactions, whether operating with or without custody of the securities, is to act in an agency capacity. [49]  Less frequently, banks may engage in securities lending as principal while acting as a conduit between the parties. [50]  We did not propose extending the securities lending exemption to a bank borrowing securities for, or lending from, its own accounts, except as a conduit lender. For the purposes of this exemption, we proposed to define the term conduit lender as a bank that borrows (or loans) securities, as principal, for its own account, and contemporaneously loans (or borrows) the same securities, as principal, for its own account. [51]  When banks conduct conduit transactions, they are conducting principal transactions that involve principal risk, including reliance by the counterparty on the creditworthiness of the bank. [52]  We proposed that a bank that qualifies

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 12 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

under our definition of a conduit lender at the commencement of a transaction would continue to qualify as long as the original securities lending transaction remains outstanding, even though substitutions of collateral may occur on the securities borrowing side of the transaction.

 **\*11**  The proposed exemption required a written securities lending agreement, which would be any contract to conduct securities lending transactions on behalf of a qualified investor. In connection with a securities lending transaction, a bank may select and negotiate with a borrower and execute, or direct the execution of, the loan with the borrower; receive, deliver, or take custody of loaned securities; receive, deliver, or take custody of collateral; provide mark-to-market, corporate action, recordkeeping or other services incidental to the administration of the securities lending transaction; reinvest, or direct the reinvestment of, cash collateral; or indemnify the lender of securities with respect to various matters.

We proposed to limit the exemption to transactions with "qualified investors," as defined in Exchange Act Section 3(a) (54). [53]  We proposed a requirement that a bank deal with a qualified investor on both sides of the transaction as a condition of this exemption because we are making this exemption available for banks' current securities lending business. Broker-dealers are currently the most frequent borrowers of securities. We understand that borrowers of securities that are not qualified investors do not directly borrow securities from noncustodial banks. Any borrowers of securities that do not meet the qualified investor test generally borrow securities through intermediaries that would be qualified investors.

In the proposing Release, we specifically acknowledged that engaging in securities lending transactions involves taking risks that require effective internal controls, and highlighted the fact that we were not proposing a requirement that banks meet the conditions that are applicable to broker-dealers engaging in stock lending. We proposed an exemption for banks because we believe that it will assist institutional investors in obtaining stock loan services from banks that do not act as their custodians and because it would cause less disruption to the market if banks were permitted to continue to engage in these transactions.

**1. Discussion of Comments Received on the Amendment to Rule 15a-11 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions**

Several commenters strongly supported the Commission for proposing the adoption of the exemption for securities lending to allow banks to continue engaging in custodial and non-custodial securities lending activities. [54]

One of these commenters specifically urged the Commission to adopt the securities lending exemption to provide banks with greater legal certainty in connection with their activities as custodians, clearing agents, and noncustodial agents or intermediaries, and in facilitating securities lending and borrowing transactions. [55]  The same commenter also stated that by confirming that banks may engage in securities lending transactions regardless of whether they are also custodians or clearing agents, the proposed exemption will help ensure that institutional investors can continue to "unbundle" securities lending services from other bank services and obtain such services in the manner that best addresses their needs. [56]

 **\*12**  The General Counsels, however, expressed the view that an SEC-granted exemption for non-custodial agency activities is unnecessary because the custody exception in Exchange Act Section 3(a)(4) is sufficiently broad to encompass situations where a bank acts as a non-custodial agent in securities lending transactions. [57]  They stated that the statute "protects securities lending services that a bank provides as agent and 'as part of' the bank's custodial and safekeeping activities. They also stated that both the custodial and non-custodial securities lending services offered by banks have grown out of, and remain integrally related to, the custody business of banks and, thus, are offered 'as part of' customary custody services." [58]

We disagree with the interpretation of the Exchange Act bank exceptions advanced in this comment letter. The exceptions found in the GLBA and the additional exemptions granted by the Commission apply to specific, qualifying transactions

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 13 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

that permit banks to engage in these transactions without having to register as broker-dealers under the securities laws. The exceptions found in the GLBA and the additional exemptions granted by the Commission are limited by their terms to the transactions listed and do not extend to transactions that are related, incidental, or the economic equivalent of the transactions listed in an exception or exemption. They are also not activity-based exceptions and exemptions that should be read to include any related transactions that might be performed by the same employees that engage in transactions that are covered within the terms of the exceptions or exemptions.

Specifically, paragraph (cc) of Exchange Act Section 3(a)(4)(B)(viii) limits securities lending to two situations. [59] A bank is permitted, without being considered a broker, to effect securities lending or borrowing transactions: (1) as part of customary banking activities provided to safekeeping and custody customers; and (2) when facilitating the transfer of funds or securities as a custodian or a clearing agency in connection with the settlement of customers' transactions in securities as part of customary banking activities.

In response to the exemption we proposed, General Counsels advanced a general argument that no securities lending exemption was necessary, except with respect to conduit transactions. This argument fails to address the limits that Congress imposed on securities lending transactions within the custody exception, or to give effect to all of the terms found in the statutory provisions. Thus, we believe that this argument disregards the plain meaning of the statute.

Moreover, the argument advanced by the General Counsels, even if we were to accept it, would not give banks legal certainty for engaging in securities lending transactions because the argument fails to address all of the uncertainty that banks have identified. For example, their interpretation would only permit a bank to be excepted from the definition of broker without having custody of the underlying securities when it invests cash collateral pledged in connection with a securities lending transaction. Their interpretation would not address any other actions the bank might take in connection with the securities lending transaction, and also would not address any transactions that would not be excepted from the bank definition of dealer. In contrast, we believe that our interpretation gives effect to all of the statutory provisions, and that the exemption we are adopting will permit banks to continue to engage in securities lending transactions with the legal certainty they requested.

**\*13** Two commenters agreed with limiting the exemption to transactions with qualified investors. [60] In particular, a pension fund in support of the exemption stated that: "[a]s a supplier of securities for lending, CalPERS believes that a leveling of the playing field for non-custodial banks should lead to increased competition between custodial and non-custodial banks, expanded liquidity, greater trading efficiencies, and lower borrowing and execution costs. As a major institutional investor, CalPERS believes the limitation of the exemption to 'qualified investors' ensures that the regulatory gap between banking law (concerned about bank solvency) and securities law (concerned about investor protection) has been successfully narrowed." [61] The state securities administrators also specifically agreed with limiting the securities lending exemption to "qualified investors." [62]

The General Counsels, however, stated that they believed that an exemption for conduit lending activities is appropriate but should not be limited to qualified investors. [63]

Although they conceded that the securities lending market is institutional in nature, they stated that the proposed "qualified investor" restriction is inconsistent with the statutory framework and should be deleted because Congress did not place any such restriction on the statutory exception for securities lending. [64] Another commenter noted that the "qualified investor" requirement may limit the scope of securities lending activities that banks might otherwise engage in, but also indicated that it does not believe that there is a substantial amount of securities lending transactions conducted by banks in a non-custodial or non-clearing capacity with persons other than qualified investors. [65] In adopting this

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 14 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

exemption, we plan to retain the requirement that securities lending transactions be conducted only with qualified investors.

We specifically asked banking regulators to advise us if the securities lending exemption would pose any risks that the Commission should address. Neither the banking regulators, nor any other commenter identified any risks that we should address. The General Counsels specifically stated that: "we do not believe there are any risks related to the securities lending activities of banks that the Commission needs to address in this rulemaking." [66]

We also requested comment on whether our choice not to impose conditions to the exemption that would require that banks conform to the standards applicable to registered broker-dealers that engage in securities lending transactions was appropriate. [67] Three commenters stated that no additional conditions were necessary and that the conditions applicable to broker-dealers should not be imposed on banks' securities lending transactions. [68] One of these commenters stated that any such conditions would create an unfair burden on banks and would be unnecessary due to the exemption's limit to transactions with qualified investors. [69] The General Counsels' Letter stated, "it would be unnecessary and inappropriate for the Commission to impose any additional restrictions on the securities lending activities of banks." [70] No commenters suggested that those conditions should be imposed on banks under this exemption.

**\*14** One commenter agreed that securities lending should be conducted under a written agreement. [71] Some commenters suggested technical and other clarifications, or changes. [72] These specific suggestions will be discussed and responded to in the next section.

## 2. Amendment to Rule 15a-1 1 — Exemption from the Definitions of "Broker" and "Dealer" for Banks Engaging in Securities Lending Transactions

We received a number of comments that requested technical changes to the language in the securities lending exemption. We agree that many of these changes will enhance the clarity of the securities lending exemption as well as the legal certainty afforded to banks. In addition, some of the comments requested that we expand the exemption in certain respects to give banks greater flexibility in conducting securities lending transactions. We also agree with many of these changes and are adopting a more flexible rule.

One commenter asked the Commission to confirm that term loans of securities are as "agreed by the parties" in Rule 15a-11(b). [73] We agree that term loans of securities would be considered as "agreed by the parties" under the exemption.

Two commenters urged the Commission to change the required form of the documentation in Rule 15a-11(a) as long as the bank is dealing with a "qualified investor." [74] These commenters argued that the availability of the exemption should not turn on the form of documentation used by the parties. [75] In their view, where a bank is acting as a conduit lender, it may not enter into a separate "agreement to provide securities lending services" with the lender. Instead, it may have two "securities lending agreements": one with the lender and one with the borrower. The terms of the agreement with the lender would normally include those items listed in the proposed exception that the parties deemed relevant. These commenters suggested that the bank would still, in effect, be providing securities lending services to the lender by borrowing securities in accordance with the securities lending agreement between the parties and in turn lending those securities to a third party. [76] We agree. We believe that it is unnecessary for a bank taking advantage of this exemption to develop a form of agreement solely to meet the terms of the wording of our exemption. Thus, we are eliminating the requirement that there be a securities lending agreement. We believe that in many instances, banks will have a securities lending agreement, especially for agency lending transactions, but we do not believe that it is necessary for us to make the existence of a securities lending agreement a condition of this exemption. We are, however, retaining the list of

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 15 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

securities lending services that may be conducted in connection with a securities lending transaction within a definition of "securities lending services."

Two commenters urge that replacement transactions for a conduit lender should be permitted under this exemption. [77] One of these commenters states that "[p]ermitting a replacement transaction would maintain the bank's matched loan and borrow of securities." [78] We proposed an exemption that did not permit conduit lenders to replace transactions, because we believed that these bank conduit transactions should be riskless principal transactions as evidenced by being entered into contemporaneously. We considered limiting the number of substitutions of parties that could occur. Although we continue to have some reservations about the risk that we may be permitting banks to have a book of matched securities loans, we have become convinced that limiting the number of substitutions of parties that could occur would require banks to prepare additional documentation without necessarily limiting their dealer transactions. We continue to believe, however, that any substitution of parties to securities lending transactions should occur within one business day of the termination of the securities lending contract by the other party. We are, therefore, adopting this change to the rule.

 **\*15** We also proposed amendments providing only for substitutions of collateral on the securities borrowing side of the transaction. In re-evaluating the language of Rule 15a-11(d), however, we are deleting the words, "on the securities borrowing side of the transaction" to permit substitutions of collateral to occur on both sides of the securities lending transaction as suggested by one of the commenters. [79] We have been persuaded that we should permit a conduit lender to replace collateral on either side of a conduit transaction under this rule.

This same commenter stated that the position of the word "solely" in the context of the exemption may be confusing because it might be interpreted as attempting to narrow in certain respects the statutory custodial lending exception by imposing a restriction to "qualified investors." [80] This commenter asks that we replace "solely to engage in or effect" with "to the extent that it engages in or effects." We agree that the language suggested by the commenter avoids this ambiguity and have incorporated this suggestion into the final rule we are adopting today. [81]

Another commenter stated that the use of the word "solely" in the securities lending exemption could be read to mean that a bank may not provide any other services in connection with non-custodial securities lending transactions. [82] That commenter asked that we clarify that the securities lending exemption and fiduciary exception could both be used for the same client. Although both the exemption and the exception could be used for the same client, each transaction would have to meet all of the elements of one of them. [83]

Two commenters recommended adding the words "or on behalf of" prior to the words "qualified investor" in two instances in paragraph (a) with conforming language in paragraph (c) to more closely track the statutory language found in the custody exception. [84] We agree that the language suggested by these commenters avoids this ambiguity and have incorporated this suggestion in the final rule.

Two commenters recommended deleting the words "[e]xcept as otherwise provided in paragraph (d) of this section…" as an unnecessary reference to the definition of "conduit lender." [85] We agree that this technical suggestion would improve the clarity of the rule and have incorporated this suggestion in the final rule.

These same two commenters also made two other technical suggestions with which we agree. First, they recommended that we clarify that a bank may <u>direct</u> the receipt and delivery of loaned securities and collateral by third parties in Rule 15a-11(c)(2) and (3). Second, they suggested that we revise the rule language to refer to a bank <u>investing or directing</u> the investment of cash collateral, rather than to the reinvesting of such collateral in Rule 15a-11(c)(5).

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 16 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

In sum, we are adopting the exemption for securities lending, Rule 15a-11, with the technical changes described above. We continue to believe that, because it is limited to qualified investors, [86] the exemption is appropriate in the public interest and is consistent with the protection of investors.

### D. Definition of "Qualified Investor"

**\*16** Exchange Act Section 3(a)(54) expressly defines the term "qualified investor," and provides authority to the Commission by rule or order to expand the definition to include any other person, taking into consideration such factors as the person's financial sophistication, net worth, and knowledge and experience in financial matters. [87]

The definition of "qualified investor" was added to the Exchange Act by the GLBA and has application to several of the bank exceptions from broker-dealer registration, including: [88] (1) the broker exception for identified banking products when the product is an equity swap agreement; [89] (2) the dealer exception for identified banking products when the product is an equity swap agreement; [90] and (3) the dealer exception for asset-backed securities. [91] Under these exceptions, banks may sell certain securities to qualified investors.

Exchange Act Section 3(a)(54)(A) enumerates an extensive list of persons that are "qualified investors." [92] Some of these entities meet the definition by merely being certain types of entities, while other entities must both be a certain type of entity and meet an ownership and investment test. For example, Subsection (xi) of Section 3(a)(54)(A) provides that "any corporation, company, or partnership that owns and invests on a discretionary basis, not less than $25,000,000 in investments" is a qualified investor.

In considering this definition, we first looked to Exchange Act Section 3(a)(9), which defines the term "person" to mean "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." [93] We also looked to Investment Company Act Section 2(a)(8), which provides that the term "'company' means a corporation, a partnership, an association, a joint-stock company, a trust, a fund, or any organized group of persons whether incorporated or not; or any receiver, trustee in a case under title 11 of the United States Code or similar official or any liquidating agent for any of the foregoing, in his capacity as such." [94]

In light of these other definitions, for the purposes of the GLBA provisions in the Exchange Act, we interpreted the term "company" as used in the definition of "qualified investor" in subsection (xi) of Section 3(a)(54)(A) to have a broad meaning that encompasses types of entities other than those specifically listed in Section 3(a)(54)(A).

We asked for comment on our interpretation of this term. One commenter urged caution in applying the expanded definition of "qualified investor" in all circumstances. [95] This commenter stated that while it may be appropriate to utilize a single definition of a "qualified investor" as a means to simplify compliance, the application should be limited to securities lending activities pending more careful and thorough analysis. [96] In contrast, three other commenters advocated using one interpretation of the definition of qualified investor. [97]

**\*17** We believe that the simplicity of having one interpretation of the statutory definition of "qualified investor" outweighs any risk that it could be overbroad in other circumstances. Thus, we believe that it is appropriate to utilize this interpretation in all circumstances where the term is used in the GLBA exceptions. We continue, however, to apply the statutory requirements to the entities expressly listed in Exchange Act Section 3(a)(54)(A). For example, a government or political subdivision, agency, or instrumentality of a government is required to invest on a discretionary basis at least $50 million in investments in order to be considered a qualified investor. [98] The statutory requirement for these governmental entities would not be changed by this interpretation.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 17 of 33 PageID #:660

In re Definition of Terms In and Specific Exemptions for..., Release No. 47364...

Similarly, any State sponsored employee benefit plan, or any other employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, other than an individual retirement account, qualifies only if the investment decisions are made by a plan fiduciary, as defined in section 3(21) of that Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser. [99] GLBA expressly limited the definition of "qualified investor" to these types of employee benefit plans, and this interpretation does not cover other types of employee benefit plans.

In the interest of clarity and legal certainty, two commenters also recommended that the Commission adopt a rule to implement its interpretation of the definition of a qualified investor. [100] We believe the Commission's interpretation suffices to enhance legal certainty for entities that are not as precisely described as others in the list of entities expressly listed as "qualified investors." It, therefore, is not necessary to adopt a general rule at this time.

In the context of the securities lending exemption, we are, however, revising the regulation so that the exemption encompasses not only securities lending transactions with or on behalf of any "qualified investor" (as that term is defined in Exchange Act Section 3(a)(54)(A) and interpreted above), but also securities lending transactions with or on behalf of any employee benefit plan that owns and invests on a discretionary basis not less than $25,000,000 in investments. Thus, we are amending Rule 15a-11 to add certain employee benefit plans that do not meet the terms of Exchange Act Section 3(a)(54)(A)(v). [101] We are making this change in response to a request by one of the commenters. [102] We believe that this addition to the exemption is appropriate. This addition will permit banks to engage in or effect securities lending transactions, and any securities lending services in connection with such transactions, with or on behalf of a person the bank reasonably believes to be a pension plan that, although it would not meet the qualitative standard set forth in paragraph (v), [103] may own and invest on a discretionary basis, not less than $25,000,000 in investments. [104]

 *18 Two commenters suggested that it would be helpful if the Commission would confirm that banks may enter into securities lending transactions with parties that they reasonably believe are "qualified investors." These commenters suggested that one non-exclusive means by which a bank should be able to reasonably conclude that a party is a "qualified investor" could be to obtain a representation to that effect by a party, unless reliance on that representation would not be reasonable under the circumstances. [105] After considering this suggestion, we have modified the definition of "qualified investor" within the context of the securities lending exemption to provide a reasonable belief standard. [106]

With regard to the places where the statutory provisions require that banks deal only with "qualified investors," we have reviewed the legislative history in this area, as well as the statutory language, and find no indication that it was Congress' intent to provide a reasonable belief standard with regard to transactions that are limited to qualified investors. [107] Although our exemptive authority would permit us to add a reasonable belief standard if we found that it is necessary or appropriate in the public interest, and consistent with the protection of investors, [108] we believe that this kind of a change should properly be made in a rule that has been subject to public notice and comment. Further, we believe that there are competing interests in this area that should be considered and that banks may be in a position to ascertain whether their customers meet the criteria of qualified investors so that they may engage in transactions that are restricted by statute to qualified investors. We also believe that we should consider whether banks should conduct the transactions that are limited by statute to qualified investors only with persons with which they have a sufficient relationship to know whether those persons are indeed "qualified investors." For all of these reasons, we will consider this question further to determine whether to propose a reasonable belief standard applicable to transactions other than securities lending.

## E. Temporary Exemption

## 1. Discussion of Comments on the Temporary Exemption

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 18 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

Several commenters stated that the final implementation of the rules pertaining to the bank exceptions from the definition of dealer should be coordinated with the upcoming revisions to the rules pertaining to the bank exceptions from the definition of broker. These commenters expressed concern that banks would have to contend with multiple implementation dates. [109] None of the comments we received were supported by specific examples or references to any specific costs that would be incurred by any bank. We received only one comment from a bank stating that the dealer rules should be delayed until the broker rules were finalized. [110] Moreover, the bank commenter offered no indication that it engages in significant dealer activities.

**\*19** We have carefully considered this view in light of the few banks that actually conduct dealer activities other than as riskless principal. We note that the provisions of Section 16 of the Glass-Steagall Act continue to prohibit national banks from underwriting, selling, or dealing in most securities. [111] After extensive discussions with the banks that conduct significant dealer activities, and our efforts to accommodate existing practices, we continue to believe that this rule will not require banks to make significant changes to their existing dealer activities, except in connection with riskless principal transactions, and that a longer phase-in period will not be necessary. Moreover, based on our discussions with banks engaged in limited dealer activities, other than riskless principal transactions, we believe that there is insignificant overlap in the broker and dealer activities conducted by banks, and that most riskless principal transactions can be restructured as agency transactions, which remain exempt under the blanket broker exception. In addition, because the broker and dealer activities are sufficiently distinct, we believe that them would not be a significant compliance benefit to banks in coordinating the effective dates of the broker and dealer rules.

Implementing the dealer rule first will permit banks to use the entire 500-transaction limit set forth in the de minimis exception to broker for riskless principal transactions under the dealer exemption. We believe that having this much room available to banks to conduct riskless principal transactions will give banks an opportunity to realistically assess their use of the de minimis exemption in an environment that provides them with the maximum flexibility to do so. Later, when the broker rules also are effective, banks will have to consider their use of the de minimis exception for broker transactions as well as any riskless principal transactions they may conduct while utilizing the same 500-transaction limit. We believe that this transition period when only the dealer requirements, exceptions, and exemptions are effective will permit banks to gain experience in identifying securities transactions in the most forgiving environment, not only because of the full availability of the 500 transactions for riskless principal transactions but also because the temporal exemption for broker transactions remains in place. Thus, transactions that may previously have been done on a principal basis in the bank may instead be carried out by the bank on an agency basis, until the blanket broker exemption ends.

This experience may lead some banks to conclude that other arrangements, such as affiliating with a broker-dealer or shifting transactions to a broker-dealer, may be necessary when all of the broker-dealer exceptions and exemptions become effective. In those instances, we believe that the banks will benefit from having this knowledge sooner and may be able to use this knowledge to take steps that will make their transition smoother.

**\*20** In addition, we believe that implementing the dealer exceptions and exemptions will permit banks to gain experience in identifying securities transactions before they are required to implement compliance with the broker exceptions and exemptions. Thus, we believe that staggering the implementation dates may actually enhance compliance and permit banks to achieve a more orderly transition to conducting their securities activities in accordance with the mandates of the GLBA.

We are, however, sympathetic to individual banks that may have specific transactions in progress for which they may need an extension of the implementation date of these rules. We urge those banks to contact our staff to determine if specific relief may be available to any such bank on a case-by-case basis for specified transactions for which a demonstrated

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 19 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

burden could be avoided or alleviated through a reasonable short extension of the compliance date, or during any period when additional specific exemption requests are being considered. [112]

**2. Adoption of Temporary Exemption and Effective Date of Dealer Rules**

Concurrent with this release, the Commission, through separate order, is further extending the temporary exemption from the definition of "dealer" for banks until September 30, 2003. On that date, the rules we are adopting today will apply to dealer transactions of banks, savings associations, and savings banks.

**F. Extension of Rule 15a-8 -- Section 29 Liability Exemption**

Two commenters asked the Commission to extend the exemption from liability under Exchange Act Section 29, since it applied only to contracts made before January 1, 2003. [113] Other commenters asked for some type of regulatory "safe harbor," or cure period. [114] Exchange Act Section 29(b) [115] provides that any contract made in violation of the Exchange Act or rules adopted under the Exchange Act shall be void as regards the rights of any person who made or engaged in the performance of any such contract. [116] Private parties have invoked this equitable remedy rarely [117] in instances involving broker-dealer registration violations by the opposite party. [118]

Rule 15a-8 [119] was included in the Rules because we recognized that the amended Exchange Act contains numerous broker-dealer definitional provisions that apply only to banks, which were previously excepted from broker-dealer regulation. [120] We understand that banks may need to adjust their procedures to shift their securities activities to registered broker-dealers or to comply with the conditions of the specific functional exceptions or exemptions to the definitions of broker and dealer. We also are aware that there may be instances where, despite having reasonable procedures in place, a bank may inadvertently fail to meet the terms and conditions of the specific functional exceptions or exemptions upon which it is relying. This could result in the bank engaging in securities activities in violation of the registration requirements of Exchange Act Section 15 and the rules promulgated under that section. We, therefore, adopted Rule 15a-8.

**\*21** Now that we are adopting an effective date for the bank dealer rules, banks may need time to adjust to these definitional provisions and exemptions. Thus, we continue to believe that it is appropriate to provide a transitional period before these provisions fully apply.

To provide certainty to banks while they become fully familiar with the operation of the exceptions, we are, therefore, adopting an amended Rule 15a-8. [121] This amendment provides an exemption for contracts entered into by banks before March 31, 2005 from being considered void or voidable by reason of Exchange Act Section 29 because a bank that is a party to the contract violated the registration requirements of Section 15(a) of the Exchange Act or any applicable provision of this Act and the rules and regulations thereunder based solely on a bank's status as a dealer when the contract was created. Banks may have inadvertent, technical violations as they become accustomed to the new regulatory requirements. This exemption is designed to recognize the unique compliance problems that banks may have by preventing any inadvertent failures by banks to meet the conditions of the functional exceptions from triggering potential rescission under Exchange Act Section 29 during this transitional period.

We note that this provision does not relieve a bank of the obligation to register as a dealer if their securities activities do not fit within a specific functional exception or exemption. We also note that a bank's securities activities continue to be subject to the antifraud provisions of the federal securities laws, irrespective of the bank's lack of registration or failure to comply with the provisions of the Exchange Act and the rules thereunder that otherwise apply to banks based on their status as broker-dealers. We, therefore, find that this exemption for dealer contracts entered into by banks before

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 20 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

March 31, 2005 from being considered void or voidable by reason of Exchange Act Section 29 is appropriate in the public interest and consistent with the protection of investors. [122]

## VI. Procedural Matters

### A. Paperwork Reduction Act

These rule amendments and new exemption do not impose recordkeeping or information collection requirements, or other collections of information that require approval of the Office of Management and Budget under 44 U.S.C. 3501, et seq. Accordingly, the Paperwork Reduction Act does not apply. [123] We received no comments on this issue.

### B. Consideration of Comments on Benefits and Costs

We believe that these rule amendments and the new exemption are consistent with Congress's intent in enacting the GLBA and are responsive to the comments we received. These rule amendments and the new exemption are very limited in scope. The amendments adopt four changes. In particular, we are adopting rules that: (1) modify the way in which transactions are counted under the exemption from the definition of "dealer" for a bank engaged in riskless principal transactions, which would permit the bank to engage in more transactions under the de minimis exception to broker and dealer registration; (2) modify certain definitions under the dealer exception that permits banks to issue and sell asset-backed securities to qualified investors to permit banks to possibly issue and sell more such securities; (3) add a new exemption from the definitions of both "broker" and "dealer" to provide banks with enhanced legal certainty when they engage in securities lending transactions; and (4) extend the exemption from liability under Section 29(b) to contracts entered into before March 31, 2005 based solely on a bank's status as dealer when the contract was created. The amendments to the first two rules are being adopted as proposed. The new exemption is being adopted with minor, technical changes from the proposal. We received no comments on the costs and benefits of the proposed amendments or new exemptions.

### 1. Benefits

 **\*22**  Both of the rule amendments modify the exceptions and the interpretations found in Rules 3a5-1 and 3b-18 in a way that expands the scope of activity in which banks may engage without registering as dealers. The new exemption for banks to engage in securities lending transactions, new Rule 15a-11, also provides increased legal certainty to banks. All of these rule amendments make it easier for banks to conduct these activities in light of the changes to the federal securities laws. We received no comments directed to this issue.

The amendment to Rule 3a5-1, the de minimis exemption, changes the way riskless principal transactions are counted to allow banks to engage in more such transactions before triggering the dealer registration requirement.

Directly engaging in asset-backed transactions without employing a broker-dealer is very unusual for banks. We found only two banks that regularly issue and sell asset-backed securities. Based on staff discussions with these two banks, we believe that the amendments to Rule 3b-18 will permit these two banks to continue to utilize their existing business models with little or no change in their procedures. These amendments modify the definition of "originate" to permit banks to use loan origination channels that would not be permitted under the Rules. We believe that the amendments to the definitions under the asset-backed transactions exception will accommodate these banks' business without sacrificing the statutory limits Congress imposed on banks' dealer activities. In response to the comments on these proposed amendments, we have clarified certain matters in this adopting release.

Lending securities is a highly specialized business for which Congress provided partial relief under the custody exception to broker registration. As discussed above, some banks were concerned about legal certainty for securities lending

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 21 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

transactions that may not meet the terms of the custody exception to broker registration and to the extent that some securities lending transactions might be considered to be subject to dealer registration. We believe that banks provide an important function in this market and that it is in the public interest that they continue to do so. The exemption will provide banks that lend securities with enhanced legal certainty that will permit them to continue to engage in this activity without broker-dealer registration. In the final rule, we are making the securities lending exemption more flexible by eliminating the requirement that these transactions be conducted pursuant to a securities lending agreement.

In addition, we are adopting an amended Rule 15a-8 that will provide an exemption for contracts entered into by banks before March 31, 2005 from being considered void or voidable by reason of Exchange Act Section 29 because a bank that is a party to the contract violated the registration requirements of Section 15(a) of the Exchange Act or any applicable provision of this Act and the rules and regulations thereunder based solely on a bank's status as a dealer when the contract was created. This temporary exemption provides banks with relief from being subject to rescission rights while they become accustomed to the new bank exceptions and exemptions from the definition of dealer under the Exchange Act. This relief should provide banks with savings from being spared potential liability under this statutory section.

## 2. Costs

**\*23** Although banks may incur certain costs to comply with the GLBA, these costs will be necessary because of the statutory change. Congress determined that all securities activities should be functionally regulated by the expert securities regulator to ensure investor protection, regardless of the entity in which the activities occur. Thus, any regulatory costs arise from Congress's determination that amendment of the Exchange Act was necessary. There are no out-of-pocket costs as a result of these rules and rule amendments. Because all of these amendments make it easier for banks to conduct these activities in light of the changes to the federal securities laws, any costs would be those associated with moving the supervision of these limited securities transactions or products from the regulatory oversight of the Commission and placing them under the banking agencies. We do not believe any such cost to be significant.

In addition, because the types of dealer activities that are the subject of these rules are not the types of activities in which small banks or small broker-dealers participate, there should be no competitive costs to small broker-dealers due to the way in which these rules modify the terms of the bank exceptions and exemptions. We did not receive any comments on this issue, nor did we receive any comments that identified specific costs related to complying with these rules.

## C. Consideration of Burden on Competition, and on Promotion of Efficiency, Competition, and Capital Formation

In accordance with our responsibilities under Section 3(f) of the Exchange Act, we have considered both the protection of investors and whether these rule amendments would promote efficiency, competition, and capital formation in determining whether they are consistent with the public interest. [124] In addition, Section 23(a)(2) of the Exchange Act [125] requires us, in adopting rules under the Exchange Act, to consider the anticompetitive effects of such rules, if any, and to refrain from adopting a rule that will impose a burden on competition not necessary or appropriate in furthering the purpose of the Exchange Act. We received no comments on these issues.

We do not believe that the interpretations, definitions, and exemptions contained in these amendments, the interpretation of the term "qualified investor," or the new exemption will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. The Rules define terms in the statutory exceptions to the definitions of broker and dealer added to the Exchange Act by Congress in the GLBA, and provide guidance to banks regarding the scope of those exceptions. The rule amendments and exemption also do not impose any additional competitive burdens on banks engaging in a securities business, other than those imposed by Congress through functional regulation in the GLBA.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 22 of 33 PageID #:660

In re Definition of Terms In and Specific Exemptions for..., Release No. 47364...

Because the types of dealer activities that are the subject of these rules are not the types of activities in which small banks or small broker-dealers directly participate, there should be no competitive costs to small banks or small broker-dealers due to the way in which these rules modify the terms of the bank exceptions and exemptions.

 **\*24**  The new conditional exemption from broker-dealer registration in Rule 15a-11 would provide banks increased legal certainty when they engage in securities lending transactions without any new burdens on banks seeking to use this limited exemption. Nothing in the rule amendments, in the new exemption, or in the Commission's interpretation of the term qualified investor will adversely affect capital formation. Banks that alter their securities-related activities in accordance with the GLBA will continue to be able to provide securities services to their customers. In enacting the GLBA, Congress determined that functional regulation was appropriate — that is, when a bank was conducting a securities business outside of the enumerated exceptions, that bank should be registered as a broker-dealer or shift its securities activities to a registered broker-dealer. In the interest of protecting the public and ensuring orderly markets, Congress determined that banks conducting a broad securities business should be subject to the same regulatory oversight as broker-dealers conducting the same types of activities. These rule amendments and the new exemption promote Congress' intent and make it easier for banks to comply with the requirements of the GLBA.

Since certain of these rule amendments define statutory exceptions mandated by Congress, we do not believe that those rules impose any extra-statutory adverse effects on efficiency, competition, or capital formation. We also are making three exemptive amendments to the Rules. We are adding a rule that provides banks with exemptive relief for certain securities lending transactions, amending the de minimis exemption for banks to make the counting of riskless principal transactions more flexible, and extending the exemption from liability under section 29(b) to contracts entered into before March 31, 2005 based solely on a bank's status as dealer when the contract was created. Each of these exemptive rules would make it easier for banks to comply with the GLBA in light of the changes to the federal securities laws and will give banks enhanced legal certainty for their securities activities. We also do not believe that those rules impose any extra-statutory adverse effects on efficiency, competition, or capital formation. When Congress passed the GLBA, it effectively determined that regulation of banks conducting a securities operation outside of certain exceptions was necessary, appropriate, and in the public interest.

### D. Regulatory Flexibility Act Certification

Pursuant to Section 605(b) of the Regulatory Flexibility Act, [126] the Commission certified that the amendment to the rule would not have a significant economic impact on a substantial number of small entities. This certification was incorporated into the Proposing Release. [127] We received no comments concerning the impact on small entities or the Regulatory Flexibility Act Certification.

### Statutory Authority

The Commission is adopting amendments Rules 3a5-1, 3b-18 and 15a-8, and a new exemption for securities lending transactions in Rule 15a-11 under the Exchange Act, pursuant to authority set forth in Sections 3(b), 15, 23(a), and 36 of the Exchange Act (15 U.S.C. 78c(b), 78*o*, 78w(a), and 78mm, respectively).

### Text of Rules and Rule Amendments

### List of Subjects in 17 CFR Part 240

 **\*25**  Broker-dealers, Reporting and recordkeeping requirements, Securities.

For the reasons set forth in the preamble, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 23 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

## PART 240 — GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

1. The authority citation for Part 240 continues to read, in part, as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1,78l, 78m, 78n, 78*o*, 78p, 78q, 78s, 78u-5, 78w, 78x, 78 ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4 and 80b-11, unless otherwise noted.

*****

2. Section 240.3a5-1 is revised to read as follows:

### § 240.3a5-1 Exemption from the definition of "dealer" for a bank engaged in riskless principal transactions.

 **\*26** (a) A bank is exempt from the definition of the term "dealer" to the extent that it engages in or effects riskless principal transactions if the number of such riskless principal transactions during a calendar year combined with transactions in which the bank is acting as an agent for a customer pursuant to section 3(a)(4)(B)(xi) of the Act (15 U.S.C. 78c(a)(4)(B)(xi)) during that same year does not exceed 500.

(b) For purposes of this section, the term riskless principal transaction means a transaction in which, after having received an order to buy from a customer, the bank purchased the security from another person to offset a contemporaneous sale to such customer or, after having received an order to sell from a customer, the bank sold the security to another person to offset a contemporaneous purchase from such customer.

3. Section 240.3b-18 is revised to read as follows:

### § 240.3b-18 Definitions of terms used in Section 3(a)(5) of the Act.

For the purposes of section 3(a)(5)(C) of the Act (15 U.S.C. 78c(a)(5)(C):

(a) The term affiliate means any company that controls, is controlled by, or is under common control with another company.

(b) The term consumer-related receivable means any obligation incurred by any natural person to pay money arising out of a transaction in which the money, property, insurance, or services (being purchased) are primarily for personal, family, or household purposes.

(c) The term member as it relates to the term "syndicate of banks" means a bank that is a participant in a syndicate of banks and together with its affiliates, other than its broker or dealer affiliates, originates no less than 10% of the value of the obligations in a pool of obligations used to back the securities issued through a grantor trust or other separate entity.

(d) The term obligation means any note, draft, acceptance, loan, lease, receivable, or other evidence of indebtedness that is not a security issued by a person other than the bank.

(e) The term originated means:

(1) Funding an obligation at the time that the obligation is created; or

(2) Initially approving and underwriting the obligation, or initially agreeing to purchase the obligation, provided that:

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 24 of 33 PageID #:660

In re Definition of Terms In and Specific Exemptions for..., Release No. 47364...

(i) The obligation conforms to the underwriting standards or is evidenced by the loan documents of the bank or its affiliates, other than its broker or dealer affiliates; and

(ii) The bank or its affiliates, other than its broker or dealer affiliates, fund the obligation in a timely manner, not to exceed six months after the obligation is created.

(f) The term <u>pool</u> means more than one obligation or type of obligation grouped together to provide collateral for a securities offering.

(g) The term <u>predominantly originated</u> means that no less than 85% of the value of the obligations in any pool were originated by:

 **\*27**  (1) The bank or its affiliates, other than its broker or dealer affiliates; or

(2) Banks that are members of a syndicate of banks and affiliates of such banks, other than their broker or dealer affiliates, if the obligations or pool of obligations consist of mortgage obligations or consumer-related receivables.

(3) For this purpose, the bank and its affiliates include any financial institution with which the bank or its affiliates have merged but does not include the purchase of a pool of obligations or the purchase of a line of business.

(h) The term <u>syndicate of banks</u> means a group of banks that acts jointly, on a temporary basis, to issue through a grantor trust or other separate entity, securities backed by obligations originated by each of the individual banks or their affiliates, other than their broker or dealer affiliates.

4. Section 240.15a-8 is revised to read as follows:

**§ 240.15a-8 Exemption for banks from Section 29 liability.**

(a) No contract entered into before January 1, 2003 shall be void or considered voidable by reason of section 29 of the Act (15 U.S.C. 78cc) because any bank that is a party to the contract violated the registration requirements of section 15(a) of the Act (15 U.S.C. 78*o*(a)) or any applicable provision of the Act (15 U.S.C. 78a<u>et seq.</u>) and the rules and regulations thereunder based solely on the bank's status as a broker or dealer when the contract was created.

(b) No contract entered into before March 31, 2005, shall be void or considered voidable by reason of section 29 of the Act (15 U.S.C. 78cc) because any bank that is a party to the contract violated the registration requirements of section 15(a) of the Act (15 U.S.C. 78*o*(a)) or any applicable provision of the Act (15 U.S.C. 78a<u>et seq.</u>) and the rules and regulations thereunder based solely on the bank's status as a dealer when the contract was created.

5. Section 240.15a-11 is added to read as follows:

**§ 240.15a-11 Exemption from the definitions of "broker" and "dealer" for banks engaging in securities lending transactions.**

(a) A bank is exempt from the definitions of the terms "broker" and "dealer" under sections 3(a)(4) and 3(a)(5) of the Act (15 U.S.C. 78c(a)(4) and (a)(5)), to the extent that, as a conduit lender, or as an agent, it engages in or effects securities lending transactions, and any securities lending services in connection with such transactions, with or on behalf of a person the bank reasonably believes to be:

(1) A qualified investor as defined in section 3(a)(54)(A) of the Act (15 U.S.C. 78c(a)(54)(A)); or

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 25 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

**\*28**  (2) Any employee benefit plan that owns and invests on a discretionary basis, not less than $25,000,000 in investments.

(b) <u>Securities lending transaction</u> means a transaction in which the owner of a security lends the security temporarily to another party pursuant to a written securities lending agreement under which the lender retains the economic interests of an owner of such securities, and has the right to terminate the transaction and to recall the loaned securities on terms agreed by the parties.

(c) <u>Securities lending services</u> means:

(1) Selecting and negotiating with a borrower and executing, or directing the execution of the loan with the borrower;

(2) Receiving, delivering, or directing the receipt or delivery of loaned securities;

(3) Receiving, delivering, or directing the receipt or delivery of collateral;

(4) Providing mark-to-market, corporate action, recordkeeping or other services incidental to the administration of the securities lending transaction;

(5) Investing, or directing the investment of, cash collateral; or

(6) Indemnifying the lender of securities with respect to various matters.

(d) For the purposes of this section, the term <u>conduit lender</u> means a bank that borrows or loans securities, as principal, for its own account, and contemporaneously loans or borrows the same securities, as principal, for its own account. A bank that qualifies under this definition as a conduit lender at the commencement of a transaction will continue to qualify, notwithstanding whether:

(1) The lending or borrowing transaction terminates and so long as the transaction is replaced within one business day by another lending or borrowing transaction involving the same securities; and

(2) Any substitutions of collateral occur.

By the Commission.
J. Lynn Taylor
Assistant Secretary

Footnotes

1    **Definition** of **Terms** in and Specific **Exemptions** for **Banks**, **Savings** Associations, and **SavingsBanks** Under **Sections3(a)(4) and3(a)(5)** of the **SecuritiesExchangeActof1934**, Release No. 34-44291, 66 FR 27760 (May 18, 2001).

2    **Definition** of **Terms** in and Specific **Exemptions** for **Banks**, **Savings** Associations, and **SavingsBanks** Under **Sections3(a)(4) and3(a)(5)** of the **SecuritiesExchangeActof1934**, Release No. 34-46745, 67 FR 67495 (November 5, 2002) ("the proposing Release").

3    Pub. L. No. 106-102, 113 Stat. 1338 (1999). On November 12, 1999, the President signed the GLBA into law. The GLBA changed federal statutes governing the scope of permissible activities and the supervision of banks, bank holding companies, and their affiliates. The GLBA lowered barriers between the banking and securities industries erected by the Banking Act of 1933 (popularly known as the "Glass-Steagall Act") Pub. L. No. 73-66, ch. 89, 48 Stat. 162 (1933) (as codified in various sections of 12 U.S.C.). Section 101 of the GLBA repealed Sections 20 (12 U.S.C. 377) and 32 (12 U.S.C. 78) of the Banking

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 26 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

Act of 1933. The GLBA did not repeal Sections 16 (12 U.S.C. 24 (Seventh)) and 21 (12 U.S.C. 377) of the Banking Act of 1933, which were retained as continuing safeguards. Section 16 prohibits national banks from underwriting, selling, or dealing in securities, except for certain bank-eligible securities such as U.S. government securities, and section 5(c) of the Glass-Steagall Act applies those same Section 16 restrictions to state-chartered banks that are members of the Federal Reserve System. See 12 U.S.C. 24 (Seventh) and 12 U.S.C. 335. Section 16 excludes from its prohibitions securities transactions in which the bank acts as agent for its customers, which is considered agency activity under banking law. Under state banking law, insured state banks also generally may act as agent for their customers. Under federal law, insured state banks are prohibited from engaging as principal in any activities that are not permissible for national banks, unless the state banks comply with applicable capital standards and the Federal Deposit Insurance Corporation ("FDIC") has determined that the activity will not pose a significant risk to the appropriate insurance fund. Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. 102-242, Title III, Section 303, 12 U.S.C. 1831a. Glass-Steagall Act Section 21, which is also still in effect, prohibits investment banks from offering checking or savings accounts. See 12 U.S.C. 378a.

The GLBA also lowered barriers between the banking and the insurance industries erected by the 1982 amendments to the Bank Holding Company Act of 1956 (the "Bank Holding Company Act"). The Garn-St. Germain Depository Institutions Act of 1982, Pub. L. No. 97-320, 96 Stat. 1469 (1982) (as codified in various sections of 12 U.S.C.), amending section 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. 1841-1850 (1994).

4    Before the GLBA, Exchange Act Section 3(a)(4) defined the term "broker" as "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." Before the GLBA, Exchange Act Section 3(a)(5) defined the term "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise, but does not include a bank.…"

5    Exchange Act Section 3(a)(6) [15 U.S.C. 78c(a)(6)] defines the term "bank" as:

(A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency…and which is supervised and examined by State or Federal authority having supervision over banks, and which is not operated for the purpose of evading the provisions of this title, and (D) a receiver, conservator, or other liquidating agent of any institution or firm included in clauses (A), (B), or (C) of this paragraph.

6    Exchange Act Section 15(a) [15 U.S.C. 78*o*(a)] generally provides that:

[i]t shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with [the provisions] of this section.

7    H.R. Rep. No. 106-74, pt. 3, at 113 (1999).

8    See, e.g., letter from Arthur Levitt, Chairman, U.S. Securities and Exchange Commission, to Senator Phil Gramm, Chairman, Committee on Banking, Housing and Urban Affairs, U.S. Senate (Oct. 14, 1999) (stating that "the Securities and Exchange Commission has long supported financial modernization legislation that provides the protections of the securities laws to all investors.").

9    17 CFR 240.15a-7.

10    Through an earlier order, the Commission delayed the effective date of the bank "broker" exceptions through orders that extended the temporary exemption to May 12, 2003.

11    Rule 15a-9 continues to exempt savings associations and savings banks from the definitions of "broker" and "dealer" under Exchange Act Sections 3(a)(4) and 3(a)(5) on the same terms and conditions that apply to banks. This exemption is limited to savings associations and savings banks that have deposits insured by the FDIC under the Federal Deposit Insurance Act ("FDIA"). 12 U.S.C. 1811 et. seq.

12    See letter dated November 19, 2002, signed by Jackie G. Prester of Baker, Donelson, Bearman & Caldwell, on behalf of First Tennessee Bank, N.A. ("the First Tennessee Letter"); letter dated December 2, 2002, received incomplete and unsigned ("the Anonymous letter"); letter dated December 9, 2002, signed by Edward Rosen of Cleary, Gottlieb, Steen & Hamilton on behalf of an ad hoc coalition of banks consisting of The Bank of New York, Barclays Global Investors, N.A., Citibank, Credit Suisse First Boston, Deutsche Bank, HSBC, and JP Morgan Chase Bank ("the Coalition of Banks' Letter"); letter dated December 10, 2002, signed by J. Virgil Mattingly, Board of Governors of the Federal Reserve System ("Federal Reserve"), William F.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 27 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

Kroener, FDIC, and Julie L. Williams, Office of the Comptroller of the Currency ("OCC") ("the General Counsels' Letter"); letter dated December 5, 2002, signed by Lawrence R. Uhlick of the Institute of International Bankers ("the IIB Letter"); letter dated December 5, 2002, signed by Sarah A. Miller of the American Bankers Association and ABA Securities Association ("the ABA/ABASA Letter"); letter dated December 6, 2002, signed by Jeffrey P. Neubert of the New York Clearinghouse Association, whose members are: Bank of America, National Association; The Bank of New York; Bank One, National Association; Citibank, N.A.; Deutsche Bank Trust Company Americas; Fleet National Bank; HSBC Bank USA; JPMorgan Chase Bank; LaSalle Bank National Association; Wachovia Bank, National Association; and Wells Fargo Bank, National Association ("the NYCH Letter"); letter dated December 5, 2002, signed by Jeffrey S. Missman of the Compliance Department of Commerce Bancshares ("the Commerce Banc Letter"); letter dated December 5, 2002, signed by Joanne F. Shephard of the Independent Community Bankers of America ("the ICBA Letter"); letter dated December 12, 2002, signed Christine A. Bruenn of the Nort American Securities Administrators Association ("the NASAA Letter"); letter dated December 13, 2002, signed by Jose Arau of CalPERS ("the CalPERS Letter"); and letter dated December 24, 2002, signed by Richard Whiting of the Financial Services Roundtable ("the Roundtable Letter").

13    One comment letter was received in an unsigned and incomplete form.

14    <u>See</u> the First Tennessee Letter, the Coalition of Banks' Letter, the Commerce Banc Letter, the ICBA Letter, the IIB Letter, the ABA/ABASA Letter, the NYCH Letter, the NASAA Letter, and the CalPERS Letter.

15    <u>See</u> the Coalition of Banks' Letter, the NYCH Letter, the CalPERS Letter, the ICBA Letter, the NASAA Letter, the IIB Letter, and the ABA/ABASA Letter.

16    <u>See</u> the General Counsels' Letter.

17    <u>See</u> the NYCH Letter.

18    <u>Id.</u>

19    Among the unique investor protections provided by the federal securities laws are:

(1) Uniform qualifications and testing requirements, including continuing education, of the registered representative sales force.

(2) Explicit supervision of sales personnel through liability that is imposed on a registered broker-dealer and its supervisory personnel under statutory provisions addressing responsibility for "failure to supervise" and "controlling person liability." <u>See</u> Exchange Act Sections 15(b)(4)(E) and 20 [15 U.S.C. 78*o*(b)(4)(E) and 78t(a)]. These provisions hold broker-dealers and broker-dealer supervisory personnel responsible for the conduct of line personnel.

(3) Membership in the Securities Investor Protection Corporation (SIPC), which provides insurance in the event of broker-dealer insolvency. Missing securities and cash of investors are guaranteed up to $500,000, including a maximum of $100,000 for cash claims. Transactions with affiliates of SIPC insured broker-dealers, such as banks, are not covered by SIPC.

(4) Self-Regulatory Organization rules governing broker-dealer sales practices aimed at protecting investors, as well as other market-oriented rules aimed at fostering fair and competitive securities markets.

<u>See generally</u> Statement of the U.S. Securities and Exchange Commission Concerning Bank Securities Issues to the Subcommittee on Oversight and Investigations, Committee on Commerce, U.S. House of Representatives Testimony of Arthur Levitt, Chairman, U.S. Securities and Exchange Commission, Concerning Financial Modernization Legislation, Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate (February 24, 1999).

20    Exchange Act Section 3(a)(5) [15 U.S.C. 78c(a)(5)]. <u>See also</u> Proposing Release at 67 FR 67498.

21    The term "underwriter" is defined in Section 2(a)(11) of the Securities Act of 1933 [15 USC 77b(a)(11)]. In determining whether a bank is acting as an underwriter when it undertakes particular securities activities, the Commission is not expressing any views on whether those activities would constitute "underwriting" for purposes of Section 16 of the Glass-Steagall Act. The Commission wishes to emphasize that the determination of dealer status with respect to securities transactions, including those that do not involve a public offering, must be made by reference to the federal securities laws. It is the Commission's view, however, that the fact that an offering is exempt from registration under the Securities Act of 1933 ("Securities Act") [15 USC 77a, et seq.] does not necessarily affect the status of a participant in that offering as an "underwriter" as defined in Securities Act Section 2(a)(11). Furthermore, in general the determination of broker or dealer status under the Exchange Act primarily depends on the broader definitions of "purchase" and "sale." <u>See</u> Exchange Act Section 3(a)(13) and 3(a)(14) [15 USC 78c(a)(13) and 78c(a)(14)].

22    <u>See, e.g.</u>, Rel. No. 34-11742 (October 5, 1975) (noting that a bank might be subject to registration as a municipal securities dealer if it engaged in underwriting, maintained a trading account or carried a dealer inventory, advertised itself as a dealer or otherwise held itself out as a dealer).

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 28 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

23    A person that is buying securities for its own account may still not be a "dealer" because it is not "engaged in the business" of buying and selling securities for its own account as part of a regular business. <u>See generally</u> L. Loss & J. Seligman, SECURITIES REGULATION, §§ 8-A-2 and 8-A-3 nn.115 and 143 (3d ed. 2001).

24    <u>See</u> the NYCH letter and the Coalition of Banks' letter.

25    <u>See</u> the NYCH Letter.

26    We have given recent guidance on what constitutes "dealer" activity. <u>See</u> OTC Derivatives Dealers, Release No. 34-40594, Section II.A.1., n. 61, 63 FR 59362 at 59370 (November 3, 1998). As we explained with respect to a group of derivative dealers that engage in limited activities:

[E]xcept to the extent expressly permitted under the rules and rule amendments, an OTC derivatives dealer may not engage directly or indirectly in any activity that may otherwise cause it to be a "dealer" as defined in Section 3(a)(5) of the Exchange Act (15 U.S.C. § 78c(a)(5)). This includes, but is not limited to, without regard to the security, (1) purchasing or selling securities as principal from or to customers; (2) carrying a dealer inventory in securities (or any portion of an affiliated broker-dealer's inventory); (3) quoting a market in or publishing quotes for securities (other than quotes on one side of the market on a quotations system generally available to non-broker-dealers, such as a retail screen broker for government securities) in connection with the purchase or sale of securities permitted under Rule 15a-1; (4) holding itself out as a dealer or market-maker or as being otherwise willing to buy or sell one or more securities on a continuous basis; (5) engaging in trading in securities for the benefit of others (including any affiliate), rather than solely for the purpose of the OTC derivatives dealer's investment, liquidity, or other permissible trading objective; (6) providing incidental investment advice with respect to securities; (7) participating in a selling group or underwriting with respect to securities; or (8) engaging in purchases or sales of securities from or to an affiliated broker-dealer except at prevailing market prices.

27    Of course, a bank also should continue to determine whether any proposed securities activity is permitted under banking law, and should consult its appropriate Federal banking agency, if necessary, to assist it in that analysis.

28    <u>See</u> the Coalition of Banks' letter. This commenter also urged the Commission to confirm that in analyzing whether a particular activity undertaken by a non-bank person, the existence or non-existence of a GLBA bank exception or exemption for that activity is not relevant to the analysis of whether that activity would constitute "broker" activity. Although we believe that this statement is generally true, we will address "broker" activity later when we propose amendments to the Rules pertaining to banks' exceptions from the definition of broker. In addition, this commenter noted that because so much of the dealer/trader distinction is set forth in the context of the Commission staff's no-action and interpretive letters, it would be helpful for the Commission to note the existence of these letters, clarify that these letters are still valid, and confirm that the proposing Release was intended to summarize, but not to modify, the traditional "dealer/trader" distinction. Because the Commission staff's letters have been written over the seven decades of the Commission's existence and are based on specific factual situations, we do not believe that it is appropriate to re-visit these letters in the context of adopting these amendments to the Rules.

29    <u>See</u> Exchange Act Section 3(a)(5)(C)(iii). [15 USC 78c(a)(5)(C)(iii).]

30    <u>See</u> Exchange Act Section 3(a)(5)(C)(ii). [15 USC 78c(a)(5)(C)(ii).]

31    A bank that contemplates a new securities activity may also seek an exemption or no-action relief from the Commission. Exchange Act Section 36 [15 U.S.C. 78mm] authorizes us to exempt any person, security, or transaction from the provisions of the Exchange Act, to the extent that such exemption is necessary or appropriate in the public interest, and consistent with the protection of investors. We authorized the Director of the Division of Market Regulation to consider, on a case-by-case basis, individual requests for exemptive relief from banks, savings associations, and savings banks. Exchange Act Rule Rule 30-3 [17 CFR 200.30-3(a)(72)]. In appropriate circumstances, the staff also may provide guidance in the form of no-action letters. <u>See</u> Release No. 33-5127 (January 25, 1971). <u>See also</u>Release No. 33-6279 (December 5, 1980).

32    This outline is a summary. It does not describe the exceptions in full. <u>See</u> Exchange Act Section 3(a)(5). [15 USC 78c(a)(5).]

33    "Riskless principal" transactions are generally described as trades in which, after receiving an order to buy (or sell) from a customer, the broker-dealer purchases (or sells) the security from (or to) another person in a contemporaneous offsetting transaction. <u>See</u> Exchange Act Rule 10b-10(a)(2)(ii)(A) [17 CFR 240.10b-10(a)(2)(ii)(A)]; Release No. 34-33743 (Mar. 9, 1994) at n.11.

Under the securities laws, riskless principal transactions are dealer activity. One commenter urged the Commission to adopt the position that riskless principal transactions are agency transactions and suggested that the Commission bring its views into accord with long-held banking practice. <u>See</u> the ICBA Letter. Because the securities laws' interpretations of riskless principal transactions are also long-standing and specifically designed for the protection of investors, we decline to adopt the banking law view. We note that the statutory bank exceptions from the definitions of broker and dealer are limited by their terms to the statutory language, and do not extend to transactions that are the legal or economic equivalent of the statutory exceptions.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 29 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

34  Exchange Act Section 3(a)(4)(B)(xi) [15 U.S.C. 78c(a)(4)(B)(xi)] excepts a bank from the definition of broker if it effects no more than 500 securities transactions per calendar year, other than transactions that qualify for one of the other statutory exceptions. A transaction in which a bank is acting as an agent for a customer would count as one transaction toward the 500-transaction limit. The GLBA provisions did not extend this de minimis exception to dealer transactions.

35  See the ICBA Letter and the IIB Letter.

36  Id.

37  We are, however, making a technical amendment to the rule to conform to a technical comment we received on the securities lending exemption. Because of that comment, we are changing the language of this rule. Instead of a bank being exempt, "solely for engaging in," it will be exempt from the definition of the term dealer "to the extent that it engages in or effects," riskless principal transactions. We are persuaded that this language more clearly sets forth the limited conduct permitted under the exemption. Although the comment was directed only to the securities lending exemption, we believe that the language of the exemptions should be consistent and are adopting this rule with this amendment.

38  If, however, a bank acts as an intermediary between one counterparty and multiple counterparties by arranging multiple transactions, the bank must count each of the transactions on the side of the intermediation that involves the largest number of transactions as a separate transaction against the annual 500 transaction-limit.

39  Exchange Act Section 3(a)(5)(C)(iii) [15 U.S.C. 78c(a)(5)(C)(iii)].

40  66 FR 27760 at 27785 (May 18, 2001).

41  We proposed to retain this requirement because the legislative history indicates that each bank selling the securities should be more than an insignificant member of the syndicate. The legislative history suggests that threshold is met when a bank together with its affiliates other than broker or dealer affiliates provided at least 10% of the obligations in the pool. The legislative history states that, "[t]he Committee expects this provision shall be interpreted so that the bank will [have] not less than ten percent of the assets in the syndicate or pool of obligations." H.R. Rep. No. 106-74, pt. 3, at 171 (1999).

42  See the ICBA Letter, the First Tennessee Letter, the General Counsels' Letter, and the NASAA Letter.

43  See the NASAA Letter.

44  See the ICBA Letter.

45  See the First Tennessee Letter and the General Counsels' Letter.

46  In defining the term "predominantly," which modifies the term "originated," we looked to other sections of the GLBA in which the term is used. Section 103(n) of the GLBA uses the term "predominantly" to modify "financial" and to allow analysis of whether nonfinancial activities and affiliations may be retained. Bank Holding Company Act Section 4(n)(2) [12 U.S.C.1843(n)(2)]. Section 103(n)(2) of the GLBA expressly provides that a firm is predominantly engaged in financial activities when at least 85% of the annual gross revenues of the consolidated company derive from financial activities, excluding any revenue from banks. To be consistent, we applied the same numerical test found in Section 103(n)(2) of GLBA for loan product originations for the purpose of the asset-backed securities exception from the definition of dealer.

47  We are, however, making a technical amendment to paragraph (e) of the rule to conform the language in the definition of "originate" to include obligations of an affiliate of a bank, other than a broker-dealer affiliate within the broader reading of the term.

48  15 U.S.C. 78c(a)(4)(B)(viii).

49  Under banking law, with some limited exceptions, banks are not permitted to own equity securities.

50  See the Coalition of Banks' Letter, which stated that by confirming that banks may continue to engage in securities lending as riskless principals, the proposed exemption will help ensure that institutional lenders can still achieve the benefits of credit intermediation and anonymity when lending through banks

51  This conduit role is similar to a riskless principal transaction, but does not involve activities that could be characterized as running a matched book. Running a matched book of repurchase agreements or other stock loans is a dealer activity because the "book running dealer" holds itself out as willing to buy and sell and thus as engaged in the business of buying and selling securities.

52  This is not meant to indicate that an agent for an undisclosed principal would not also have direct personal liability to the parties with whom it dealt because the counterparty would be relying on the credit of the agent, rather than the principal. SeeRestatement (Second) of Agency § 322 (1958).

53  See discussion at Section D, infra.

54  See the Coalition of Banks' Letter, the NYCH Letter, the CalPERS Letter, the ICBA Letter, the NASAA Letter, the IIB Letter, and the ABA/ABASA Letter.

55  See the Coalition.of Banks' Letter.

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 30 of 33 PageID #:660

In re Definition of Terms In and Specific Exemptions for..., Release No. 47364...

56    <u>See</u> the Coalition of Banks' Letter.

57    <u>See</u> the General Counsels' Letter.

58    <u>Id.</u>

59    Exchange Act Section 3(a)(4)(B)(viii)(cc) [15 U.S.C. 78c(a)(4)(B)(viii)(cc)] provides that a bank may effect "securities lending or borrowing transactions with or on behalf of customers as part of services provided to customers pursuant to division (aa) or (bb)" or invest "cash collateral pledged in connection with such transactions."

60    <u>See</u> the CalPERS Letter and the NASAA Letter.

61    <u>See</u> the CalPERS Letter.

62    <u>See</u> the NASAA Letter.

63    <u>See</u> the General Counsels' Letter.

64    <u>Id.</u>

65    <u>See</u> the Coalition of Banks' Letter.

66    <u>See</u> the General Counsels' Letter.

67    <u>See e.g.</u>, Rule 15c3-3(b)(3) [17 CFR 240.15c3-3(b)(3)].

68    <u>See</u> the General Counsels' Letter, the NYCH Letter, and the Coalition of Banks' Letter.

69    <u>See</u> the NYCH Letter.

70    <u>See</u> the General Counsels' Letter.

71    <u>See</u> the ICBA Letter.

72    <u>See e.g.</u>, the Coalition of Banks' Letter and the NYCH Letter.

73    <u>See</u> the Coalition of Banks' Letter.

74    <u>See</u> the Coalition of Banks' Letter and the NYCH Letter.

75    <u>Id.</u>

76    <u>Id.</u>

77    <u>See</u> the Coalition of Banks' Letter and the NYCH Letter.

78    <u>See</u> the NYCH Letter.

79    <u>See</u> the NYCH Letter.

80    <u>Id.</u>

81    For consistency, we made a similar change in the language of Rule 3a5-1.

82    <u>See</u> the ABA/ABASA Letter.

83    This issue arises only in the context of the "broker" exception for trust and fiduciary activities. The issue does not arise in the context of the "dealer" exception for fiduciary transactions because the "dealer" exception for trustee and fiduciary transactions only applies when the bank buys or sells securities for investment purposes for the bank, or in accounts for which the bank acts as a fiduciary. We note, however, that in giving meaning to the term "fiduciary" in Section 3(a)(5) (ii), we look to the legislative history. The legislative history states that [Exchange Act Section 3(a)(5)] "excepts a bank from the definition of 'dealer' when it buys and sells securities for investment purposes for the bank or for accounts for which the bank acts as trustee or fiduciary. This mirrors existing law distinguishing between investors and dealers, and is limited to the portfolio trading of the bank and accounts for which it makes investment decisions." H.R. Rep. No. 106-74, pt. 3, at 170-171 (1999).

84    <u>See</u> the Coalition of Banks' Letter and the NYCH Letter.

85    <u>See</u> the Coalition of Banks' Letter and the NYCH Letter.

86    <u>See</u> additional discussion of "qualified investors" at Section D, <u>infra</u>.

87    15 U.S.C. 78c(a)(54)(A). Under this definition qualified investors include persons such as investment companies, banks, small business investment companies, any State sponsored employee benefit plan, institutional trusts, market intermediaries, and natural persons, corporations or partnerships that own and invest on a discretionary basis more than $25,000,000. 15 U.S.C. 78c(a)(54)(C) gives the Commission additional authority to define a "qualified investor."

88    In addition to these three provisions, a participation in a loan, to be an "identified banking product," also must either be sold to: (1) a qualified investor; or (2) to other persons that have an opportunity to review and assess any material information regarding the borrower's creditworthiness and based on such factors as financial sophistication, net worth, and knowledge and experience in financial matters, have the capability to evaluate the information available, as determined under generally applicable banking standards or guidelines. Thus, a bank utilizing the exceptions to broker and dealer registration to sell a participation interest would either have to sell such an interest to a qualified investor or undertake a more extensive factual

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 31 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

assessment of the purchaser. See Section 206(a)(5) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(4)(B)(ix) [15 U.S.C. 78c(a)(4)(B)(ix)] and Section 3(a)(5)(C)(iv) [15 U.S.C. 78c(a)(5)(C)(iv)].

89    Section 206(a)(6) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(4)(B)(ix) [15 U.S.C. 78c(a)(4)(B)(ix)].

90    Section 206(a)(6) of Public Law 106-102 [15 U.S.C. 78c note] as incorporated into Exchange Act Section 3(a)(5)(C)(iv) [15 U.S.C. 78c(a)(5)(C)(iv)].

91    Exchange Act Section 3(a)(5)(C)(iii) [15 U.S.C. 78c(a)(5)(C)(iii)].

92    Subsections (i) through (xiv) of Section 3(a)(54)(A) list entities that are qualified investors.

93    Exchange Act Section 3(a)(9) [15 U.S.C. 78c(a)(9)].

94    Investment Company Act Section 2(a)(8) [15 U.S.C. 80a-2(a)(8)].

95    See the ICBA Letter.

96    Id.

97    See the NYCH Letter, the ABA/ABASA Letter, and the Coalition of Banks' Letter.

98    Section 3(a)(54)(A)(xiii) of the Exchange Act [15 U.S.C. 78c(a)(54)(C)(xiii)].

99    Section 3(a)(54)(A)(v) of the Exchange Act [15 U.S.C. 78c(a)(54)(C)(v)].

100   See the NYCH Letter and the Coalition of Banks' Letter.

101   15 U.S.C. 78c(a)(54)(A)(v).

102   See the Coalition of Banks' Letter, which asked for clarification of the status of foreign pension plans.

103   This provision relates to pension plans that are "any State sponsored employee benefit plan, or any other employee benefit plan, within the meaning of the Employee Retirement Income Security Act of 1974, other than an individual retirement account, if the investment decisions are made by a plan fiduciary, as defined in section 3(21) of that Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser." 15 U.S.C. 78c(a)(54)(A)(v).

104   Rule 15a-11(e). [17 CFR 240.15a-11.] When the individual plan participants or beneficiaries of a pension plan make their own investment decisions, the plan itself would not meet the requirement that it invests the plan assets on a discretionary basis. See Section 3(a)(35) of the Exchange Act [15 USC 78c(a)(35)].

105   See the Coalition of Banks' Letter and the NYCH Letter.

106   For guidance on how to ascertain whether a person is a qualified investor, see Rule 144A(d)(1) under the Securities Act of 1933 [17 CFR 230.144A(d)(1)]. We note that the determination of whether a person is a qualified investor may involve both a qualitative analysis and a quantitative analysis. The source materials listed in Rule 144A would provide information that could be used in both types of determinations.

107   See H.R. Rep. No. 106-74, pt. 3, at 175 (1999).

108   Under Exchange Act Section 36(a), "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this title or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." 15 U.S.C. 78mm(a). The Commission also has authority to issue exemptive orders that grant relief from specific provisions of the Exchange Act as well as from specific Commission rules promulgated thereunder. For example, either by rule or by order, the Commission may, pursuant to Section 15(a)(2) of the Exchange Act, conditionally or unconditionally exempt any broker or dealer from the registration provisions of Section 15(a)(1). 15 U.S.C. 78o(a)(1).

109   See the ABA/ABASA Letter, the General Counsels' Letter, the IIB Letter, the Commerce Banc Letter, and the Roundtable Letter.

110   See the Commerce Banc Letter.

111   This section excepted certain bank-eligible securities such as U.S. government securities. Section 5(c) of the Glass-Steagall Act also applied the same Section 16 restrictions to state-chartered banks that are members of the Federal Reserve System. Savings Associations and savings banks did not have the exemption from broker-dealer registration until we adopted the Rule 15a-9 as part of the Interim Final Rules.

112   See supra note 109.

113   See the ABA/ABASA Letter and the NYCH Letter.

114   See the General Counsels' Letter, the ABA/ABASA Letter, the NYCH Letter, the Coalition of Banks' Letter, and the Roundtable Letter.

115   15 U.S.C. 78cc(b).

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 32 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

116    Exchange Act Section 29(b) does not make the contract automatically a nullity. Rather, the contract is voidable at the option of the innocent party. <u>Mills v. Electric Auto-Lite Co.</u>, 396 U.S. 375,387 (1970). In this manner, "the interests of the victim are sufficiently protected by giving him the right to rescind; to regard the contract as void where he has not invoked the right would only create the possibility of hardships to him or others without necessarily advancing the statutory policy of disclosure." <u>Id.</u> at 388.

117    <u>Id.</u> at 388; <u>see also Occidental Life Ins. Co. v. Pat Ryan and Assoc.</u>, 496 F.2d 1255, 1267 (4th Cir.), cert. denied, 419 U.S. 1023 (1974) (principles of equity, like estoppel and waiver, apply to actions brought under Exchange Act Section 29(b)).

118    <u>See Boguslavsky v. Kaplan</u>, 159 F.3d 715, 722 (2nd Cir. 1998) (under the liberal pleading standard accorded pro se litigants, an investor properly presented an identifiable claim for rescission under Exchange Act Section 29(b) in asserting that the firm operated without director of compliance and thus was not properly registered as securities broker-dealer); <u>Regional Properties, Inc. v. Financial and Real Estate Consulting Co.</u>, 752 F.2d 178, 182(5th Cir. 1985) (subject to equitable defenses, real estate developers were entitled to rescind agreement with broker to structure and market limited partnership interest where broker had failed to register as required by the Exchange Act); <u>Regional Properties v. Financial and Real Estate Consulting Co.</u>, 678 F.2d 552, 557, 566-67 (5th Cir. 1982), aff'd on other grounds, 752 F.2d 178 (5th Cir. 1985) (later appeal) (recognizing that Exchange Act Section 29(b) provides for a private, equitable cause of action for the rescission of a contract where the securities broker was unlicensed); <u>Eastside Church of Christ v. National Plan, Inc.</u>, 391 F.2d 357, 362 (5th Cir.), <u>cert. denied</u>, 393 U.S. 913 (1968) (churches could void a transaction with broker under Exchange Act Section 29(b) because the broker was unregistered); <u>Couldock and Bohan, Inc. v. Societe Generale Securities, Corp.</u>, 93 F. Supp. 2d 220, 233 (D. Conn. 2000) (a contract violating broker registration requirements of the Exchange Act is voidable at the option of file innocent party under Exchange Act Section 29(b)).

119    17 CFR 240.15a-8.

120    In the past, the Commission has been asked for this type of relief and has declined to grant it. <u>See</u> Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54 FR 30013 at 30021 (July 18, 1989). Our research indicates that there was not an increase in suits against foreign broker-dealers under Section 29 of the Exchange Act.

121    17 CFR 240.15a-8. On May 11, 2001, we adopted Rule 15a-8 as part of the Rules and sought comment on it. See Release No. 34-44291, 66 FR 27760 (May 18, 2001). At that time, we provided and anticipated that the general exemption for banks from the definition of dealer would end on October 1, 2001, and that an additional conditional exemption from the definition would end on January 1, 2002. Accordingly, to provide for sufficient transition time, we adopted Rule 15a-8 to provide for exemption from Section 29 rescission liability until January 1, 2003. During the comment period on the Rules, we received no comments suggesting that such an exemption was inappropriate.

Ultimately, however, to allow sufficient time to address concerns raised about the Rules, we further extended the exemption from the definition of dealer until September 30, 2003 (with today's extension). Accordingly, the transition period that we proposed and adopted in Rule 15a-8 has not yet commenced, because the existing Rule includes a specific termination date of January 1, 2003. Thus, the Rule as currently written would provide no adjustment period for banks. Accordingly, the recommended amendment to 15a-8 does nothing more than amend the Rule to establish a transition period commencing on the date that the general exemption from the definition actually expires, exactly as was contemplated when the existing Rule was adopted on an interim basis and published for public comment. Under these circumstances, we find good cause to conclude that this amendment to Rule 15a-8 may be accomplished without our separately and specifically providing notice of and an opportunity to comment on the amendment. We also believe that such notice is "unnecessary" within the meaning of 5 U.S.C. 553(b)(3)(B). Moreover, the proposing Release did include questions seeking input about any necessary accommodations for an orderly transition, and two commenters specifically suggested the accommodation that this amendment to Rule 15a-8 provides.

122    Exchange Act Section 36(a)(1) [15 U.S.C. 78mm(a)(1)].

123    We would expect banks, as a matter of good business practice, to be able to demonstrate that they meet the terms of a particular exemption. We also note that Section 204 of the GLBA specifically requires the bank agencies to promulgate recordkeeping requirements.

124    15 U.S.C. 78c(f).

125    15 U.S.C. 78w(a)(2).

126    5 U.S.C. 605(b).

127    <u>See</u> Proposing Release, <u>supra</u> note 2.

Release No. 47364 (S.E.C. Release No.), Release No. 34-47364, 79 S.E.C. Docket 1838, 2003 WL 328058

Case: 1:19-cv-01711 Document #: 52-4 Filed: 07/12/19 Page 33 of 33 PageID #:660

In re Definition of Terms in and Specific Exemptions for..., Release No. 47364...

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.