# EXHIBIT E

# Study on Investment Advisers and Broker-Dealers

**As Required by Section 913 of the
Dodd-Frank Wall Street Reform
and Consumer Protection Act**



**This is a Study of the Staff of the
U.S. Securities and Exchange Commission**

**January 2011**

**This is a study by the Staff of the U.S. Securities and Exchange Commission. The Commission has expressed no view regarding the analysis, findings, or conclusions contained herein.**

## Executive Summary

**Background**

Retail investors seek guidance from broker-dealers and investment advisers to manage their investments and to meet their own and their families' financial goals. These investors rely on broker-dealers and investment advisers for investment advice and expect that advice to be given in the investors' best interest. The regulatory regime that governs the provision of investment advice to retail investors is essential to assuring the integrity of that advice and to matching legal obligations with the expectations and needs of investors.

Broker-dealers and investment advisers are regulated extensively, but the regulatory regimes differ, and broker-dealers and investment advisers are subject to different standards under federal law when providing investment advice about securities. Retail investors generally are not aware of these differences or their legal implications. Many investors are also confused by the different standards of care that apply to investment advisers and broker-dealers. That investor confusion has been a source of concern for regulators and Congress.

Section 913 of Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") requires the U.S. Securities and Exchange Commission (the "Commission") to conduct a study (the "Study") to evaluate:

- The effectiveness of existing legal or regulatory standards of care (imposed by the Commission, a national securities association, and other federal or state authorities) for providing personalized investment advice and recommendations about securities to retail customers; and

- Whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute.

Section 913 also includes 14 items that must be considered in conducting the Study. The considerations address the following areas, among others:

- Whether retail customers understand or are confused by the differences in the standards of care that apply to broker-dealers and investment advisers;

- The regulatory, examination, and enforcement resources to enforce standards of care;

- The potential impact on retail customers if regulatory requirements change, including their access to the range of products and services offered by broker-dealers;

- The potential impact of eliminating the broker-dealer exclusion from the definition of "investment adviser" under the Investment Advisers Act of 1940 (the "Advisers Act"); and

- The potential additional costs to retail customers, broker-dealers, and investment advisers from potential changes in regulatory requirements.

As required by Section 913, the Study describes the considerations, analysis and public and industry input that the Staff considered in making its recommendations, and it includes an analysis of differences in legal and regulatory standards in the protection of retail customers relating to the standards of care for broker-dealers, investment advisers and their associated persons for providing personalized investment advice about securities to retail customers.

The Commission established a cross-Divisional staff task force (the "Staff") to bring a multi-disciplinary approach to the Study. The Commission also solicited comments and data as part of the Study and received over 3,500 comment letters. The Staff reviewed all of the comment letters, and appreciates commenters' thoughtful efforts to inform the Staff and to raise complex issues for consideration. The Staff also met with interested parties representing investors, broker-dealers, investment advisers, other representatives of the financial services industry, academics, state securities regulators, the North American Securities Administrator Association ("NASAA"), and the Financial Industry Regulatory Authority ("FINRA"), which serves as a self-regulatory organization ("SRO") for broker-dealers.

This Study outlines the Staff's findings and makes recommendations to the Commission for potential new rulemaking, guidance, and other policy changes. These recommendations are intended to make consistent the standards of conduct applying when retail customers receive personalized investment advice about securities from broker-dealers or investment advisers. The Staff therefore recommends establishing a uniform fiduciary standard for investment advisers and broker-dealers when providing investment advice about securities to retail customers that is consistent with the standard that currently applies to investment advisers. The recommendations also include suggestions for considering harmonization of the broker-dealer and investment adviser regulatory regimes, with a view toward enhancing their effectiveness in the retail marketplace.

The views expressed in this Study are those of the Staff and do not necessarily reflect the views of the Commission or the individual Commissioners. This Study was approved for release by the Commission.

**Current State of the Investment Adviser and Broker-Dealer Industries**

*Investment Advisers*:  Over 11,000 investment advisers are registered with the Commission.  As of September 30, 2010, Commission-registered advisers managed more than $38 trillion for more than 14 million clients.  In addition, there are more than 275,000 state-registered investment adviser representatives and more than 15,000 state-registered investment advisers.  Approximately 5% of Commission-registered investment advisers are also registered as broker-dealers, and 22% have a related person that is a broker-dealer.  Additionally, approximately 88% of investment adviser representatives are also registered representatives of broker-dealers.  A majority of Commission-registered investment advisers reported that over half of their assets under management related to the accounts of individual clients.  Most investment advisers charge their clients fees based on the percentage of assets under management, while others may charge hourly or fixed rates.

*Broker-Dealers*:  The Commission and FINRA oversee approximately 5,100 broker-dealers.  As of the end of 2009, FINRA-registered broker-dealers held over 109 million retail and institutional accounts.   Approximately 18% of FINRA-registered broker-dealers also are registered as investment advisers with the Commission or a state.  Most broker-dealers receive transaction-based compensation.

**Regulation of Investment Advisers and Broker-Dealers**

The regulatory schemes for investment advisers and broker-dealers are designed to protect investors through different approaches.  Investment advisers are fiduciaries to their clients, and the regulation under the Advisers Act generally is principles-based.  The regulation of broker-dealers governs how broker-dealers operate, for the most part, through the Commission's antifraud authority in the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), specific Exchange Act rules, and SRO rules based on Exchange Act principles, including (among others) principles of fairness and transparency.   Certain differences in the regulation of broker-dealers and advisers reflect differences, current and historical, in their functions, while others may reflect differences in the regulatory regime, particularly when investment advisers and broker-dealers are engaging in the same or substantially similar activity.  The recommendations listed in the Study are designed to address gaps in the regulatory regime, as well as differences in approach that are no longer warranted, as they relate to providing personalized investment advice about securities to retail customers.

*Investment Advisers*:  An investment adviser is a fiduciary whose duty is to serve the best interests of its clients, including an obligation not to subordinate clients' interests to its own.  Included in the fiduciary standard are the duties of loyalty and care.  An adviser that has a material conflict of interest must either eliminate that conflict or fully disclose to its clients all material facts relating to the conflict.

In addition, the Advisers Act expressly prohibits an adviser, acting as principal for its own account, from effecting any sale or purchase of any security for the account of a

client, without disclosing certain information to the client in writing before the completion of the transaction and obtaining the client's consent.

The states also regulate the activities of many investment advisers. Most smaller investment advisers are registered and regulated at the state level. Investment adviser representatives of state- and federally-registered advisers commonly are subject to state registration, licensing or qualification requirements.

*Broker-Dealers*: Broker-dealers that do business with the public generally must become members of FINRA. Under the antifraud provisions of the federal securities laws and SRO rules, including SRO rules relating to just and equitable principles of trade and high standards of commercial honor, broker-dealers are required to deal fairly with their customers. While broker-dealers are generally not subject to a fiduciary duty under the federal securities laws, courts have found broker-dealers to have a fiduciary duty under certain circumstances. Moreover, broker-dealers are subject to statutory, Commission and SRO requirements that are designed to promote business conduct that protects customers from abusive practices, including practices that may be unethical but may not necessarily be fraudulent. The federal securities laws and rules and SRO rules address broker-dealer conflicts in one of three ways: express prohibition; mitigation; or disclosure.

An important aspect of a broker-dealer's duty of fair dealing is the suitability obligation, which generally requires a broker-dealer to make recommendations that are consistent with the interests of its customer. Broker-dealers also are required under certain circumstances, such as when making a recommendation, to disclose material conflicts of interest to their customers, in some cases at the time of the completion of the transaction. The federal securities laws and FINRA rules restrict broker-dealers from participating in certain transactions that may present particularly acute potential conflicts of interest. At the state level, broker-dealers and their agents must register with or be licensed by the states in which they conduct their business.

**Examination and Enforcement Resources**

The Commission's Office of Compliance Inspections and Examinations ("OCIE") examines Commission-registered investment advisers using a risk-based approach. Due, among other things, to an increase in the number of Commission-registered advisers, a decrease in the number of OCIE staff, and a greater focus on more complex examinations, the number and frequency of examinations of these advisers by OCIE has decreased in recent years. The Commission recently released a study required by Dodd-Frank Act Section 914 that discusses possible approaches for improving the frequency of investment adviser examinations.

FINRA has primary responsibility for examining broker-dealers. The Commission staff also examines broker-dealers, particularly when a risk has been identified or when evaluating the examination work of an SRO, including FINRA, but generally does not examine broker-dealers on a routine basis. The states are responsible

iv

for examining state-registered investment advisers, and they work with FINRA and the Commission on broker-dealer examinations.

The Commission has broad statutory authority under the federal securities laws to investigate violations of the federal securities laws and SRO rules. The Commission's Division of Enforcement investigates potential securities law violations, recommends that the Commission bring civil actions or institute administrative proceedings, and prosecutes these cases on behalf of the Commission. Examples of enforcement actions involving investment advisers include failures to disclose material conflicts of interest, misrepresentations, and other frauds. For broker-dealers, examples include abusive sales practices, failures to disclose material conflicts of interest, misrepresentations, failures to have a reasonable basis for recommending securities, other frauds, failures to reasonably supervise representatives. The Commission may seek remedial sanctions such as censures, suspensions, injunctions and limitations on business, and violators may be required to pay disgorgement and civil penalties.

**Retail Investor Perceptions**

Many retail investors and investor advocates submitted comments stating that retail investors do not understand the differences between investment advisers and broker-dealers or the standards of care applicable to broker-dealers and investment advisers. Many find the standards of care confusing, and are uncertain about the meaning of the various titles and designations used by investment advisers and broker-dealers. Many expect that both investment advisers and broker-dealers are obligated to act in the investors' best interests. The Commission has sponsored studies of investor understanding of the roles, duties and obligations of investment advisers and broker-dealers that similarly reflect confusion by retail investors regarding the roles, titles, and legal obligations of investment advisers and broker-dealers, although the studies found that investors generally were satisfied with their financial professionals. Several of the recommendations listed below are designed to address investor confusion and provide for a stronger and more consistent regulatory regime for broker-dealers and investment advisers providing personalized investment advice about securities to retail investors.

**Recommendations**

Based on its review of the broker-dealer and investment adviser industries, the regulatory landscape, issues raised by commenters, and other considerations required by Dodd-Frank Act Section 913, the Staff prepared recommendations that are listed below. The recommendations are designed to increase investor protection and decrease investor confusion in the most practicable, least burdensome way for investors, broker-dealers and investment advisers.

**Uniform Fiduciary Standard**: Consistent with Congress's grant of authority in Section 913, the Staff recommends the consideration of rulemakings that would apply expressly and uniformly to both broker-dealers and investment advisers, when providing personalized investment advice about securities to retail customers, a fiduciary standard

no less stringent than currently applied to investment advisers under Advisers Act Sections 206(1) and (2). In particular, the Staff recommends that the Commission exercise its rulemaking authority under Dodd-Frank Act Section 913(g), which permits the Commission to promulgate rules to provide that:

> the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.

The standard outlined above is referred to in the Study as the "uniform fiduciary standard."

The Staff notes that Section 913 explicitly provides that the receipt of commission-based compensation, or other standard compensation, for the sale of securities does not, in and of itself, violate the uniform fiduciary standard of conduct applied to a broker-dealer. Section 913 also provides that the uniform fiduciary standard does not necessarily require broker-dealers to have a continuing duty of care or loyalty to a retail customer after providing personalized investment advice.

The following recommendations suggest a path toward implementing a uniform fiduciary standard for investment advisers and broker-dealers when providing personalized investment advice about securities to retail customers:

- *Standard of Conduct:* The Commission should exercise its rulemaking authority to implement the uniform fiduciary standard of conduct for broker-dealers and investment advisers when providing personalized investment advice about securities to retail customers. Specifically, the Staff recommends that the uniform fiduciary standard of conduct established by the Commission should provide that:

> the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers (and such other customers as the Commission may by rule provide), shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice.

*Implementing the Uniform Fiduciary Standard*: The Commission should engage in rulemaking and/or issue interpretive guidance addressing the components of the uniform fiduciary standard: the duties of loyalty and care. In doing so, the Commission should identify specific examples of potentially relevant and common material conflicts of interest in order to facilitate a smooth transition to the new standard by broker-dealers and consistent interpretations by broker-dealers and investment advisers. The Staff is of the view that the existing guidance and precedent under the Advisers Act regarding

fiduciary duty, as developed primarily through Commission interpretive pronouncements under the antifraud provisions of the Advisers Act, and through case law and numerous enforcement actions, will continue to apply.

- *Duty of Loyalty:* A uniform standard of conduct will obligate both investment advisers and broker-dealers to eliminate or disclose conflicts of interest. The Commission should prohibit certain conflicts and facilitate the provision of uniform, simple and clear disclosures to retail investors about the terms of their relationships with broker-dealers and investment advisers, including any material conflicts of interest.

  - o   The Commission should consider which disclosures might be provided most effectively (a) in a general relationship guide akin to the new Form ADV Part 2A that advisers deliver at the time of entry into the retail customer relationship, and (b) in more specific disclosures at the time of providing investment advice (<u>e.g.</u>, about certain transactions that the Commission believes raise particular customer protection concerns).

  - o   The Commission also should consider the utility and feasibility of a summary relationship disclosure document containing key information on a firm's services, fees, and conflicts and the scope of its services (<u>e.g.</u>, whether its advice and related duties are limited in time or are ongoing).

  - o   The Commission should consider whether rulemaking would be appropriate to prohibit certain conflicts, to require firms to mitigate conflicts through specific action, or to impose specific disclosure and consent requirements.

- *Principal Trading*:  The Commission should address through interpretive guidance and/or rulemaking how broker-dealers should fulfill the uniform fiduciary standard when engaging in principal trading.

- *Duty of Care*:  The Commission should consider specifying uniform standards for the duty of care owed to retail investors, through rulemaking and/or interpretive guidance.  Minimum baseline professionalism standards could include, for example, specifying what basis a broker-dealer or investment adviser should have in making a recommendation to an investor.

- *Personalized Investment Advice About Securities:*  The Commission should engage in rulemaking and/or issue interpretive guidance to explain what it means to provide "personalized investment advice about securities."

- *Investor Education:* The Commission should consider additional investor education outreach as an important complement to the uniform fiduciary standard.

The Staff believes that the uniform fiduciary standard and related disclosure requirements may offer several benefits, including the following:

- Heightened investor protection;

- Heightened investor awareness;

- It is flexible and can accommodate different existing business models and fee structures;

- It would preserve investor choice;

- It should not decrease investors' access to existing products or services or service providers;

- Both investment advisers and broker-dealers would continue to be subject to all of their existing duties under applicable law; and

- Most importantly, it would require that investors receive investment advice that is given in their best interest, under a uniform standard, regardless of the regulatory label (broker-dealer or investment adviser) of the professional providing the advice.

The Staff also believes that to fully protect the interests of retail investors, the Commission should couple the fiduciary duty with effective oversight. Dodd-Frank Act Section 913 includes a provision requiring the Commission to enforce violations of the uniform fiduciary standard consistently against investment advisers and broker-dealers. This should provide additional protection to retail investors.

**Harmonization of Regulation**: The Staff believes that a harmonization of regulation—where such harmonization adds meaningful investor protection—would offer several advantages, including that it would provide retail investors the same or substantially similar protections when obtaining the same or substantially similar services from investment advisers and broker-dealers. The following recommendations address certain other areas where investment adviser and broker-dealer laws and regulations differ, and where the Commission should consider whether laws and regulations that apply to these functions should be harmonized for the benefit of retail investors:

- *Advertising and Other Communications*: The Commission should consider articulating consistent substantive advertising and customer communication rules and/or guidance for broker-dealers and investment advisers regarding the content of advertisements and other customer communications for similar services. In addition, the Commission should consider, at a minimum, harmonizing internal pre-use review requirements for investment adviser and broker-dealer advertisements or requiring investment advisers to designate employees to review and approve advertisements.

- *Use of Finders and Solicitors:* The Commission should review the use of finders and solicitors by investment advisers and broker-dealers and consider whether to provide additional guidance or harmonize existing regulatory requirements to address the status of finders and solicitors and their respective relevant disclosure requirements to assure that retail customers better understand the conflicts associated with the solicitor's and finder's receipt of compensation for sending a retail customer to an adviser or broker-dealer.

- *Supervision:* The Commission should review supervisory requirements for investment advisers and broker-dealers, with a focus on whether any harmonization would facilitate the examination and oversight of these entities (e.g., whether detailed supervisory structures would not be appropriate for a firm with a small number of employees) and consider whether to provide any additional guidance or engage in rulemaking.

- *Licensing and Registration of Firms:* The Commission should consider whether the disclosure requirements in Form ADV and Form BD should be harmonized where they address similar issues, so that regulators and retail investors have access to comparable information. The Commission also should consider whether investment advisers should be subject to a substantive review prior to registration.

- *Licensing and Continuing Education Requirements for Persons Associated with Broker-Dealers and Investment Advisers:* The Commission could consider requiring investment adviser representatives to be subject to federal continuing education and licensing requirements.

- *Books and Records:* The Commission should consider whether to modify the Advisers Act books and records requirements, including by adding a general requirement to retain all communications and agreements (including electronic information and communications and agreements) related to an adviser's "business as such," consistent with the standard applicable to broker-dealers.

The Staff understands and is sensitive to the fact that, in addition to the benefits they would provide, changes in legal or regulatory standards related to providing personalized investment advice to retail investors could lead to increased costs for investors, investment advisers, broker-dealers, and their associated persons. The Study considers a number of potential costs, expenses and impacts of various potential regulatory changes.

Dodd-Frank Act Section 913 required the Staff to consider the potential impact of: (a) eliminating the broker-dealer exclusion from the definition of "investment adviser" in the Advisers Act; and (b) applying the duty of care and other requirements of the Advisers Act to broker-dealers. The Staff believes that these alternatives would not provide the Commission with a flexible, practical approach to addressing what standard

should apply to broker-dealers and investment advisers when they are performing the same functions for retail investors.

\*       \*       \*

In the end, the Staff's recommendations were guided by an effort to establish a standard to provide for the integrity of advice given to retail investors and to recommend a harmonized regulatory regime for investment advisers and broker-dealers when providing the same or substantially similar services, to better protect retail investors. The Staff developed its recommendations with a view toward minimizing cost and disruption and assuring that retail investors continue to have access to various investment products and choice among compensation schemes to pay for advice.

x

# Table of Contents

I.    **Introduction**................................................................................................. 1

    A.    Study's Mandate ........................................................................................1

    B.    Study's Scope............................................................................................4

II.   **Overview of the Current Business and Regulatory Landscape**........................ 5

    A.    Current Business Landscape for Investment Advisers and Broker-Dealers ..6

        1.    Investment Advisers.................................................................... 6

        2.    Broker-Dealers ........................................................................... 8

        3.    Dual Registrants ....................................................................... 12

    B.    Commission and Self Regulatory Organization ("SRO") Regulation of Investment Advisers and Broker-Dealers ................................................ 13

        1.    Investment Advisers.................................................................. 14

        2.    Broker-Dealers ......................................................................... 46

    C.    State and Other Regulation of Investment Advisers and Broker-Dealers... 84

        1.    Investment Advisers.................................................................. 84

        2.    Broker-Dealers ......................................................................... 89

III.  **Retail Investor Perceptions and Confusion Regarding Financial Service Provider Obligations and Standard of Conduct** ............................................ 93

    A.    Investor and Investor Advocate Comments .................................................. 94

    B.    Commission-sponsored Studies..................................................................... 95

    C.    CFA Survey...................................................................................................... 99

    D.    Conclusion.................................................................................................... 101

IV.  **Analysis and Recommendations** ................................................................... 101

    A.    General Differences in Investment Adviser and Broker-Dealer Regulation 102

    B.    Standards of Conduct.................................................................................... 106

    C.    Implementing the Uniform Fiduciary Standard ........................................ 110

        1.    Duty of Loyalty........................................................................ 112

        2.    Duty of Care............................................................................. 120

|  |  | 3. | Personalized Investment Advice About Securities | 123 |
|  |  | 4. | Investor Education | 128 |
|  | D. | Harmonization of Regulation | | 129 |
|  |  | 1. | Advertising and the Use of Finders and Solicitors | 130 |
|  |  | 2. | Remedies | 133 |
|  |  | 3. | Supervision | 135 |
|  |  | 4. | Licensing and Registration of Firms | 136 |
|  |  | 5. | Licensing and Continuing Education Requirements for Persons Associated with Broker-Dealers and Investment Advisers | 138 |
|  |  | 7. | Books and Records | 139 |
|  | E. | Alternatives to the Uniform Fiduciary Standard | | 139 |
|  |  | 1. | Repealing the Broker-Dealer Exclusion | 139 |
|  |  | 2. | Imposition of the Standard of Conduct and Other Requirements of the Advisers Act | 140 |
|  |  | 3. | Potential Drawbacks of Both Approaches | 140 |

**V.** **Cost Analysis** ............................................................................. **143**

|  | A. | Introduction | | 143 |
|  | B. | Potential Costs Associated with the Elimination of the Broker-Dealer Exclusion | | 146 |
|  |  | 1. | Costs to Broker-Dealers | 146 |
|  |  | 2. | Costs to Investment Advisers | 151 |
|  |  | 3. | Costs to Retail Investors, including Loss of Investor Choice | 151 |
|  | C. | Potential Costs Associated with Staff Recommendation to Consider Rules Applying a Standard of Conduct No Less Stringent than Advisers Act Sections 206(1) and 206(2) to Broker-Dealers, Investment Advisers and their Respective Associated Persons. | | 155 |
|  |  | 1. | Costs to Broker-Dealers | 156 |
|  |  | 2. | Costs to Investment Advisers | 159 |
|  |  | 3. | Costs to Retail Investors, including Loss of Investor Choice | 159 |
|  | D. | Potential Costs Associated with the Application of Additional Harmonized Standards Beyond those Associated with sub-Section C | | 163 |
|  |  | 1. | Costs to Broker-Dealers | 163 |
|  |  | 2. | Costs to Investment Advisers | 164 |
|  |  | 3. | Costs to Retail Investors, including Loss of Investor Choice | 165 |

**VI.** **Conclusion** ................................................................................. **165**

**Appendix A: Regulatory, Examination and Enforcement Resources Devoted to Enforcing Standards of Care for Providing Personalized Investment Advice and Recommendations ................................................................. A-1**

I.      Commission and SRO Regulatory, Examination and Enforcement Resources ................................................................................ A-1

     A.      Recent Commission Developments to Enhance Effectiveness of Examinations ...................................................................... A-1

     B.      Examinations of Investment Advisers and Broker-Dealers ........ A-2

     C.      Commission Enforcement ........................................... A-17

     D.      FINRA Enforcement ................................................ A-21

II.     State Regulatory, Examination and Enforcement Resources ................. A-22

     A.      Overview of State Examinations ................................... A-22

     B.      Investment Adviser Examinations ................................. A-23

     C.      Broker-Dealer Examinations ....................................... A-25

     D.      Investment Adviser and Broker-Dealer Examination Outcomes ............................................................. A-26

**Appendix B: Groups, Entities and Individuals Who Met with the Staff ................. B-1**

## I.      Introduction

### A.      Study's Mandate

On July 21, 2010, President Obama signed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act").[1]   Dodd-Frank Act of Title IX of Section 913 ("Dodd-Frank Section 913") requires the Commission to conduct a study regarding the obligations of brokers, dealers, and investment advisers ("Study").

Specifically, Dodd-Frank Act Section 913(b) requires the evaluation of the effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, and persons associated with brokers, dealers, and  investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association (i.e., the Financial Industry Regulatory Authority ("FINRA")), and other Federal and State legal or regulatory standards.  In addition, the Study must evaluate whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, and persons associated with brokers, dealers, and investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute.  Dodd-Frank Act Section 913(g) defines a "retail customer" as "a natural person, or the legal representative of a natural person, who – (A) receives personalized investment advice about securities from a broker, dealer, or investment adviser, and (B) uses such advice primarily for personal, family or household purposes."

Dodd-Frank Act Section 913(c) specifies 14 issues that the Commission must consider in conducting the Study.  These issues are:

- The effectiveness of existing legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers imposed by the Commission and a national securities association, and other Federal and State legal or regulatory standards;

- Whether there are legal or regulatory gaps, shortcomings, or overlaps in legal or regulatory standards in the protection of retail customers relating to the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice about securities to retail customers that should be addressed by rule or statute;

---

[1]      Pub. L. No. 111-203, 124 Stat. 1376 (2010).

1

- Whether retail customers understand that there are different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers in the provision of personalized investment advice about securities to retail customers;

- Whether the existence of different standards of care applicable to brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers is a source of confusion for retail customers regarding the quality of personalized investment advice that retail customers receive;

- The regulatory, examination, and enforcement resources devoted to, and activities of, the Commission, the States, and a national securities association to enforce the standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers when providing personalized investment advice and recommendations about securities to retail customers, including—

  (A)    the effectiveness of the examinations of brokers, dealers, and investment advisers in determining compliance with regulations;

  (B)    the frequency of the examinations; and

  (C)    the length of time of the examinations;

- The substantive differences in the regulation of brokers, dealers, and investment advisers, when providing personalized investment advice and recommendations about securities to retail customers;

- The specific instances related to the provision of personalized investment advice about securities in which—

  (A)    the regulation and oversight of investment advisers provide greater protection to retail customers than the regulation and oversight of brokers and dealers; and

  (B)    the regulation and oversight of brokers and dealers provide greater protection to retail customers than the regulation and oversight of investment advisers;

- The existing legal or regulatory standards of state securities regulators and other regulators intended to protect retail customers;

- The potential impact on retail customers, including the potential impact on access of retail customers to the range of products and services offered by brokers and dealers, of imposing upon brokers, dealers, and persons associated with brokers or

2

dealers—

    (A)    the standard of care applied under the Investment Advisers Act of 1940 ("Advisers Act") for providing personalized investment advice about securities to retail customers of investment advisers, as interpreted by the Commission and the courts; and

    (B)    other requirements of the Advisers Act;

- The potential impact of eliminating the broker and dealer exclusion from the definition of "investment adviser" under Advisers Act Section 202(a)(11)(C), in terms of—

    (A)    the impact and potential benefits and harm to retail customers that could result from such a change, including any potential impact on access to personalized investment advice and recommendations about securities to retail customers or the availability of such advice and recommendations;

    (B)    the number of additional entities and individuals that would be required to register under, or become subject to, the Advisers Act, and the additional requirements to which brokers, dealers, and persons associated with brokers and dealers would become subject, including—

        (i)  any potential additional associated person licensing, registration, and examination requirements; and

        (ii) the additional costs, if any, to the additional entities and individuals; and

    (C)    the impact on Commission and State resources to—

        (i)  conduct examinations of registered investment advisers and the representatives of registered investment advisers, including the impact on the examination cycle; and

        (ii) enforce the standard of care and other applicable requirements imposed under the Advisers Act;

- The varying level of services provided by brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers to retail customers and the varying scope and terms of retail customer relationships of brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers with such retail customers;

3

- The potential impact upon retail customers that could result from potential changes in the regulatory requirements or legal standards of care affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations to retail customers regarding the provision of investment advice, including any potential impact on—

  (A)     protection from fraud;

  (B)     access to personalized investment advice, and recommendations about securities to retail customers; or

  (C)     the availability of such advice and recommendations;

- The potential additional costs and expenses to—

  (A)     retail customers regarding, and the potential impact on the profitability of, their investment decisions; and

  (B)     brokers, dealers, and investment advisers resulting from potential changes in the regulatory requirements or legal standards affecting brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers relating to their obligations, including duty of care, to retail customers; and

- Any other considerations that the Commission considers necessary and appropriate in determining whether to conduct a rulemaking, following the study, to address the legal or regulatory standards of care for brokers, dealers, investment advisers, persons associated with brokers or dealers, and persons associated with investment advisers for providing personalized investment advice and recommendations about securities to retail customers.

These considerations are addressed in more detail in the relevant portions of the Study below.   Finally, the Commission is required by Dodd-Frank Act Section 913(d) to submit a report on the Study to the Committee on Banking, Housing and Urban Affairs of the Senate and the Committee of Financial Services of the House of Representatives.  The report must describe the findings, conclusions and recommendations from the Study.  The views expressed in this Study are those of the Staff and do not necessarily reflect the views of the Commission or the individual Commissioners.

**B.     Study's Scope**

Dodd-Frank Act Section 913(e) directs the Commission to seek and consider public input in preparing the Study.  On July 27, 2010, the Commission published a request for

public comments and data to inform the Study.[2]  The comment period closed on August 30, 2010.  The Commission received more than 3,000 individualized comments, including comments from investors, financial professionals, industry groups, academics, and other regulators.  The Commission also received over 500 comments that comprised seven types of form letters.  The Commission staff has carefully considered the views of these commenters and has incorporated them in the Study, as appropriate.

Given the array of issues to be considered in the Study, including issues related to investment advisers, broker-dealers, investor disclosures, costs, and examination and enforcement responsibilities and resources, a cross-Divisional staff task force was formed to bring a multi-disciplinary approach to the Study ("Staff").  Staff participants include representatives from the:

Division of Investment Management;
Division of Risk, Strategy, and Financial Innovation;
Division of Trading and Markets;
Office of Compliance Inspections and Examinations;
Office of the General Counsel; and
Office of Investor Education and Advocacy.

To help further inform the Study and consistent with the Commission's public outreach on these issues, the Staff met with interested parties representing a variety of perspectives beginning in August 2010 (see Appendix B).  The Staff met with outside groups constituting a range of industry perspectives, from wirehouses to financial planners.  In addition, the Staff met with FINRA, state securities regulators (i.e., the North American Securities Administrator Association ("NASAA")), and organizations (e.g., the Consumer Federation of America, the Committee for a Fiduciary Standard and the Public Investors Arbitration Bar Association). The Staff also requested assistance from state securities regulators and FINRA with the aspects of the study involving their efforts, such as examinations and enforcement.

## II.    Overview of the Current Business and Regulatory Landscape

Investment advisers and broker-dealers offer a variety of services and products to their retail clients and customers, with the scope and terms of the relationship and the associated compensation reflecting the services and products offered.  The following section summarizes the size and scope of the investment advisory and brokerage businesses, including dual registrants, focusing particularly on the various services and products provided by investment advisers and broker-dealers to retail clients and customers, and the scope and terms of advisory or brokerage relationships with retail clients and customers.

---

[2]     Study Regarding Obligations of Brokers, Dealers, and Investment Advisers, Exchange Act Release No. 62577 (July 27, 2010).

### A.    Current Business Landscape for Investment Advisers and Broker-Dealers

#### 1.    Investment Advisers

Investment advisers provide a wide range of investment advisory services and play an important role in helping individuals and institutions make significant financial decisions.  From individuals and families seeking to plan for retirement or save for college to large institutions managing billions of dollars, clients seek the services of investment advisers to help them evaluate their investment needs, plan for their future, develop and implement investment strategies, and cope with the ever-growing complexities of the financial markets.  Today, the more than 11,000 advisers registered with the Commission manage more than $38 trillion for more than 14 million individual and institutional clients.[3]  In addition, there are more than 275,000 investment adviser representatives registered in the applicable states and more than 15,000 state-registered investment advisers.[4]

The majority of Commission-registered investment advisers manage client portfolios.[5]  For example, approximately 75% of Commission-registered investment

---

[3]     Unless otherwise specified, the statistics in Section II.A.1 are based on data derived from Commission-registered investment advisers' responses to questions on Part 1A of Form ADV reported through the Investment Adviser Registration Depository ("IARD") as of September 30, 2010.  This does not include state-registered investment advisers.  We note that these figures will change due to the reallocation of federal and state responsibilities for registered investment advisers provided by Title IV of the Dodd-Frank Act.  See, e.g., Study on Enhancing Investment Adviser Examinations (Jan. 2011) (the "Section 914 Study").  See also Commissioner Elisse B. Walter,  Statement on Study Enhancing Investment Adviser Examinations (Required by Section 914 of Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act) (Jan. 2010) , available at http://www.sec.gov/news/speech/2011/spch011911ebw.pdf  ("Commissioner Walter Statement").  See also Rules Implementing Amendments to the Investment Advisers Act of 1940, Investment Advisers Act Release No. 3110 (Nov. 19, 2010) ("Release 3110").  The number of investment advisers has increased by 38.5% since 2004, when there were 8,581 registered investment advisers; and the amount of assets under management of registered investment advisers also has increased, by 58.9% since 2004, when assets totaled $24.1 trillion.  Section 914 Study at 8 – 9.

[4]     See Sections II.C.1 and II.C.2 of the Study, infra, for a discussion of the federal and state registration requirements for investment advisers and investment adviser representatives.

[5]     Form ADV (Uniform Application for Investment Adviser Registration) requires applicants to, among other things, identify the types of clients and advisory service provided.  The types of clients listed in Part 1A, Item 5.D of Form ADV are individuals (other than high net worth individuals); high net worth individuals (as that term is defined in the Glossary to Form ADV); banking or thrift institutions; investment companies (including mutual funds); pension and profit sharing plans (other than plan participants); other pooled investment vehicles (e.g., hedge funds); charitable organizations; corporations or other businesses not previously listed; state or municipal government entities; and any other type of clients.  The ten types of advisory activities listed in Part 1A, Item 5.G of Form ADV include financial planning services; portfolio management for individuals and/or small businesses; portfolio management for investment companies; portfolio management for business or institutional clients (other than investment companies); pension

advisers managed the portfolios of individuals and small businesses. Commission-registered investment advisers also reported that approximately 91.2% of their assets under management were in discretionary accounts, while 8.8% were in non-discretionary accounts.[6] Approximately 63.9% of Commission-registered investment advisers reported that 51% or more of their assets under management related to the accounts of individual clients (other than high net worth individuals).

Investment advisers also manage the portfolios of pooled investment vehicles such as hedge funds and other private funds, pension funds and registered investment companies. Investment advisers also provide financial planning and pension consulting services, or may select investment advisers for others. In addition, investment advisers sponsor wrap fee programs and may act as portfolio managers in wrap fee programs.[7] Some investment advisers publish periodicals or newsletters, or provide securities ratings or pricing services. Many investment advisers also engage in other non-advisory businesses, such as insurance broker or agent, or as a registered broker-dealer or registered representative of a broker-dealer.[8] Most investment advisers charge clients fees for investment advisory services based on the percentage of assets under management (over 95%).[9] Others may charge hourly or fixed rates. Few investment advisers reported receiving commission-based compensation (8.9% of Commission-registered investment advisers). The majority of Commission-registered investment advisers (51.2%) reported that they have six or fewer non-clerical employees, and 91% reported that they have 50 or fewer employees.

---

[_] consulting services; selection of other advisers; publication of periodicals or newsletters; security ratings or pricing services; market timing services; and any other advisory service.

[6] These figures do not distinguish between the types of clients (i.e., individual or institutional).

[7] Form ADV's Glossary defines a "wrap fee program" as "any advisory program under which a specified fee or fees not based directly upon transactions in a client's account is charged for investment advisory services (which may include portfolio management or advice concerning the selection of other investment advisers) and the execution of client transactions." Part 1A, Item 5.I of Form ADV requires applicants to identify whether they participate in a wrap fee program, and if so, whether they sponsor the program or act as a portfolio manager to the program.

[8] Part 1A, Item 6 of Form ADV requires an investment adviser applicant to disclose, among other things, whether it is actively engaged in business as a broker-dealer; registered representative of a broker-dealer; futures commission merchant, commodity pool operator, or commodity trading advisor; real estate broker, dealer, or agent; insurance broker or agent; bank (including a separately identifiable department or division of a bank); other financial product salesperson; or any other business (other than giving investment advice).

[9] Part 1A, Item 5.E of Form ADV requires applicants to disclose whether they are compensated for their investment advisory services by a percentage of assets under management; hourly charges; subscription fees (for a newsletter or periodical); fixed fees (other than subscription fees); commissions; performance-based fees; or any other fees.

2.        **Broker-Dealers**

Like investment advisers, broker-dealers provide services that play an important role in helping retail and institutional investors make significant financial decisions. As intermediaries, they connect investors to investments, which range from common stock and mutual funds to complex financial products, and in doing so, enhance the overall liquidity and efficiency of the financial markets. As of the end of 2009, broker-dealers held approximately 110 million customer accounts.[10] Currently, the Commission oversees approximately 5,100 broker-dealers[11] with over 600,000 registered representatives[12] engaging in a variety of business activities, which may or may not include the provision of personalized investment advice or recommendations about securities to retail customers.[13] Of the 5,100 registered broker-dealer firms, 985 have indicated on Form BD that they engage in, or expect to engage in, investment advisory services constituting one percent or more of their annual revenue.[14]

---

[10]    See letter from Angela Goelzer, FINRA, dated Jan. 11, 2011 ("FINRA January Letter") (noting that as of December 31, 2009, there were 109.5 million retail and institutional accounts held at FINRA registered broker-dealers).

[11]    Unless otherwise specified, the statistics in Section II.A.2 are based on data derived from broker-dealers' responses to questions on the Uniform Application for Broker-Dealer Registration ("Form BD") reported through the Central Registration Depository ("CRD") as of September 30, 2010. Of this number, approximately 4,600 are FINRA member firms with approximately 163,000 branch offices. FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics.

[12]    These figures are based on data derived from the BrokerCheck system as of September 30, 2010. See also FINRA, 2009 Annual Financial Report, at 2, available at: http://www.finra.org/web/groups/corporate/@corp/@about/@ar/documents/corporate/p122204.pdf. The number of FINRA member firms has decreased by 10.4% since 2005, from 5,111 to 4,578 in 2010. The number of registered representatives has decreased by 3.8% since 2005, from 655,832 to 630,692 in 2010. FINRA Statistics, available at http://www.finra.org/Newsroom/Statistics/, and NASD 2005 Year in Review at 7, available at http://www.finra.org/web/groups/corporate/@corp/@about/@ar/documents/corporate/p016705.pdf .

[13]    Form BD requires applicants to identify the types of business engaged in (or to be engaged in) that accounts for 1% or more of the applicant's annual revenue from the securities or investment advisory business. The 29 types of business listed on Form BD include, among others: engaging in stock exchange floor activities; making inter-dealer markets in corporate securities over-the-counter; retailing corporate equity securities over-the-counter; acting as an underwriter or selling group participant; acting as a mutual fund underwriter or sponsor; retailing mutual funds; acting as a U.S. government securities dealer or broker; acting as a municipal securities dealer or broker; selling variable life insurance or annuities; selling securities of only one issuer or associate issuers (other than mutual funds); providing investment advisory services; trading securities for own account; engaging in private placements of securities; and any other business.

[14]    These figures are based on data derived from broker-dealers' responses to questions on Form BD reported through the CRD as of September 30, 2010. Form BD does not define "investment advisory business." Rather, it is up to the applicant to determine and disclose. "Investment advisory business" could be any investment advisory activity, regardless of whether it requires registration as an adviser (at the federal or state level), that amounts to 1% or more of the applicant's annual revenue. According to FINRA, as of September 30, 2010, 1,734 or approximately 37%, of its 4,648 registered firms had affiliates that engaged in investment advisory

The products and services offered by broker-dealers fall into two broad categories: brokerage services and dealer services. Generally, a broker is one who acts as an agent for someone else, while a dealer is one who acts as principal for its own account.[15] A person can act as principal by selling securities out of inventory, or act in a riskless principal capacity.[16] A person can be both a broker and a dealer.

Broker-dealers may offer a variety of brokerage (i.e., agency) services and products to retail customers including, but not limited to: providing execution-only services (e.g., discount brokerage);[17] providing custody and trade execution to a customer who has selected an independent financial adviser; executing trades placed by investment advisers in a wrap fee programs; offering margin accounts; providing generalized research, advice, and education;[18] operating a call center (e.g., responding to a customer request for stock quotes, information about an issuer or industry, and then placing a trade at the customer's request);[19] providing asset allocation services with recommendations about asset classes, specific sectors, or specific securities; providing customer-specific research and analysis;[20]

---

[15]    activities. Of these 1,734 firms, approximately 83% were not dually registered as investment advisers, and approximately 17% were dually registered. In addition to the 1,734 firms, there were 553 firms that were dually registered but did not report having an investment advisory affiliate. FINRA January Letter, supra note 10.

[15]    See discussion in Section II.B below.

[16]    A riskless principal transaction is generally defined as one in which a broker or dealer, after receiving an order to buy (or sell) a security from a customer, purchases (or sells) the security to offset a contemporaneous sale to (or purchase from) the customer. See Exchange Act Rule 10b-10(a)(2)(ii).

[17]    See, e.g., letter from R. Scott Henderson, Deputy General Counsel, Global Wealth & Investment Management, Bank of America, dated Aug. 30, 2010 ("BOA Letter"); letter from David M. Carroll, Senior Executive Vice President of Wealth, Brokerage and Retirement, Wells Fargo & Co., dated Aug. 30, 2010 ("Wells Fargo Letter").

[18]    Examples of generalized research, advice and education include: issuing sell-side research reports; providing third-party or proprietary securities research to a customer (e.g., online research pages or "electronic libraries" of research, reports, news, quotes, and charts that customers can obtain or request); providing self-directed tools to allow customers to sort through a broad range of stocks and industry sectors; and providing subscription services to e-mails or other communications that alert customers to news affecting the securities in the customers' portfolios or on the customers' "watch list." See, e.g., NASD Notice to Members 01-23 (Suitability Rule and Online Communications).

[19]    See, e.g., letter from Christopher P. Gilkerson, Senior Vice President & Deputy General Counsel, Charles Schwab & Co., Inc., dated Aug. 30, 2010 ("Schwab Letter").

[20]    Examples of customer-specific research and analysis include: sending customer-specific electronic communications to a targeted customer or targeted group of customers encouraging the particular customer(s) to buy a security; sending customers an e-mail stating that customers should invest in a particular sector and providing a list of "buy" or "sell" recommendations; and providing a portfolio analysis tool that generates buy or sell recommendations of specific securities. See, e.g., NASD Notice to Members 01-23 (Suitability Rule and Online Communications).

exercising limited trading discretion over customer accounts;[21] providing transaction-specific recommendations to buy or sell securities in a non-discretionary account for commissions;[22] providing discretionary portfolio management for commissions; providing financial planning for commissions or no fee;[23] and providing comprehensive (or private) wealth management for commissions.[24]

Broker-dealers also may offer a variety of dealer (i.e., principal) services and products to retail customers, including, but not limited to: selling securities (such as bonds) out of inventory; buying securities from customers; selling proprietary products (e.g., products such as affiliated mutual funds, structured products, private equity and other alternative investments); selling initial and follow-on public offerings; selling other underwritten offerings; acting as principal in Individual Retirement Accounts; acting as a market maker; and otherwise acting as a dealer.[25] Broker-dealers may offer solely proprietary products, a limited range of products, or a diverse range of products.[26]

In addition to these broker and dealer activities, broker-dealers often provide ancillary services, such as lending, bill paying, cash sweeps, and debit cards.[27] Broker-dealers may also refer investors to affiliates for non-securities related financial offerings, such as mortgages, insurance, credit cards or bank deposits.[28]

Broker-dealers currently offer customers a variety of pricing and compensation structures for the products and services offered.[29] Generally, the compensation in a broker-

---

[21]    See, e.g., letter from Sarah A. Miller, Senior Vice President, American Bankers Association ("ABA"), and Executive Director and General Counsel, ABA Securities Association ("ABASA"), dated Aug. 30, 2010 ("ABA & ABASA Letter").

[22]    See, e.g., Schwab Letter, supra note 19.

[23]    Id.

[24]    Examples of comprehensive (or private) wealth management include: life event planning; retirement planning; college planning; tax management; life insurance; estate planning; and charitable giving.

[25]    See Guide to Broker-Dealer Registration, (April 2008), available at: http://www.sec.gov/divisions/marketreg/bdguide.html ("Guide to Broker-Dealer Registration"); BOA Letter, supra note 17; letter from Ira D. Hammerman, Senior Managing Director and General Counsel, Securities Industry and Financial Markets Association, dated Aug. 30, 2010 ("SIFMA Letter"); Wells Fargo Letter, supra note 17.

[26]    See, e.g., letter from Michael Koffler and Clifford E. Kirsch, Sutherland, Asbill & Brennan LLP, on behalf of the Committee of Annuity Insurers, dated Aug. 30, 2010 ("CAI Letter").

[27]    See, e.g., SIFMA Letter, supra note 25; BOA Letter, supra note 17.

[28]    See, e.g., Wells Fargo Letter, supra note 17.

[29]    See, e.g., BOA Letter, supra note 17; SIFMA Letter, supra note 25.

dealer relationship is transaction-based and is earned through commissions, mark-ups, mark-downs, sales loads or similar fees on specific transactions, where advice is provided that is solely incidental to the transaction.[30] A brokerage relationship may involve incidental advice with transaction-based compensation, or no advice and, therefore no charge, for advice.[31]

As noted above, this wide spectrum of services and products provided by broker-dealers may or may not involve the provision of personalized investment advice or recommendations about securities to retail customers.[32] Moreover, there are variations in the level and the extent of the advice and recommendations provided and the compensation structure that applies.[33]

Broker-dealers provide brokerage products and services to a broad range of retail customers. For example, retail customers may include inexperienced retail investors seeking more basic brokerage services and recommendations, as well as retail investors with aggressive investment objectives or unique situations that are seeking sophisticated investment strategies (e.g., concentrated positions, hedging, options, and other complex strategies).[34] Retail customers may have multiple relationships and accounts with the same broker-dealer, with varying levels of service provided to each account.[35] For example, a retail customer may have a brokerage account that includes the provision of investment advice and recommendations for commissions, and also a self-directed brokerage account that does not include such advice or recommendations, with a single broker-dealer.[36]

Most broker-dealers are small in size. As of the end of December 2010, approximately 53% of all FINRA-registered broker-dealers employ 10 or fewer registered individuals (i.e., registered representatives or registered principals).[37] Approximately 29% of FINRA-registered broker-dealers employ 10-50 registered individuals, approximately

---

[30]     See, e.g., letter from John Ivan, Senior Vice President and General Counsel, Janney Montgomery Scott, dated Aug. 30, 2010 ("Janney Letter"); Schwab Letter, supra note 19; SIFMA Letter, supra note 25.

[31]     See, e.g., Wells Fargo Letter, supra note 17.

[32]     As addressed in more detail in Section IV.C.3, commenters provided a variety of views on which broker-dealer services and products involved personalized investment advice or recommendations for retail customers, and the extent to which a new standard of conduct should apply to such products.

[33]     See, e.g., Schwab Letter, supra note 19.

[34]     See, e.g., SIFMA Letter, supra note 25; BOA Letter, supra note 17.

[35]     See, e.g., ABA & ABASA Letter, supra note 21.

[36]     See, e.g., ABA & ABASA Letter, supra note 21.

[37]     See FINRA January Letter, supra note 10.

9% employ 51-150 registered individuals, and the remaining 9% employ over 151 registered individuals.[38]

### 3. Dual Registrants

As indicated above, many financial services firms may offer both investment advisory and broker-dealer services.[39] For example, approximately 5% of Commission-registered investment advisers reported that they also were registered as a broker-dealer, and 22% of Commission-registered investment advisers reported that they had a related person that was a broker-dealer.[40] In addition, as of mid-October 2010, 842 firms registered with FINRA as a broker-dealer, or approximately 18% of broker-dealers registered with FINRA, were also registered as an investment adviser with either the Commission or a state.[41] Further, as of the end of September 2010, approximately 37% of FINRA-registered broker-dealers had an affiliate engaged in investment advisory activities.[42]

Many of these financial services firms' personnel may also be dually registered as investment adviser representatives and registered representatives. As of mid-October 2010, approximately 88% of investment adviser representatives were also registered representatives of a FINRA registered broker-dealer.[43]

Dual registration often allows these firms to provide a variety of services not available through entities that are solely registered as investment advisers or broker-dealers. For example, one firm noted that dual registrants may "provide under one roof a combination of immediate execution, liquidity, research-driven guidance, a wide choice of products, securities tailored to individual client needs, and other services" that go beyond what non-dually registered investment advisers and broker-dealers offer.[44]

---

[38]    See FINRA January Letter, supra note 10.

[39]    See, e.g., Schwab Letter, supra note 19; SIFMA Letter, supra note 25; BOA Letter, supra note 17; letter from John Junek, Executive VP and General Counsel, Ameriprise Financial, Inc., dated Aug. 30, 2010 ("Ameriprise Letter"); Robert J. McCann, CEO, UBS Financial Services, Inc., dated Aug. 30, 2010 ("UBS Letter"); and letter from Charles D. Johnston, President, Morgan Stanley Smith Barney LLC, dated Aug. 30, 2010 ("Morgan Stanley Letter").

[40]    See Section 914 Study and Commissioner Walter Statement, supra note 3.

[41]    See letter from Angela C. Goelzer, FINRA, dated Nov. 3, 2010 ("FINRA November Letter"). As of September 30, 2010, 856 firms overseen by FINRA were dually registered. See FINRA January Letter, supra note 10.

[42]    See FINRA January Letter, supra note 10. Of these firms, approximately 83% were not dually registered as investment advisers, and approximately 17% were dually registered. In addition to the 1,734 firms, there were 553 firms that were dually registered but did not report having an investment advisory affiliate. FINRA January Letter, supra note 10.

[43]    FINRA November Letter, supra note 41.

[44]    See, e.g., UBS Letter, supra note 39.