|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  1:19-cv-01711 |
| RIVER NORTH EQUITY LLC, EDWARD M. LICEAGA, MICHAEL A. CHAVEZ, NANOTECH ENTERTAINMENT, INC., NANOTECH GAMING, INC., DAVID R. FOLEY, LISA L. FOLEY, JEFFREY A. FOLEY, and BENNIE L. BLANKENSHIP, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |

## MICHAEL A. CHAVEZ'S ANSWER AND AFFIRMATIVE DEFENSES

Defendant Michael A. Chavez ("Chavez") answers Plaintiff Securities and Exchange Commission's ("Plaintiff") Complaint (Dkt. No. 1) as follows:

Chavez incorporates the main headings of the Complaint solely for organizational and reference purposes.  Chavez denies any allegations contained in the headings and unnumbered paragraphs of the Complaint, as well as any characterizations of documents referred to in the Complaint.  Every allegation that is not specifically admitted is hereby denied.

### Nature of the Case

1.     This case involves an illegal stock distribution and market manipulation scheme

orchestrated by defendant David R. Foley, the founder of defendant NanoTech Entertainment, Inc. ("NTEK") and defendant NanoTech Gaming, Inc. ("NTGL"). NTEK and NTGL are microcap or penny stock companies quoted on OTC Link, an electronic inter-dealer quotation system that displays price quotes from broker-dealers for many over-the-counter securities.

**ANSWER:** **The allegations in the first sentence of Paragraph 1 contain conclusions of law to which no response is required. To the extent a response is required, Chavez denies these allegations. Chavez lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1 and therefore denies same.**

2. Between February 2014 and October 2016, David Foley sold 1.1 billion shares of NTEK stock, and 19.1 million shares of NTGL stock, to defendant River North Equity LLC ("River North"), a securities trading company based in Chicago, Illinois, in a series of unregistered transactions. Subsequently, River North and its president, defendant Edward M. Liceaga, sold these shares to the public. The scheme involved several steps.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and therefore denies same.**

3. <u>First</u>, David Foley caused NTEK to issue convertible promissory notes to himself for debt purportedly owed to him by NTEK for unpaid salary and expenses. David Foley also acquired a convertible promissory note for a debt purportedly owed by a company which was a predecessor of NTGL.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and therefore denies same.**

4.     Second, in February 2014, David Foley began converting his notes to stock in NTEK and NTGL, and selling that stock to River North. Defendant Michael A. Chavez, an employee of River North, acted as an unregistered broker for these transactions. Chavez received fees from David Foley, Liceaga and River North, and also received a bonus consisting of a portion of River North's profits from the resale of NTEK and NTGL securities.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 4.  Chavez denies the allegations in the second sentence of Paragraph 4.  With respect to the last sentence of Paragraph 4, Chavez admits that he received a salary and bonus payments from his employer, River North Equity, LLC ("River North") for business development activity he engaged in pursuant to his employment as River North's Director of Business Development. Chavez denies the remaining allegations of the last sentence of Paragraph 4 to the extent not admitted.**

5.     Third, David Foley hired defendant Bennie L. Blankenship, the owner of a stock promotion company, to help him boost the price of and market for NTEK and NTGL stock. David Foley paid Blankenship for his efforts in cash and NTEK stock.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 and therefore denies same.**

6.     David Foley spent $500,000 to purchase 6.5 million shares of NTEK in the public market, at prices which were substantially higher than the prices at which he could have acquired shares through his own convertible notes. Blankenship used Twitter and YouTube to promote

NTEK and NTGL, and encouraged potential investors, including the members of an investor group that he had cultivated, to buy both companies' stock.

**ANSWER:   Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and therefore denies same.**

7.      Fourth, David Foley directed his brother, defendant Jeffrey A. Foley, who he had appointed as CEO and Chairman of both NTEK and NTGL, to prepare false documents which were used by River North to deposit NTEK and NTGL shares into its brokerage accounts without registering them with the SEC.

**ANSWER:   Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and therefore denies same.**

8.      David Foley also prepared NTEK's and NTGL's quarterly financial statements for publication on website for the OTC Markets Group, Inc. ("OTC Markets"), where they were available to the investing public. These financial statements materially inflated NTEK's income, and failed to disclose all of the convertible promissory notes and debentures that had been issued to David Foley and his assignees.

**ANSWER:   Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 and therefore denies same.**

9.      This scheme continued even after David Foley pleaded guilty to fraud charges in two unrelated cases and began serving a two-year prison sentence.

**ANSWER:   Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and therefore denies same.**

10.     Shortly before he reported to prison in June 2015, David Foley and his wife, defendant Lisa Foley, created three companies: Royal Capital Group, Inc. ("Royal Capital"), Galaxy Entertainment Group, Inc. ("Galaxy Entertainment"), and Universal Communication Partners, Inc. ("Universal Communication"). David Foley assigned his remaining convertible notes to Royal Capital and Galaxy Entertainment for no consideration.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 and therefore denies same.**

11.     David Foley continued to control both NTEK and NTGL from prison, by directing both companies' activities through Jeff Foley and other company employees. David Foley also communicated with Lisa Foley through emails and recorded phone calls, and instructed her how to convert the notes and sell the shares to River North.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 and therefore denies same.**

12.     Lisa Foley ultimately completed over half of the sales of NTEK and NTGL stock to River North, with the assistance of Jeff Foley and Chavez. David Foley and Lisa Foley then funneled proceeds from these stock sales back to NTEK and NTGL through bank accounts held in the names of Royal Capital, Galaxy Entertainment and Universal Communications.

**ANSWER:     To the extent Plaintiff alleges that Chavez provided assistance in completing the transactions at issue in Paragraph 12, Chavez denies these allegations. Chavez lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12 and therefore denies same.**

13.     River North and Liceaga ultimately paid approximately $12.5 million to David Foley, Lisa Foley, and their companies to acquire shares of NTEK and NTGL stock, and then sold these shares for more than $17 million, generating net profits of approximately $3.4 million. David and Lisa Foley obtained personal profits of $4.9 million.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and therefore denies same.**

14.     Defendants River North, Edward Liceaga, David Foley, Lisa Foley, Jeff Foley, Bennie Blankenship, NTEK and NTGL violated Sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"). Defendants David Foley and Blankenship violated Section 17(a) of the Securities Act, and Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act'), and Rule 10b-5 thereunder. Defendants River North and Michael Chavez violated Section 15(a) of the Exchange Act; Liceaga is subject to control person liability for River North's violations of Section 15(a) of the Exchange Act; and, in the alternative, Liceaga and Chavez aided and abetted River North's violations of Section 15(a) of the Exchange Act.

**ANSWER:     The allegations in Paragraph 14 are conclusions of law to which no response is required.  To the extent a response is required, Chavez denies the allegations in Paragraph 14.**

15.     The SEC seeks to enjoin each of the defendants in this action from future violations of the federal securities laws, and to require certain defendants to disgorge their ill-gotten gains, along with prejudgment interest. The SEC also seeks civil penalties and penny

stock bars against the individual defendants and River North, and to bar David Foley from

serving as an officer or director of any public company.

**ANSWER:** **The allegations in Paragraph 15 are conclusions of law or requests for**

**relief to which no response is required. To the extent a response is required, Chavez denies**

**these allegations and denies that Plaintiff is entitled to any relief against him.**

## Jurisdiction and Venue

16.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15

U.S.C. § 78u(d)].

**ANSWER:** **The allegations in Paragraph 16 are conclusions of law to which no**

**response is required.**

17.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28

U.S.C. § 1331.

**ANSWER:** **The allegations in Paragraph 17 are conclusions of law to which no**

**response is required.**

18.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], because certain of

the defendants currently reside or transact business in this district, and some of the acts,

practices, and courses of business constituting the securities violations alleged herein occurred

within this district.

**ANSWER:** The allegations in Paragraph 18 are conclusions of law to which no response is required.

**Defendants**

**A. Unregistered Broker-Dealers**

19. River North Equity LLC is an Illinois corporation based in Chicago. Since 2013, River North has operated as an investment firm that buys and sells penny stocks through the conversion of promissory notes by third-parties. River North has never been registered as a broker-dealer, investment adviser or investment company.

**ANSWER: Chavez admits the allegations in Paragraph 19.**

20. Edward M. Liceaga, age 39, is a resident of Cook County, Illinois and Puerto Rico. He also does business and owns property in Chicago, Illinois. Liceaga is River North's President and sole manager. He is also the President of Dorado Investments, LLC ("Dorado Investments"). Liceaga previously was licensed as a registered representative and investment adviser representative.

**ANSWER: Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies same.**

21. Michael A. Chavez, f/k/a Miguel A. Chavez, age 40, is a resident of Austin, Texas. From approximately April 1, 2014 through January 1, 2016, Chavez was the Director of Business Development at River North. On July 17, 2009, the Financial Industry Regulatory Authority ("FINRA") permanently barred Chavez from associating with any FINRA member firm in any capacity.

**ANSWER:** **Chavez admits the allegations in Paragraph 21.**

**B.** **Stock Issuers and Affiliates**

22. NanoTech Entertainment, Inc., is a Nevada corporation with its principal place of business in San Jose, California. NTEK produces technology, including a subscription video streaming platform for viewing movies. At all relevant times, NTEK's stock was quoted on the OTC Link, which is operated by OTC Markets. NTEK published quarterly and annual disclosures on the OTC Markets website for the periods ending June 2009 through March 2017. NTEK's securities have never been registered with the SEC.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and therefore denies same.**

23. NanoTech Gaming, Inc., f/k/a NanoTech Gaming Labs, is a Nevada corporation involved in the development of gaming technology with its principal place of business in Las Vegas, Nevada. Its main product was a skill-based pinball game, but the product was never licensed and NTGL earned no revenue. NTGL operated as a division of NTEK until February 2015, when it became a separate corporation. At all relevant times, NTGL's stock was quoted on OTC Link. NTGL filed quarterly and annual disclosures on the OTC Markets website for the periods ending December 2014 through March 2016. NTGL's securities have never been registered with the SEC.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and therefore denies same.**

24.     David R. Foley, age 53, is a resident of Los Gatos, California. He is the cofounder of NTEK and the founder of NTGL. David Foley has served as NTEK's Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), Chief Technology Officer, Secretary, Treasurer, Director, and Chairman of the Board. In January 2014, he pleaded guilty to charges of conspiracy to commit mail fraud, wire fraud, and bank fraud, arising from two different federal criminal cases, and received a 24-month prison sentence.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies same.**

25.     Lisa L. Foley, age 49, is the wife of David Foley and a resident of Los Gatos, California. Lisa Foley was placed on NTEK's payroll when her husband was in prison. She was an officer and director of both Royal Capital and Galaxy Entertainment.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore denies same.**

26.     Jeffrey A. Foley, age 49, is David Foley's younger brother, and a resident of Napa, California. Jeff Foley operates an ice sculpting business which became a subsidiary of NTEK. He became a NTEK director in November 2010 and NTEK's President, CEO, and Chairman of the Board in June 2012. In July 2015, Jeff Foley became NTGL's CEO, Secretary, and Chairman of the Board. Jeff Foley resigned from all of his positions at NTEK and NTGL in August 2017.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore denies same.**

**C.      Stock Promoter**

27.      Bennie L. Blankenship, age 47, is a resident of Springfield, Ohio. Blankenship founded Big Investment Group LLC, which promoted NTEK and NTGL stock. Blankenship promoted NTEK stock through an investor internet chat group and on Twitter and in YouTube videos.

**ANSWER:      Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore denies same.**

### Related Entities

28.      Royal Capital Group, Inc. was a South Dakota corporation established by David Foley in March 2015, and managed by Lisa Foley while David Foley was in prison. Lisa Foley served as Royal Capital's Chairman, Director, President, Treasurer and Secretary until she resigned from these positions in October 2016. Royal Capital was administratively dissolved in May 2018.

**ANSWER:      Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and therefore denies same.**

29.      Galaxy Entertainment Group, Inc. was a South Dakota corporation established by David Foley in June 2015, and managed by Lisa Foley while David Foley was in prison. The company was administratively dissolved in May 2018.

**ANSWER:      Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and therefore denies same.**

30.     Universal Communication Partners, Inc. was a South Dakota corporation

established by David Foley in June 2015. The company was administratively dissolved in May

2018.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to
the truth of the allegations in Paragraph 30 and therefore denies same.**

<u>Facts</u>

**A.     David Foley Controlled NTEK and NTGL**

31.     David Foley co-founded NTEK in 2007. At various times, he held the titles of

CEO, COO, and various other positions. David Foley designed and promoted NTEK's

technology, ran its operations, issued press releases and prepared financial statements for NTEK.

Although David Foley's titles at NTEK changed over time, he remained in control of its

operations, and placed friends and family members on NTEK's board.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to
the truth of the allegations in Paragraph 31 and therefore denies same.**

32.     In January 2012, NTEK announced that David Foley had resigned from all of his

officer and director positions, including CEO and Chairman of the Board. A friend of David

Foley's began serving as Chairman of the Board, but resigned a few months later because of

failing health.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to
the truth of the allegations in Paragraph 32 and therefore denies same.**

33.     In June 2012, David Foley appointed his brother, Jeff Foley, as NTEK's CEO and Chairman. At the time, Jeff Foley knew very little about the NTEK's business and technology. David Foley managed the day-to-day operations of the company. So Jeff Foley had very few responsibilities, other than signing NTEK's financial statements, which were created by David Foley.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and therefore denies same.**

34.     David Foley also controlled and managed the operations of NTGL. David Foley appointed Jeff Foley as NTGL's CEO, Secretary, and Chairman around July 2015. Jeff Foley held these positions at NTEK and NTGL until he resigned in August 2017.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies same.**

35.     During the time David Foley controlled NTEK and NTGL, he was charged in two unrelated criminal cases. In July 2009, a federal grand jury indicted David Foley for offenses that included mail and wire fraud, theft of trade secrets, and money laundering. In August 2011, a different federal grand jury indicted David Foley on charges of bank fraud and making false statements to a federal agency.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies same.**

36.     On January 6, 2012, David Foley entered guilty pleas, in both criminal cases, for conspiracy to commit mail, wire, and bank fraud. In January 2014, he received a 24-month

concurrent prison sentence. David Foley reported to prison in June 2015, and was released from federal custody in December 2016.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and therefore denies same.**

**B.** **David Foley Acquired Convertible Notes for NTEK and NTGL Stock.**

37. Between his arrest in 2009 and his incarceration in June 2015, David Foley caused NTEK to issue to him a number of convertible promissory notes, dated between September 30, 2011 and May 31, 2014. These notes purported to be compensation for unpaid wages or expenses and totaled approximately $689,500. However, most of these notes were not reflected in NTEK's financial statements.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore denies same.**

38. The NTEK notes issued to David Foley provided that if the debt was not paid within one year, he was entitled to convert the debt into stock, at prices of $0.001 or $0.0001 per share, provided that the shares from such a conversion would be less than 10% of NTEK's outstanding common stock. Beginning in February 2014, David Foley began converting his notes into millions of shares of NTEK stock through River North.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies same.**

39. In early 2015, David Foley was assigned a convertible promissory note, dated September 2, 2014 in the amount of $50,000, which previously had been issued to another person.

That note purported to be compensation for work performed by an independent contractor for High Velocity Enterprises, Inc. ("HVEL"), a company David Foley controlled, which later became NTGL. However, that contractor had not performed any such work.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore denies same.**

40.     This note provided for the conversion of debt into shares, at $0.0005 per share, if the debt was not repaid within a year and if share ownership after the conversion remained less than 10% of the company's outstanding common stock. In March 2015, David Foley converted a small portion of that debt into 1.1 million shares of HVEL, which became NTGL stock after April 2015.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and therefore denies same.**

41.     Shortly before reporting to prison, David Foley created Royal Capital and Galaxy Entertainment and named himself and Lisa Foley as directors of each corporation. He then assigned his NTEK convertible notes to Royal Capital, and assigned the HVEL note he had acquired to Galaxy Entertainment.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and therefore denies same.**

42.     In June 2015, David Foley also created Universal Communication, and opened a company bank account by representing that he was its CEO and he and Lisa Foley were its co-owners.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and therefore denies same.**

**C.** **River North's Unregistered Sales of NTEK and NTGL Stock**

43.     In early 2014, David and Lisa Foley began selling millions of shares of NTEK and NTGL stock to River North and Liceaga, the company's owner and president.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and therefore denies same.**

44.     According to River North's website, its primary business was investing in small and micro-cap businesses and providing flexible funding structures for small and micro-cap businesses and securities. From its inception in 2013, River North sought out and purchased penny stocks from holders of convertible debt instruments, including at microcap industry conferences, and then sold those shares on OTC Link.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore denies same.**

45.     During the time River North did business with the Foleys, River North purchased and sold 60 other microcap securities quoted on OTC Link, in addition to NTEK and NTGL. River North acquired more than 9 billion shares from these other companies, and obtained more than $14 million from the sale of those securities. Liceaga has testified that he specialized in purchasing convertible debt and aged debt investments.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore denies same.**

46.     Between February 2014 and October 2016, River North directly and indirectly purchased a total of 1.1 billion shares of NTEK stock, and 19.1 million shares of NTGL stock, from David and Lisa Foley. River North then sold those shares for approximately $17.8 million. None of these transactions were registered with the SEC.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore denies same.**

47.     For the 610 trading days between February 28, 2014 and July 30, 2016, River North's sales of NTEK stock constituted approximately 26% of the total market volume for NTEK. During this same period, on those days that River North sold any NTEK shares, River North's sales comprised approximately 34% of the total market volume for NTEK.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore denies same.**

48.     Liceaga personally directed the sales of all of the shares of NTEK and NTGL stock that River North purchased from David and Lisa Foley. River North and Liceaga sold all 1.1 billion shares of NTEK stock through River North's brokerage accounts, often selling millions of NTEK shares on consecutive days as soon as the shares were cleared for trading.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore denies same.**

49.     River North generally owned in its inventory just under 10% of NTEK's outstanding shares of common stock. However, after certain of its purchases from the Foleys, River North actually owned more than 10% of NTEK's outstanding shares of common stock.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies same.**

50.     Liceaga did not deposit all of the NTEK stock certificates into a River North brokerage account until it appeared that River North had sold enough shares to reduce its ownership of NTEK stock below 10% in that particular account. In testimony to the SEC, Liceaga admitted that he "slowly leaked" River North's NTEK shares into the market in order to stay between 20% and 30% of the stock's trading volume; he did not want to "kill" the stock by dumping all of River North's shares at once.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies same.**

51.     River North also purchased 19.1 million shares of NTGL and HVEL stock from David and Lisa Foley, in four separate transactions, and deposited 13 million of the NTGL shares into River North's brokerage accounts. Liceaga later transferred 12 million of the shares of NTGL stock to Dorado Investments, another entity that Liceaga owned and controlled, through a separate stock purchase agreement between River North and Dorado Investments.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore denies same.**

52.     It took longer for River North and Liceaga to sell their NTGL shares than was required to sell their NTEK shares. However, River North and Dorado Investment eventually sold all of the NTGL shares purchased from David Foley and his assignees within a few months after they were purchased.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore denies same.

**D.     David Foley Controlled NTEK and NTGL from Prison**

53.     While he was in prison, David Foley continued to control NTEK and NTGL. He made phone calls, sent emails, and sent handwritten letters from prison to Jeff Foley and others, containing his instructions regarding company operations, including the hiring and firing of employees and the publication of press releases.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore denies same.

54.     For example, David Foley told Jeff Foley when and how to issue shares to Lisa Foley, Royal Capital, and Galaxy Entertainment. The purpose of issuing these shares was to facilitate the sales of NTEK and NTGL stock to Liceaga and River North, and obtain funds for NTEK, NTGL, and Lisa Foley.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 and therefore denies same.

55.     David Foley also drafted and sent NTEK shareholder letters to Jeff Foley and directed him to adopt them as his own statements and publish them on the OTC Markets website. David Foley also requested that NTEK employees send him emails with daily NTEK and NTGL stock prices so that he could "make sure that [his] assets are being covered correctly."

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 and therefore denies same.

56.     In addition, while David Foley was in prison, he instructed Lisa Foley to send NTEK some of the funds generated from the note and debenture conversions, and subsequent stock sales to River North and Liceaga.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore denies same.**

57.     David Foley also wrote NTEK's and NTGL's quarterly financial statements and sent them to Jeff Foley with directions to publish them on the OTC Markets website, where they were available to the investing public.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore denies same.**

58.     David Foley included some of the funds that he and Lisa Foley received from converting and selling NTEK stock to River North as operating income on NTEK's financial statements. This improperly inflated NTEK's income during the applicable periods by approximately $7.2 million. Both NTEK and NTGL needed, and relied upon, this funding generated by David Foley because the companies had little or no actual income.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and therefore denies same.**

59.     Accordingly, the financial statements of NTEK and NTGL were false and misleading. Without the $7.2 million generated by David Foley from the sale of NTEK stock, NTEK would have reported losses of approximately $5.8 million between 2014 and 2016. In addition, the financial statements prepared by David Foley disclosed only $60,500 of the

$495,000 in convertible promissory notes and debentures purportedly issued to David Foley or his assignees (including Lisa Foley, Royal Capital, and Galaxy Entertainment).

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and therefore denies same.**

### 1.    Jeff Foley assisted David Foley

60.    After David Foley reported to prison, Jeff Foley continued to follow his instructions regarding NTEK's and NTGL's operations, and regarding the issuance of shares of NTEK and NTGL stock. Jeff Foley also was a substantial factor, and a necessary participant, in the offer and sales of NTEK and NTGL stock initiated by David Foley.

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and therefore denies same.**

61.    David Foley provided Jeff Foley with handwritten instructions to issue 15 million shares of NTEK stock to River North each week. Using forms created by David Foley, Jeff Foley prepared the documents necessary for River North to deposit the NTEK shares into its brokerage accounts and obtain legal opinions stating that the shares did not need to be registered with the SEC.

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and therefore denies same.**

62.    More specifically, acting at David Foley's direction, Jeff Foley drafted issuer representation letters on behalf of NTEK attesting that: (1) Royal Capital had paid for the NTEK shares more than one year prior to the date of the conversion; (2) Lisa Foley and Royal Capital

were not acting as underwriters and were not part of a distribution of NTEK shares; (3) the removal of restricted stock legends was not intended to evade the registration provisions of theSecurities Act; and (4) the proposed transactions would not be part of a distribution of NTEK's securities. All of the foregoing representations were false, and David Foley knew that they were false.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and therefore denies same.**

63.     In addition, acting at David Foley's direction, Jeff Foley also prepared non-affiliate shareholder representation letters that stated that Lisa Foley was not an affiliate or an underwriter, was not aware of any non-public material adverse information about the company, and that full consideration had been paid for the shares. These representations were false, and David Foley knew that they were false.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 and therefore denies same.**

64.     At David Foley's direction, Jeff Foley also prepared stock purchase agreements ("SPAs") and conversion notices for Lisa Foley and/or Royal Capital and River North that identified the amount of debt being converted, the dates of the promissory notes being converted, and the conversion rates. He further drafted NTEK board minutes and consents authorizing the issuance of NTEK shares to Royal Capital in order to "reduce the liabilities of the company and fulfill its obligations." Jeff Foley then contacted NTEK's transfer agent to authorize the issuance

of unrestricted NTEK shares to River North, and he emailed documents to River North to help Liceaga obtain legal opinions that the shares were unrestricted.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and therefore denies same.**

65.     Jeff Foley created the same type of documents for the sale of NTGL shares to River North by Lisa Foley and Galaxy Entertainment, and followed a similar process to assist River North in depositing NTGL shares into its brokerage accounts.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and therefore denies same.**

66.     On at least one occasion, Jeff Foley followed David Foley's written instructions to create a NTEK debenture to Royal Capital which was backdated to April 7, 2015. David Foley directed Jeff Foley to authorize the issuance of this debenture so that NTEK could obtain money by converting the debenture to shares, and selling those shares to River North.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and therefore denies same.**

67.     In 2013, acting at David Foley's direction, Jeff Foley opened a brokerage account in his own name at E-Trade. This account was funded by David Foley, and used by David Foley to manipulate NTEK's trading volume and stock price while he was selling NTEK stock to Liceaga and River North.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 and therefore denies same.**

68.     Between March and August 2014, Jeff Foley transferred to his own bank account more than $350,000 of the funds that David Foley generated by trading NTEK stock, and used some of those funds to pay expenses for NTEK and NTGL.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 and therefore denies same.**

### 2.     Lisa Foley assisted David Foley

69.     While David Foley was in prison, Lisa Foley helped him negotiate the sales of NTEK and NTGL stock to Liceaga and River North. Lisa Foley was a substantial factor and a necessary participant in these transactions. Between June 2015 and September 2016, Lisa participated in more than 40 stock sales to River North, and allowed Jeff Foley to place her electronic signature on the required SPAs, conversion notices, and non-affiliate shareholder representation letters.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and therefore denies same.**

70.     At David Foley's direction, Lisa Foley asked River North for advance payments before the NTEK and NTGL shares were deposited with River North's brokerage firms, and River North paid advances before certain of the transactions. Lisa Foley used the proceeds of the sales of NTEK and NTGL stock to fund NTEK's and NTGL's payroll and bills, and to cover the Foleys' personal expenses, including the mortgage on their home and their son's private school tuition.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and therefore denies same.**

71. Through Royal Capital, David Foley directed a total of $25,000 to be paid to Blankenship for his "support" of NTEK and NTGL shares, pursuant to an agreement between Blankenship and David Foley. These payments were made by wire transfer between October and December 2016. Certain of these payments were handled personally by Lisa Foley.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 and therefore denies same.**

72. In addition, Lisa Foley used the bank accounts of Royal Capital, Galaxy Entertainment and Universal Communication to transfer funds to NTEK and NTGL after receiving payments from River North. Most of NTEK's funds for its operations came from the proceeds of stock sales to River North.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72 and therefore denies same.**

> **E.** **The Sales of NTEK and NTGL Stock to River North Were Not Exempt from Registration with the SEC**

73. For each of David and Lisa Foleys' sales of NTEK and NTGL to River North, Liceaga obtained legal opinion letters which purported to exempt the subsequent sale of those shares from registration under the Securities Act, allowing them to be sold without a restrictive legend. However, these opinion letters were based upon false statements contained in issuer

representation letters and non-affiliate shareholder representation letters prepared by Jeff Foley at David Foley's direction.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 and therefore denies same.**

74. These false statements included the following: (a) David Foley, Royal Capital Group, Galaxy Entertainment, and River North were not affiliates of NTEK or NTGL; (b) River North and Liceaga had fully paid for and owned the shares for more than one year pursuant to SEC Rule 144; and (c) River North and Liceaga would not be considered underwriters under SEC rules.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and therefore denies same.**

75. David Foley was an affiliate of both NTEK and NTGL. He controlled both companies, even after reporting to prison. With assistance from Lisa Foley, David Foley also controlled Royal Capital and Galaxy Entertainment, which also were affiliates of NTEK and NTGL, and neither company paid any valid consideration for the assignment of David Foley's convertible notes.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 and therefore denies same.**

76. In fact, both NTEK and NTGL relied upon the Foleys' conversion of notes, and the subsequent sales of stock, to fund their operations. Further, the sales of NTEK and NTGL

stock to River North and Liceaga were intended to be part of a distribution of securities to the investing public.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76 and therefore denies same.**

77.     In selling their shares of NTEK and NTGL stock to the unsuspecting investing public, Liceaga and River North ignored several red flags indicating that these sales did not qualify for an exemption from registration. For example, Liceaga testified that: he viewed David and Lisa Foley, Royal Capital, and Galaxy Entertainment as one unit; he knew David Foley had been NTEK's CEO; he knew that Jeff Foley was David Foley's brother; and he knew that David Foley had been indicted and charged with fraud.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 and therefore denies same.**

78.     There were also discrepancies in, and information missing from, the documents provided to and reviewed by River North and Liceaga that called into question the legitimacy of the Foleys' stock conversions.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 and therefore denies same.**

79.     For example, David Foley converted shares from a promissory note dated March 31, 2012 in the amount of $52,500 five separate times, and sold shares from that note for a total of $92,500. Further, nine of David Foley's promissory notes, with a total outstanding balance of $378,500, were dated prior to December 2013. Those notes were converted in transactions with

River North in 2014 but were not reflected in NTEK's December 2013 financial statements, or in the company's 2014 financial statements. Finally, some of the NTGL convertible debentures were not reflected in NTGL's financial statements.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 79 and therefore denies same.**

80.     Despite these red flags, River North and Liceaga promptly sold all of the NTEK and NTGL shares which they had purchased from the Foleys into the open market, without waiting a year as indicated in the attorney opinion letters.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80 and therefore denies same.**

### F.     Chavez Acted as an Unregistered Broker

81.     Chavez acted as an unregistered broker for David and Lisa Foley's sales of NTEK and NTGL stock to River North. As River North's Director of Business Development, Chavez was responsible for identifying possible investment opportunities involving debt securities, researching the issuers, and negotiating the terms of potential transactions.

**ANSWER:** **Chavez admits that he was employed as River North's Director of Business Development but denies the remaining allegations in Paragraph 81.**

82.     Chavez negotiated substantial discounts on the deals involving securities, including NTEK and NTGL, which he brought to Liceaga and River North. Beginning in 2014, Chavez confirmed the key terms of each stock sale with David and Lisa Foley, and obtained the necessary paperwork from Lisa and Jeff Foley, to deposit the shares in River North's brokerage

accounts. Chavez also assisted the Foleys in obtaining advances from Liceaga and River North in connection with certain stock sales.

**ANSWER:** **Chavez denies the allegations in Paragraph 82.**

83. Between February 2014 and September 2016, and despite having been barred by FINRA from association with any member firm, Chavez helped facilitate approximately 78 NTEK transactions and four NTGL transactions between David and Lisa Foley, as the sellers, and Liceaga and River North, as the buyers.

**ANSWER:** **Chavez admits that he was barred by FINRA from associating with any member firm. Chavez further admits that he provided minor administrative assistance related to the transactions referenced in Paragraph 83 but denies the allegations to the extent Plaintiff seeks to characterize this activity as indicative of broker activity.**

84. For each transaction, Chavez was supposed to receive what the Foleys and Liceaga referred to as a "finder's fee" of 2.5% from each party. Liceaga paid the entire 5% fee (which included the Foleys' portion) to a brokerage firm in Nassau, Bahamas.

**ANSWER:** **Chavez admits that he received a fee but denies the allegations in Paragraph 84 to the extent Plaintiff attempts to characterize this fee as a broker fee. Chavez lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 and therefore denies all allegations not specifically admitted.**

85. The payments to the Bahamian firm were made as a way to funnel money to Chavez. For each transaction, after Liceaga wired funds to the Bahamian firm, the firm

transferred the money back to Chavez's U.S. bank account, minus a fee for acting as an "intermediary broker." The Bahamian firm never handled any of the securities at issue.

**ANSWER:** **Chavez admits that he received a fee but denies the allegations in Paragraph 85 to the extent Plaintiff attempts to characterize this fee as a broker fee. Chavez denies all remaining allegations in Paragraph 85 not specifically admitted.**

86.     In addition, for each transaction David and Lisa Foley paid Chavez an additional 1.95% fee that they referred to as a "broker" fee. And Liceaga paid Chavez a series of bonuses amounting to between 20% and 33% of River North's and Liceaga's profits from the sales of converted NTEK and NTGL stock to the investing public.

**ANSWER:** **The allegation that Chavez received a "broker" fee is a legal conclusion to which no response is required.  To the extent a response is required, Chavez denies that he received any compensation that can be characterized as a "broker" fee. Chavez admits he received bonuses as part of his compensation as River North's Director of Business Development.  Chavez denies all other allegations in Paragraph 86 to the extent not expressly admitted.**

**G.     David Foley and Blankenship Manipulated the Market for Shares of NTEK and NTGL**

87.     In December 2013, David Foley and Blankenship agreed to artificially support the market price and volume of NTEK and NTGL stock during the time David Foley planned to sell stock to River North. David Foley offered to give Blankenship shares of NTEK stock under a

purported consulting agreement with Royal Capital in exchange for Blankenship's promotional efforts and "secondary" trading support for NTEK and NTGL.

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and therefore denies same.**

88.    Blankenship owned a stock promotion company, named Big Investment Group LLC, through which he could promote NTEK stock. Beginning in January 2014, pursuant to his agreement with David Foley, Blankenship used Big Investment Group to promote NTEK on social media through Twitter and YouTube videos.

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 and therefore denies same.**

89.    Around that same time, in early 2014, David Foley began trading NTEK stock in Jeff Foley's E-Trade account, as well as in David Foley's personal E-Trade account. Between January 15, 2014 and September 15, 2014, David Foley placed over 2,000 limit orders in the two accounts in order to purchase over 6.5 million shares of NTEK for a total cost of approximately $500,000 (a weighted average share price of $.0771 per share).

**ANSWER:    Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and therefore denies same.**

90.    During this same time period, David Foley could have acquired the same number of shares of NTEK stock at substantially lower prices of either $0.0001 or $0.001 by converting a small portion of his remaining convertible promissory notes.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90 and therefore denies same.**

91.     Instead, by purchasing shares in the open market, David Foley attempted to increase the prices at which he could sell shares to River North, and at which River North and Liceaga could sell all of their NTEK and NTGL shares. As part of this effort, on May 29, 2014 David Foley advised Liceaga and Chavez that "I spent $50k in the last two days ensuring that your sale price never got below 15% of your purchase price." In August of 2014, David Foley advised Liceaga that "I'm buying up to bring it back, and I have more support coming on Tuesday," and "I've been buying to support".

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 91 and therefore denies same.**

92.     After receiving these emails, River North and Liceaga purchased additional shares of NTEK stock from David Foley, including 7,500,000 NTEK shares on July 28, 2014 and 9,000,000 NTEK shares on August 14 and 28, 2014.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92 and therefore denies same.**

93.     In early 2014, David Foley had agreed to give Blankenship 7.58 million shares of NTEK stock as partial payment for his promotions of NTEK's stock. However, in an April 3, 2014 email exchange, David Foley and Blankenship agreed that they would represent that Blankenship's deposit of these shares into his brokerage account was the result of a "private placement" for $250,000, rather than as payment for supporting NTEK stock.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93 and therefore denies same.**

94.     David Foley and Blankenship did not complete this transaction until March 2015. At that time, David Foley created a fake convertible promissory note, issued from NTEK to Blankenship, and backdated it to April 1, 2014. David Foley also placed Jeff Foley's electronic signature on NTEK board minutes and consents, without Jeff Foley's knowledge or permission. Blankenship then used these bogus documents to obtain a legal opinion stating that the NTEK shares did not have to be registered.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and therefore denies same.**

95.     Blankenship also created a phony check, backdated to March 26, 2014, purportedly as payment by Blankenship for the 7.58 million NTEK shares, in the amount of $250,000. Blankenship then endorsed the fake check with a forged bank stamp and provided it to his broker – along with the false representation that NTEK already had deposited the check into its own bank account.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95 and therefore denies same.**

96.     Throughout 2014 and the first half of 2015, David Foley and Blankenship worked together to purchase shares of NTEK stock on the open market and to place bids for additional shares of NTEK.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96 and therefore denies same.**

97.     In addition, Blankenship promoted NTEK and NTGL stock and sent emails encouraging an investor group he had cultivated on social media to buy shares of NTEK and NTGL stock at specific times throughout the relevant time period. Blankenship documented his own purchases of NTEK shares in numerous emails to David and Lisa Foley, and included the number of shares purchased by members of his investor group as evidence of his successful stock promotion efforts.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 and therefore denies same.**

98.     Blankenship pressured the members of his investor group to buy NTEK and NTGL shares during the same times that David Foley and Blankenship were supporting the stock. Blankenship did not tell the members of his investor group that he was being compensated to promote NTEK and NTGL. The members of Blankenship's investor group who purchased NTEK and NTGL based on his recommendations eventually suffered substantial losses on their investments.

**ANSWER:** **Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 98 and therefore denies same.**

99.     Blankenship also promoted NTEK through social media in YouTube videos throughout 2014 and on Twitter during 2014 and 2015. None of Blankenship's tweets and videos disclosed that he was being compensated by David Foley, in cash and stock.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99 and therefore denies same.

100. During the 18 months when David Foley was in prison, from June 2015 through December 2016, he was not able to support the market for NTEK and NTGL stock through his own trading. So David Foley paid Blankenship to provide artificial "primary" support for NTEK and NTGL, and asked Lisa Foley to find someone else to provide "secondary" support.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100 and therefore denies same.

101. Lisa Foley used advances provided by River North to pay an individual to support the trading in NTEK and NTGL shares, but that person ultimately did not make any trades. However, Blankenship continued to support the market for NTEK's and NTGL's stock during David Foley's incarceration. Blankenship provided evidence of his NTEK and NTGL stock purchases to Lisa Foley in exchange for cash payments and additional shares of NTEK stock.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101 and therefore denies same.

102. Between March 2015 and February 2017, David and Lisa Foley issued more than 28 million shares of NTEK stock to Blankenship, and also paid him $25,000 for supporting the market for NTEK and NTGL stock. Blankenship deposited these NTEK shares in his brokerage account and immediately began selling them in the open market.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and therefore denies same.

103.     Between May and August 2014, David Foley, Blankenship, and Blankenship's investor group purchased more than 25 million shares of NTEK in the open market, and sold more than 17 million shares. Between December 2015 and February 2016, these same individuals purchased more than 4 million shares of NTGL in the open market, and sold 2 million shares. This trading activity created the appearance of a liquid and active market for NTEK and NTGL stock, and increased the trading volume of NTEK and NTGL stock.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 and therefore denies same.**

### H.     Proceeds from the Illegal Sales of NTEK and NTGL Stock

104.     The fraudulent and illegal scheme to sell and artificially support the shares of NTEK and NTGL stock was profitable to all of the defendants.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 and therefore denies same.**

105.     Between March 2014 and September 2016, River North paid approximately $12.5 million for the shares of NTEK and NTGL stock, and sold the shares for approximately $17.8 million. After paying expenses, River North and Liceaga jointly enjoyed total profits of approximately $3.4 million.

**ANSWER:     Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 and therefore denies same.**

106.     Similarly, after paying business expenses for NTEK and NTGL, David and Lisa Foley received total profits of approximately $4.9 million.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106 and therefore denies same.

107. Jeff Foley obtained profits of at least $213,000.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107 and therefore denies same.

108. Bennie Blankenship obtained profits of more than $230,000.

**ANSWER:** Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and therefore denies same.

109. Michael Chavez obtained profits of nearly $2.1 million.

**ANSWER:** Chavez denies the allegations in Paragraph 109.

## COUNT I

### Violations of Section 5(a) and (c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and (c)]
### (Against Defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL)

110. Paragraphs 1 through 109 are realleged and incorporated herein by reference.

**ANSWER:** Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.

111. By engaging in the conduct described above, defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL directly or indirectly: (a) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale,

carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

**ANSWER:     The allegations in Paragraph 111 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 and therefore denies same.**

112.    By reason of the foregoing, defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship, NTEK and NTGL violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

**ANSWER:     The allegations in Paragraph 112 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112 and therefore denies same.**

**COUNT II**
**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**
**(Against Defendants David Foley and Blankenship)**

113.    Paragraphs 1 through 109 are realleged and incorporated herein by reference.

**ANSWER:     Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

114.     By engaging in the conduct described above, defendants David Foley and Blankenship, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes and artifices to defraud.

**ANSWER:     The allegations in Paragraph 114 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 and therefore denies same.**

115.     Defendants David Foley and Blankenship acted knowingly or with severe recklessness.

**ANSWER:     The allegations in Paragraph 115 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115 and therefore denies same.**

116.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**ANSWER:     The allegations in Paragraph 116 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 and therefore denies same.**

## COUNT III
## Violations of Sections 17(a)(2) and of the Securities Act
## [15 U.S.C. § 77q(a)(2)]
## (Against Defendants David Foley and Blankenship)

117. Paragraphs 1 through 109 are realleged and incorporated herein by reference.

**ANSWER:** **Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

118. By engaging in the conduct described above, defendants David Foley and Blankenship in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:** **The allegations in Paragraph 118 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 and therefore denies same.**

119. Defendants David Foley and Blankenship acted knowingly, with severe recklessness and/or negligently.

**ANSWER:** **The allegations in Paragraph 119 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 and therefore denies same.**

120.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**ANSWER:     The allegations in Paragraph 120 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120 and therefore denies same.**

**COUNT IV**
**Violations of Section 17a(3) of the Securities Act**
**[15 U.S.C. § 77q(a)(3)]**
**(Against Defendants David Foley and Blankenship)**

121.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

**ANSWER:     Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

122.     By engaging in the conduct described above, defendants David Foley and Blankenship, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

**ANSWER:     The allegations in Paragraph 122 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and therefore denies same.**

123.     Defendants David Foley and Blankenship acted knowingly, with severe recklessness and/or negligently.

**ANSWER:     The allegations in Paragraph 123 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and therefore denies same.**

124.     By reason of the foregoing, defendants David Foley and Blankenship violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**ANSWER:     The allegations in Paragraph 124 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and therefore denies same.**

**COUNT V**
**Violations of Section 9(a)(2) of the Exchange Act**
**[15 U.S.C. § 78i(a)(2)]**
**(Against Defendants David Foley and Blankenship)**

125.     Paragraphs 1 through 109 are realleged and incorporated herein by reference.

**ANSWER:     Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

126.     By engaging in the conduct described above, defendants David Foley and Blankenship engaged in a series of transactions in a security registered on a national security exchange, creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

**ANSWER:** The allegations in Paragraph 126 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 and therefore denies same.

127. Defendants' conduct was willful.

**ANSWER:** The allegations in Paragraph 127 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127 and therefore denies same.

128. By reason of the foregoing, defendants David Foley and Blankenship violated Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

**ANSWER:** The allegations in Paragraph 128 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 and therefore denies same.

### COUNT VI
### Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder
### [15 U.S.C. §78j(b, 17 C.F.R. 240.10b-5]
### (Against Defendants David Foley and Blankenship)

129. Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

**ANSWER:** Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.

130. Defendants David Foley and Blankenship, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: (a) used and employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon sellers and purchasers and prospective purchasers of securities.

**ANSWER: The allegations in Paragraph 130 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130 and therefore denies same.**

131. Defendants acted with *scienter* in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme described above.

**ANSWER: The allegations in Paragraph 131 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131 and therefore denies same.**

132.     By reason of the foregoing, defendants David Foley and Blankenship violated

Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

240.10b-5].

**ANSWER:     The allegations in Paragraph 132 are conclusions of law to which no
response is required.  To the extent a response is required, Chavez lacks knowledge or
information sufficient to form a belief as to the truth of the allegations in Paragraph 132
and therefore denies same.**

**COUNT VII**
**Violations of Section 15(a) of the Exchange Act**
**[15 U.S.C. § 78o(a)]**
**(Against Defendants River North and Chavez)**

133.     Paragraphs 1 through 109 are realleged and incorporated by reference as though

fully set forth herein.

**ANSWER:     Chavez incorporates his answers to Paragraphs 1 through 109 by
reference, as though fully stated herein.**

134.     Defendant River North operated as a dealer, and as part of its regular business

regularly engaged in buying and selling securities for its own account, making use of the mails or

means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to

induce the purchase or sale of a security, without being registered with the SEC.

**ANSWER:     The allegations in Paragraph 134 are conclusions of law to which no
response is required.  To the extent a response is required, Chavez lacks knowledge or
information sufficient to form a belief as to the truth of the allegations in Paragraph 134
and therefore denies same.**

135.    Defendant Chavez operated as a broker, engaged in the business of effecting securities transactions for the accounts of others, making use of the mails or means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

**ANSWER:    The allegations in Paragraph 135 are conclusions of law to which no response is required.  To the extent a response is required, Chavez denies the allegations in Paragraph 135.**

136.    By reason of the foregoing, defendants River North and Chavez violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**ANSWER:    The allegations in Paragraph 136 are conclusions of law to which no response is required.  To the extent a response is required, Chavez denies the allegations directed at him and lacks knowledge or information sufficient to form a belief as to the truth of the allegations directed at River North and therefore denies same.**

### COUNT VIII
### Aiding and Abetting Violations of Section 15(a) of the Exchange Act
### [15 U.S.C. § 78o(a)]
### (Against Liceaga and Chavez)

137.    Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

**ANSWER:    Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

138.    Defendant River North operated as a dealer, and as part of its regular business regularly engaged in buying and selling securities for its own account, making use of the mails or

means or instrumentality of interstate commerce, to affect transactions in, or induce or attempt to induce the purchase or sale of a security, without being registered with the SEC.

**ANSWER:** **The allegations in Paragraph 138 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138 and therefore denies same.**

139. Defendants Liceaga and Chavez aided and abetted River North's violation of Section 15(a) of the Securities Act by knowingly or recklessly providing substantial assistance to River North in violating this section.

**ANSWER:** **The allegations in Paragraph 139 are conclusions of law to which no response is required. To the extent a response is required, Chavez denies the allegations directed at him and lacks knowledge or information sufficient to form a belief as to the truth of the allegations directed at River North and therefore denies same.**

140. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], defendants Liceaga and Chavez indirectly violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**ANSWER:** **The allegations in Paragraph 140 are conclusions of law to which no response is required. To the extent a response is required, Chavez denies the allegations directed at him and lacks knowledge or information sufficient to form a belief as to the truth of the allegations directed at River North and therefore denies same.**

## COUNT IX
## Violations of Section 15(a) of the Exchange Act
## [15 U.S.C. § 78o(a)]
## (Defendant Liceaga as a Control Person Over River North)

141.    Paragraphs 1 through 109 are realleged and incorporated by reference as though fully set forth herein.

**ANSWER:    Chavez incorporates his answers to Paragraphs 1 through 109 by reference, as though fully stated herein.**

142.    As alleged above, defendant River North violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**ANSWER:    The allegations in Paragraph 142 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 and therefore denies same.**

143.    At all relevant times, defendant Liceaga was a control person of defendant River North for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

**ANSWER:    The allegations in Paragraph 143 are conclusions of law to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143 and therefore denies same.**

144.    At all relevant times, defendant Liceaga exercised power and control over defendant River North, including by managing and directing that entity, and by directing and participating in the acts constituting River North's violations of the securities laws.

**ANSWER:** The allegations in Paragraph 144 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144 and therefore denies same.

145. By reason of the foregoing, defendant Liceaga is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for defendant River North's violations of the Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**ANSWER:** The allegations in Paragraph 145 are conclusions of law to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 and therefore denies same.

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

I. Find that the Defendants committed the violations alleged herein.

**ANSWER:** The allegations in Paragraph I are conclusions of law or requests for relief to which no response is required. To the extent a response is required, Chavez denies these allegations to the extent they are directed at him and denies that Plaintiff is entitled to the relief requested against him, and he further lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they are directed at other defendants and therefore denies same.

II. Issue orders of permanent injunction restraining and enjoining defendants River North, Liceaga, NTEK, NTGL, David Foley, Lisa Foley, Jeff Foley, and Blankenship, as well as their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e].

**ANSWER: The allegations in Paragraph II are conclusions of law or requests for relief to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies same.**

III. Issue orders of permanent injunction restraining and enjoining defendants River North, Liceaga and Chavez, as well as their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them, from directly or indirectly violating Section 15(a) of the Securities Exchange Act [15 U.S.C. § 78o(a)].

**ANSWER: The allegations in Paragraph III are conclusions of law or requests for relief to which no response is required. To the extent a response is required, Chavez denies these allegations to the extent they are directed at him and denies that Plaintiff is entitled to the relief requested against him, and he further lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they are directed at other defendants and therefore denies same.**

IV. Issue orders of permanent injunction restraining and enjoining defendants David Foley and Blankenship, as well as their officers, agents, servants, employees, attorneys and those

persons in active concert or participation with them, from violating Section 17(a) of the

Securities Act [15 U.S.C. §§ 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C.

§§ 78i(a)(2)] and 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

**ANSWER:** **The allegations in Paragraph IV are conclusions of law or requests for relief to which no response is required. To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies same.**

V.      Order defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley,

Blankenship and Chavez to disgorge their ill-gotten gains received directly or indirectly as a

result of the violations alleged in this Complaint, with prejudgment interest thereon. Given the

close relationship between certain individuals and entities engaging in this misconduct, joint and

several liability is appropriate between River North and Liceaga, and between David Foley and

Lisa Foley.

**ANSWER:** **The allegations in Paragraph V are conclusions of law or requests for relief to which no response is required. To the extent a response is required, Chavez denies these allegations to the extent they are directed at him and denies that Plaintiff is entitled to the relief requested against him, and he further lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they are directed at other defendants and therefore denies same.**

VI.     Order defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship and Chavez to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**ANSWER:     The allegations in Paragraph VI are conclusions of law or requests for relief to which no response is required.  To the extent a response is required, Chavez denies these allegations to the extent they are directed at him and denies that Plaintiff is entitled to the relief requested against him, and he further lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they are directed at other defendants and therefore denies same.**

VII.     Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar defendants River North, Liceaga, David Foley, Lisa Foley, Jeff Foley, Blankenship and Chavez from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**ANSWER:     The allegations in Paragraph VII are conclusions of law or requests for relief to which no response is required.  To the extent a response is required, Chavez denies these allegations to the extent they are directed at him and denies that Plaintiff is entitled to the relief requested against him, and he further lacks knowledge or information sufficient to form a belief as to the truth of the allegations to the extent they are directed at other defendants and therefore denies same.**

VIII.  Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit defendant David Foley from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**ANSWER:    The allegations in Paragraph VIII are conclusions of law or requests for relief to which no response is required.  To the extent a response is required, Chavez lacks knowledge or information sufficient to form a belief as to the truth of these allegations and therefore denies same.**

IX.  Retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**ANSWER:    The allegations in Paragraph IX are requests for relief to which no response is required.  To the extent a response is required, Chavez denies these allegations.**

X.  Grant such other relief as this Court deems appropriate.

**ANSWER:    The allegations in Paragraph X are requests for relief to which no response is required.  To the extent a response is required, Chavez denies these allegations and denies that Plaintiff is entitled to the relief requested.**

### BANKRUPTCY NOTICE

All relief requested herein as to Defendant David Foley is being sought to the extent permissible pursuant to Section 362(b)(4) of the Bankruptcy Code [1 U.S.C. § 362(b)(4)], as it

relates to his Chapter 11 proceeding, *In re David R. Foley*, No. 19-50335 (Bankr. N.D. Cal.). Nothing in this Complaint shall be construed as an act of collection by the SEC against Defendant David Foley until the automatic stay is no longer in effect or has been determined with finality not to apply.

**ANSWER:** **The allegations in the preceding paragraph are conclusions of law or requests for relief to which no response is required.**

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

**ANSWER:** **The allegations in the preceding paragraph are conclusions of law or requests for relief to which no response is required.**

## <u>AFFIRMATIVE DEFENSES</u>

Chavez asserts the following affirmative defenses to Plaintiff's lawsuit:

1.      Plaintiff's Complaint fails to sufficiently state a claim for violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claim that Chavez acted as a broker is not supported by allegations that, if true, can support liability on this claim. Plaintiff has not sufficiently alleged that Chavez effected transactions in securities for the accounts of others. Specifically, it has not sufficiently alleged that Chavez: (1) exercised control or authority over the accounts of others; (2) is an employee of the issuer; (3) received commissions as opposed to a salary; (4) is selling, or previously sold, the securities of other

issuers; (5) is involved in negotiations between the issuer and the investor; (6) makes valuations as to the merits of the investment or gives advice; (7) is an active rather than passive finder of investors; and (8) participated in securities transactions at key points in the chain of distribution. *See SEC v. Mapp*, 240 F. Supp. 3d 569, 592 (E.D. Tex. 2017); *SEC v. M & A West, Inc.*, No. C-01-3376 VRW, 2005 WL 1514101, at *9 (N.D. Cal. June 20, 2005), *aff'd*, 538 F.3d 1043 (9th Cir. 2008); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1339 (M.D. Fla. 2011); *SEC v. Benger*, 697 F. Supp. 2d 932, 944-45 (N.D. Ill. 2010); *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984).

2.　　Plaintiff's Complaint fails to sufficiently state a claim for aiding and abetting River North's alleged violation of Section 15(a) of the Exchange Act.  Plaintiff's claim that Chavez aided and abetted River North's alleged failure to register as a dealer is not supported by allegations that, if true, can support liability on this claim.  Plaintiff has not sufficiently alleged (1) a primary violation of the underlying securities laws; (2) that Chavez acted with scienter; and (3) that Chavez provided substantial assistance in the primary violation.  *SEC v. Sentinel Mgmt. Grp., Inc.*, No. 07 C 4684, 2012 WL 1079961, at *12 (N.D. Ill. Mar. 30, 2012).  Specifically, Plaintiff has not sufficiently alleged: (1) that River North acted as an unregistered dealer; (2) that Chavez had knowledge of such violation and of his own role in furthering it; and (3) that Chavez substantially assisted River North in the business of buying and selling securities or assisted River North in failing to register as a dealer.  *See SEC v. Fisher*, No. 07 C 4483, 2012 WL 3757375, at *11 (N.D. Ill. Aug. 28, 2012) (citing *SEC v. Mozilo*, No. CV 09-3994-JFW MANX,

2010 WL 3656068, at *21 (C.D. Cal. Sept. 16, 2010) and *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003)).

3.      Plaintiff's claims are barred, in part, by the statute of limitations.  The applicable federal statute of limitations, 28 U.S.C. § 2462, provides that the SEC's actions "shall not be entertained unless commenced within five years from the date when the claim first accrued[.]" 28 U.S.C. § 2462.  Plaintiff filed its Complaint on March 11, 2019.  Therefore, any acts or omissions of Chavez that occurred prior to March 11, 2014 are outside the 5-year limitations period, and the Plaintiff's claims based on such acts or omissions are barred by the statute of limitations.

4.      Chavez adopts by reference any applicable defenses pleaded by any other defendant in this matter not expressly set forth herein.

Chavez reserves the right to assert any additional defenses or matters that may become relevant or apparent through the course of discovery or otherwise during the course of this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Chavez respectfully requests that the Court:

a)  Order that Plaintiff take nothing by this lawsuit;

b)  Award Chavez the costs he has incurred in litigation this matter; and

c)  Grant Chavez such other and further relief to which he may be justly entitled.


Dated: December 16, 2019                    Respectfully submitted,


*/s/ Marina Stefanova*
Matt Hiller
Illinois Bar #6277662
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
matt.hiller@dlapiper.com

Marina Stefanova (*pro hac vice*)
Texas Bar #24093200
DLA Piper LLP (US)
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
marina.stefanova@dlapiper.com

*Attorneys for Defendant Michael Chavez*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Michael A. Chavez's

Answer and Affirmative Defenses was filed on December 16, 2019 with the Clerk of the Court

using the CM/ECF system, which will send a notice of filing to all attorneys of record.


/s/ *Marina Stefanova*
Marina Stefanova